UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Rosa Bol Ring; Adiel Abaker Abdalla; Arbab Khamis
Khater; Ismail Idris Adam; Fatma Omar Ahmed;
Hawa Ismail; Adam Abakar Hissein; Achan Achor
Dumo; Mong Peter Lam; Jacob Lok Gatkouth; Mahdi
Altigani Alnour; Haydar Ahmed Abdalla; Mahmoud
Mohamed Ibrahim; Rabab Ahmed El Sayed Adam;
Hanadi Abaker Mohamed; Ahmed Juma Ahmed;
Atong D Deng; Abdalla Mohamed Idriss; Mohamed
Omer Salih Hasabo; Omar Baher Sibouru; Adam
Abdelrahman Ismail; Abdulmajid A Gamar; Mutaz
Mohamed Maki Komi; Gaffar Hamid Ali Noureldein;
Noha Gaffer Hamid Ali; Fathia Yagoub Elnour
Bakhat; Sadam Y Mohamed; Khalid Sayfeldin
Krameldin; Salah Ibrahim Ahmed; Somia Ali Ali;
Abdelrahman Hassan Ahmed; Mohamed Adam
Osman Mohamed; Elhadi Haroun Adam; Yahya
Musa Abdalla; Abdalrahman Osman Fadoul;
Abdelkarim Mousa Omar; Kuier Aguer Atemdeng;
Said Abobakar Ahmed Abdala; Abdelraziq Musa
Hussein; Mustafa Alnor; Mohamed I. Aboh; Ali
Omer Amir Tagal; Ibrahim Fadl Jumaa; Abbas
Khamis Haroon; Zeinab Abbu; Younes Omar Adam;
Ibrahim Fadel Hussein; Kalthoum Arbab Musa; Musa
S Adam; Abdulatif Isaak; Maryam Babo; Babiker
Abdalla Isaac; Ibrahim Alnor Juma; Aboud Issa
Saleh; Omer Amir Bakhit; Noreldin Adam Osman;
Eisa Mohamed; Idriss Adam Mohamed Dawoud;
Abdelazim Adam Ahmed Abdelmoula; Ramadan
Yahai Haroun; Abdushafaie Abubaker Ahmed; Nawal
Abakr; Musa Mohamed Ahmed; Mustafa Isaac
Mohammed; Haroun Mohamed Idris; Abdalla Omer
Amir; Haleema Harswon Abdalla; Abdelgadir
Mohamed Abbaker; Musa Babiker Ali Hussein;
Abdelkarim Mohamed Togol Baket Bakhit;
Mohamed Abdalla Mohamud; Hassen A Mohamed
Ismael; Yakoub A Yakoub; Saleh Mohamed Ahmed;
Yagoub Omer Elsheikh; Shadia Mokhtar Hamad
Abdelrhaman; Ismail Abbas; Maria Adam Salih;
James Thon Aleer; Malual Manyok Deng Duot; Amir
Suleiman Shawkar; Yor Chol Yor; Morwel Mathiang
Deng; Thon Majak Deng; Ishag Othman Adam
Ahmed; Suleiman Mohamed Saleh; Joseph Ajeo

Civil Action No:1:23-cv-5552

**JURY TRIAL DEMANDED**

Moilinga; Kristena Peter Rufael; Elaf Rufael;
Noureldin Mahdi Abdalla Eltom; Arbab Abdallah
Adam; Moustapha Ibrahim Mahamat; Samia Arbab
Abdurhaman; Hamra Ibrahim Fadoul; Djouma Arbab
Adam; Matar Makine Abakar; and Yakub Haroun
Abdulmola

Plaintiffs,

– against –

BNP Paribas, S.A., a French corporation; BNP
Paribas, S.A. New York Branch, a foreign
branch; and BNP Paribas US Wholesale
Holdings, Corp., a Delaware corporation;

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## **COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<u>PAGE(S)</u>

I.      INTRODUCTION ................................................................................. 2

II.     THE PARTIES .................................................................................. 11

     A.      Plaintiffs ................................................................................ 11

     C.      Defendants ............................................................................ 75

III.    JURISDICTION AND VENUE ............................................................ 76

IV.     FACTUAL BACKGROUND ................................................................. 79

     A.      The Government of Sudan Sought to Exploit Its Oil Resources to
            Maintain Power and Fund a Campaign of Mass Atrocities ................. 79

          1.      The al-Bashir Regime ................................................. 79

          2.      Sudan's 1997 Entry Into International Oil Markets ................ 81

          3.      To Capitalize on Oil Exports, the GOS Needed Access to
              "Petrodollars," Which BNPP Agreed to Provide ................... 82

     B.      U.S. Sanctions Implemented U.S. Policy Opposing the
            Government of Sudan's Persecution of Disfavored Sudanese
            Civilians and the Use of Oil Income to Finance Such Persecution ........ 84

     C.      BNPP Agreed and Conspired with the GOS to Provide Illegal
            Access to U.S. Financial Markets with the Understanding That
            This Would Sustain and Expand the GOS's Campaign of Violence
            and Internal Repression ............................................................ 91

     D.      With Access to Petrodollars Provided by BNPP, Sudan's Exports
            of Oil and Revenues Rose Dramatically ...................................... 96

     E.      As a Result of Increased Oil Revenues, Military Spending Grew,
            Both in Total Dollars and as a Percentage of Government Spending ...... 98

     F.      Sudan Used its Oil Revenue to Buy and Manufacture Weapons and
            Weapons Delivery Systems ....................................................... 99

     G.      Well-Funded by Oil Revenues and Equipped with Newly-
            Purchased Weapons, Against Civilians, Including Plaintiffs ............. 102

H.      Plaintiffs' Injuries Were Foreseeable:  BNPP Knew the Atrocities
        in Sudan Were Funded By and an Intrinsic Part of the Government
        of Sudan's Exploitation of Its Oil Resources, Which BNPP Made
        Possible ......................................................................................................108

        1.      Contemporaneous Reporting of the Atrocities in Sudan and
                the Connection to Oil...............................................................108

        2.      Three Companies, Talisman, Lundin, and OMV, Were
                Forced to Withdraw from Sudan by Public Pressure .............................113

I.      As a Result of an Array of Federal and State Investigations, BNPP
        Agreed to Two Criminal Guilty Pleas, Two Cease And Desist
        Orders, a Settlement Agreement, and a Consent Order....................................119

        1.      BNPP Pled Guilty to Violating U.S. Sanctions ......................................119

        2.      BNPP Pled Guilty to Violating New York Law......................................122

        3.      BNPP Entered into Agreements with Federal and State
                Regulators Admitting Substantial Wrongdoing and
                Agreeing to Substantial Penalties ...........................................................123

VI.     THE CAUSES OF ACTION ALLEGED HEREIN ACTION ARE TIMELY .......130

VII.    CAUSES OF ACTION .................................................................................132

VIII.   PRAYER FOR RELIEF ..............................................................................134

## TABLE OF EXHIBITS

| Document Name | Exhibit |
|---|---|
| Information, *United States v. BNP Paribas* (S.D.N.Y., filed July 9, 2014) (Docket 14-CR-460-LGS No. 002) | A |
| Letter from Preet Bharara, United States Attorney for the Southern District of New York, Leslie Caldwell, Assistant Attorney General, Criminal Division, Department of Justice, and Jaikumar Ramaswamy, Chief, Asset Forfeiture and Money Laundering Section, Department of Justice, to Karen Patton Seymour, Esq., Sullivan & Cromwell LLP, *United States v. BNP Paribas, S.A.*, June 27, 2014. | B |
| Statement of Facts dated June 30, 2014, Ex. 2 to Plea Agreement, Dkt. No. 14-CR-00460-LGS Doc. No. 13 | C |
| Plea Agreement Between BNP Paribas SA and the District Attorney of the County of New York, June 30, 2014 | D |
| Exhibit A to Plea Agreement Between BNP Paribas SA and the District Attorney of the County of New York, June 30, 2014 | E |
| Cease and Desist Order Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended; Supervisory Cooperation Decision Applying the Joint Statement of French and US Banking Supervisors of May, 24th 2004, Dkt. No. 14-022-B-FB | F |
| Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, Dkt. Nos. 14-022-B-FB, 14-022-CMP-FB | G |
| Settlement Agreement between the U.S. Department of Treasury's Office of Foreign Asset Control ("OFAC") and BNP Paribas SA ("BNPP"), COMPL-2013-193659 | H |
| *In re BNP Paribas, S.A. New York Branch*, *Consent Order Under New York Banking Law § 44*, New York State Department of Financial Services ("DFS") | I |
| DFS Press Release, Cuomo Administration Announces BNP Paribas to Pay $8.9 Billion, Including $2.24 Billion to NYDFS, Terminate Senior Executives, Restrict U.S. Dollar Clearing Operations for Violations of Law (June 30, 2014) | J |

| **<u>Document Name</u>** | **<u>Exhibit</u>** |
|---|---|
| *BNP Paribas Sentenced for Conspiring to Violate the International Emergency Economic Power Act and the Trading with the Enemy Act, Justice News*, May 1, 2015 | K |
| Maps of Sudan | L-O |

Plaintiffs Rosa Bol Ring; Adiel Abaker Abdalla; Arbab Khamis Khater; Ismail Idris Adam; Fatma Omar Ahmed; Hawa Ismail; Adam Abakar Hissein; Achan Achor Dumo; Mong Peter Lam; Jacob Lok Gatkouth; Mahdi Altigani Alnour; Haydar Ahmed Abdalla; Mahmoud Mohamed Ibrahim; Rabab Ahmed El Sayed Adam; Hanadi Abaker Mohamed; Ahmed Juma Ahmed; Atong D Deng; Abdalla Mohamed Idriss; Mohamed Omer Salih Hasabo; Omar Baher Sibouru; Adam Abdelrahman Ismail; Abdulmajid A Gamar; Mutaz Mohamed Maki Komi; Gaffar Hamid Ali Noureldein; Noha Gaffer Hamid Ali; Fathia Yagoub Elnour Bakhat; Sadam Y Mohamed; Khalid Sayfeldin Krameldin; Salah Ibrahim Ahmed; Somia Ali Ali; Abdelrahman Hassan Ahmed; Mohamed Adam Osman Mohamed; Elhadi Haroun Adam; Yahya Musa Abdalla; Abdalrahman Osman Fadoul; Abdelkarim Mousa Omar; Kuier Aguer Atemdeng; Said Abobakar Ahmed Abdala; Abdelraziq Musa Hussein; Mustafa Alnor; Mohamed I. Aboh; Ali Omer Amir Tagal; Ibrahim Fadl Jumaa; Abbas Khamis Haroon; Zeinab Abbu; Younes Omar Adam; Ibrahim Fadel Hussein; Kalthoum Arbab Musa; Musa S Adam; Abdulatif Isaak; Maryam Babo; Babiker Abdalla Isaac; Ibrahim Alnor Juma; Aboud Issa Saleh; Omer Amir Bakhit; Noreldin Adam Osman; Eisa Mohamed; Idriss Adam Mohamed Dawoud; Abdelazim Adam Ahmed Abdelmoula; Ramadan Yahai Haroun; Abdushafaie Abubaker Ahmed; Nawal Abakr; Musa Mohamed Ahmed; Mustafa Isaac Mohammed; Haroun Mohamed Idris; Abdalla Omer Amir; Haleema Harswon Abdalla; Abdelgadir Mohamed Abbaker; Musa Babiker Ali Hussein; Abdelkarim Mohamed Togol Baket Bakhit; Mohamed Abdalla Mohamud; Hassen A Mohamed Ismael; Yakoub A Yakoub; Saleh Mohamed Ahmed; Yagoub Omer Elsheikh; Shadia Mokhtar Hamad Abdelrhaman; Ismail Abbas; Maria Adam Salih; James Thon Aleer; Malual Manyok Deng Duot; Amir Suleiman Shawkar; Yor Chol Yor; Morwel Mathiang Deng; Thon Majak Deng; Ishag Othman Adam Ahmed; Suleiman Mohamed Saleh; Joseph Ajeo Moilinga; Kristena Peter Rufael; Elaf Rufael; Noureldin Mahdi

1

Abdalla Eltom; Arbab Abdallah Adam; Moustapha Ibrahim Mahamat; Samia Arbab Abdurhaman; Hamra Ibrahim Fadoul; Djouma Arbab Adam; Matar Makine Abakar; and Yakub Haroun Abdulmola (collectively, "Plaintiffs"), through their undersigned attorneys, hereby bring this action and allege as follows:

## I.    INTRODUCTION

1.    This action seeks justice on behalf of Plaintiffs, who are among the victims of one of the greatest bank crimes of all time.  From 1997 to at least 2007, in criminal violation of U.S. sanctions that were intended to stop Sudan's terrorist activities and human rights abuses and of New York law, Defendant BNP Paribas, S.A., along with its affiliates Defendants BNP Paribas, S.A. New York Branch and BNP Paribas US Wholesale Holdings, Corp. (f/k/a BNP Paribas North America, Inc.), (collectively "BNPP") secretly conspired with the rogue government of Sudan and gave it forbidden access to the U.S. financial markets and U.S. dollar clearing services in New York.  By 2007, BNPP facilitated an astonishing quarter of Sudan's exports and a fifth of its imports.  BNPP's financial transactions for the government of Sudan, along with some other illicit transactions with Iran and Cuba, totaled at least as much as $190 billion dollars.  With BNPP's assistance, rather than being crippled by the U.S. sanctions, the government of Sudan exploited its oil resources by harming, killing, and displacing civilians living in oil rich regions and saw its revenues from oil dramatically increase, revenues it used to buy planes, helicopters and weapons, to fund its military and militias, and to escalate its campaign of unspeakable atrocities against its own people.

2.    Defendants' criminal conduct, which began in 1997, was a substantial factor in causing Plaintiffs' injuries that have persisted to the present.  Plaintiffs were the intended beneficiaries of the very sanctions that Defendants have been convicted, in New York, of violating. And Plaintiffs have suffered grave injury as a result of BNPP providing Sudan with the means to

wage genocidal and unlawful attacks on civilians.  Without BNPP's willingness to break U.S. and New York law to provide Sudan with much needed dollars used to trade oil and buy arms, Sudan could not have engaged in the well-documented mass scale ethnic cleansing and violence against its disfavored population, including crude, indiscriminate bombings of their homes and villages, mass rape, torture, infection with HIV, loss of property and income, and displacement of hundreds of thousands from their homes and property through the use of large scale weapons purchased after BNPP became the government of Sudan's bank providing it access to U.S. dollars.  BNPP's clandestine, criminal conduct in conspiracy with the government of Sudan went far beyond ordinary commercial banking activity, as in the case of other multinationals sued for their business ventures with rogue governments.

3.     Defendant BNP Paribas, S.A. ultimately was caught by U.S. authorities, pled guilty to violating U.S. sanctions against doing business with Sudan and to committing a New York felony for falsifying business records, and was ordered to pay a criminal forfeiture of approximately $8.9 billion.  But BNPP's ultimate victims, including Plaintiffs, have not been compensated for their injuries caused by BNPP's conduct.  Plaintiffs, all of whom now lawfully live in the United States, now seek damages from BNPP.

*****

4.     In 1989, military officers under then-Colonel Omar al-Bashir seized power in Sudan.  The military coup had the support of the National Islamic Front, an offshoot of the Muslim Brotherhood.[1]  As head of the military junta, al-Bashir became Sudan's president, chief of state, prime minister, and chief of the armed forces.  The coup began what is now a decades-long pattern of serious human rights abuses, including genocide, in violation of international law and support

---

[1] The National Islamic Front changed its name to the National Congress Party in 1998.

for terrorism.[2]  By the mid-1990s, the human rights abuses in Sudan were well known, including by BNPP, and attracted considerable international attention.

5.      At the same time, the Khartoum regime sought to exploit Sudan's rich oil reserves, knowing that money was crucial to keep it in power.  Though Sudan's oil reserves had been known for many years, even by 1997, Sudan had not been able to produce sufficient oil for export, let alone enough oil to generate substantial revenue.  The exploitation of oil required access to the capital and the know-how needed to drill for oil, as well as access to international financial markets to export it at the highest price.

6.      Due to longstanding and economically compelling market forces, international oil transactions are priced in U.S. dollars ("petrodollars"), and overwhelmingly cleared through financial intermediaries in New York City that have large dollar deposits.  Sudan therefore needed access to the U.S. financial system to maximize its future oil revenue.  Conversely, if a country like Sudan desired to sell oil without access to U.S. dollars and the ability to clear transactions in New York or elsewhere in the United States, it would suffer a substantial discount, either having to barter its oil in exchange for other commodities or goods or sell it in other currencies.

7.      Sudan's development of its oil resources was linked to its human rights abuses not just through the government's desire to use oil revenue to stay in power.  Many of Sudan's oil rich regions were occupied by civilians opposed to the government of Sudan on the basis of ethnicity, religion, and longstanding political disagreements with successive Khartoum governments, particularly the military-Islamist regime that grabbed power in 1989.  To exploit its oil resources,

---

[2] Along with Syria and Iran, Sudan is one of only three countries designated by the U.S. State Department as a state sponsor of terrorism.

the government of Sudan had used and would use its military and allied militias to harm, kill or displace hundreds of thousands of civilians from oil rich regions.

8.      In 1997, cognizant of Sudan's desire to exploit its oil resources and the link between that oil exploitation and human rights abuses, the United States enacted sweeping sanctions specifically to curtail and to stop the government of Sudan's human rights abuses and its support for global terrorism.  Pursuant to the International Emergency Economic Powers Act ("IEEPA")[3] and the Trading with the Enemy Act ("TWEA"),[4] President Bill Clinton imposed comprehensive criminal sanctions that, among other things, barred banks operating in the United States from extending credit to or facilitating or brokering U.S. dollar transactions for the government of Sudan and its agencies, instrumentalities, and controlled entities (collectively, the "GOS").  In 2006, President George W. Bush enacted further sanctions (collectively and together with their implementing regulations, the "U.S. Sanctions," or the "Sanctions").  The U.S. Congress and the Executive Branch thus recognized the causal link—***the precise causal link at issue in this case***— between the GOS's access to the U.S. financial system and the GOS's  atrocities against its civilians, including those from its oil exploitation.

9.      Given its nascent oil development, Sudan's meagre, pre-oil economy was particularly vulnerable to U.S. Sanctions.  The U.S. Sanctions, if observed, would have cut the GOS off from funding to exploit its oil resources and to export its oil at market prices, thereby negatively impacting the GOS's revenues from its oil and limiting the GOS's ability to commit atrocities.  Similarly, the U.S. Sanctions, if observed, would have cut the GOS off from importing goods using dollar-denominated lines of credit, thereby negatively impacting its buying power and

---

[3] International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq*.

[4] Trading with the Enemy Act, 50 U.S.C. §§ 4303 *et seq*.

its ability to acquire goods, such as planes, helicopters and weapons.  Thus, U.S. Sanctions were designed and intended to have an adverse impact on the GOS's economy, thereby limiting the al-Bashir regime's solidification of its hold on power and its ability to wage its campaign of atrocities against its civilian population.

10.     But the U.S. Sanctions did not have their intended or expected impact because BNPP flagrantly and knowingly chose to violate them.  In 1997, just as the first U.S. Sanctions were going into effect, knowing that the GOS was a terrorist state and that it was committing atrocities against civilians, BNPP agreed and conspired with the GOS to circumvent U.S. Sanctions and prevent the Sanctions from having their intended and expected impact on the GOS and Sudan's economy and the protection of Sudan's victims.  BNPP became the GOS's sole correspondent bank in Europe and provided the GOS with the means to evade U.S. Sanctions via concealed access to U.S. financial markets and clearing facilities in New York City.

11.     Specifically, BNPP assisted the GOS with its oil exploitation efforts, which were well-known to include harming, killing and displacing people in oil rich regions.  In turn, assisting the GOS in its export of oil, BNPP gave the GOS resources to exploit additional oil resources. Thus, BNPP's U.S. Sanctions violations created a macabre feedback loop.  The resources that oil development generated allowed the GOS to purchase planes, helicopters and weapons, to manufacture weapons, and to fund militia.  In turn, the GOS violently harmed, killed and displaced more Sudanese civilians, including those it perceived as ethnically and politically "non-Arab" and those who were in the way of oil development.  Oil revenue was both the object and the *sine qua non* of its ability to carry out the mass destruction and extermination that it let loose on its own civilian population, including Plaintiffs.

12.     As recognized in the promulgation of the U.S. Sanctions themselves by Congress and the Executive Branch, in the experience of other countries subjected to U.S. sanctions like Iraq and Iran, and in the opinions of observers and experts, when complied with, U.S. sanctions are effective because the lion's share of international trade, particularly for commodities like oil that are priced in dollars, relies on access to the U.S. financial system.  Absent that access, countries need to export commodities and import goods through barter or through use of secondary currencies, both of which are significantly less efficient and result in less revenue from exports and more costly imports.  As a result, when U.S. sanction are observed, a country's economy suffers, and it will inevitably have less economic resources with which to acquire weapons and oppress its people.

13.     By conspiring with the government of Sudan and giving it access to the U.S. financial system in the pursuit of illicit profits, BNPP enriched itself, undermined U.S. Sanctions and prevented their intended and expected effect, and assisted the terrorist, genocidal government of Sudan.  Thus, BNPP's Sanctions violations were a natural result of its conspiring with the government of Sudan and were a substantial factor in causing the atrocities suffered by Plaintiffs.

14.     The injuries to Plaintiffs were also reasonably foreseeable by BNPP.  As documented in its own internal files, BNPP knew that its violations of Sanctions were linked to human rights abuses.  BNPP knew that the Sanctions were intended and expected, if observed, to protect the civilians of Sudan, including Plaintiffs. BNPP knew that the GOS wanted BNPP's assistance to increase its ability to exploit its oil resources which directly involved human rights abuses.  BNPP knew that the GOS wanted BNPP's assistance to increase the GOS's economic resources both for its exports and imports.  And BNPP knew, as documented in contemporaneous reports by the United States, Canada, international NGOs, and the media, that the GOS used those

7

increased economic resources to increase its military expenditures and to escalate its human rights abuses.  Among other things, BNPP knew about the GOS's acquisition of advanced military hardware and funding of militias with those additional resources, about the GOS's manufacture of weapons, and about the GOS's committing human rights atrocities using that military hardware and those militias.  Thus, by violating the Sanctions, BNPP knew that Sudan's human rights abuses would escalate, not be curtailed.

15.     BNPP's deliberate violation of U.S. Sanctions aimed at preventing the GOS's human rights abuses against the Sudanese people is incontestable.  To no avail, responsible BNPP officials raised internal alarms, including by executives, that if BNPP's illegal support for the GOS became known externally, it would demonstrate BNPP's complicity in the GOS actions.  BNPP also did everything it could to keep its complicity secret, including falsifying business records.

16.     Ultimately, the United States and the State of New York discovered BNPP's crimes, through years-long investigations and the exercise of prosecutorial discretion by the United States and New York.  Five federal and state agencies, primarily in New York, extensively investigated Defendants' illicit financial dealings with Sudan as well as with Iran and Cuba:

a.     The U.S. Department of Justice ("DOJ") through the U.S. Attorney for the Southern District of New York;

b.     The New York County District Attorneys' Office ("DANY");

c.     The Federal Reserve Board of New York ("FRB-NY");

d.     The U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"); and

e.     The New York Department of Financial Services ("DFS").

17.     These investigations culminated in two criminal guilty pleas in this judicial district in 2015—to a federal felony, a New York felony, and a New York misdemeanor, two cease and desist orders, a settlement agreement, and a consent order.  In 2014, BNPP pled guilty to

conspiracy to violate the IEEPA and the TWEA by processing billions of dollars of transactions through the U.S. financial system on behalf of Sudanese, Iranian, and Cuban entities subject to U.S. economic sanctions, and BNPP pled guilty to violation of the New York State Penal Law[5] by falsifying business records with the intent to commit, aid, or conceal another crime.  OFAC's investigation resulted in a settlement agreement with BNPP, pursuant to which OFAC fined BNPP over $960 million and BNPP agreed to terminate its Sanctions violating conduct.  Similarly, DFS's investigation resulted in a consent decree, pursuant to which DFS fined BNPP over $2 billion and BNPP agreed to make reparations and restitution in the amount of $1.05 billion.  Further, BNPPNY was suspended for clearing U.S. dollar transactions for other BNPP branches for a year, and BNPP could not act as a U.S. dollar clearing bank for unaffiliated third-party banks for two years.

        18.     The array of enforcement actions, regulating BNPP's past and future conduct, taken by both the United States and New York demonstrates their critical interest in preserving New York as a global financial center and in ensuring that New York is not used to aid in committing human rights abuses.  Indeed, New York was central to BNPP's illegal activities.  BNPP aided and abetted and conspired with the GOS to evade Sanctions through various means and methods in New York.  These included, among other things: accepting and following the direction of sanctioned entities to structure financial transactions on behalf of blocked entities in New York to evade the Sanctions; actually processing prohibited transactions in New York through the facilities of BNPPNY and other New York based banks; and in a felony violation of New York law, using false and fraudulent transaction descriptions and transmittal messaging at BNPPNY and the other New York banks to conceal that the transactions were being processed on behalf of blocked entities.  These actions, without which BNPP would not have been able to aid the Sudanese

_____

[5] New York State Penal Law Section 175.10.

government, undermined not only the Sanctions regime but also the integrity of the New York financial system.

19.     In 2015, BNPP was sentenced to forfeit approximately $8.9 billion as part of its agreement to plead guilty.[6]  OFAC also levied a fine of $963 million in a parallel civil settlement. Approximately 70% of BNPP's criminal asset forfeiture addressed BNPP's activities with the GOS.  BNPP's criminal activity starkly contrasts with ordinary commercial or banking activity.

20.     The forfeiture and fine, none of which went to the victims of BNPP, are among the largest penalties ever levied.  Nevertheless, as reported by the Wall Street Journal's Editorial Board, BNPP "got off easy in its plea deal with U.S. authorities."[7]

21.     Plaintiffs, who lawfully immigrated to the United States under extreme circumstances, allege the claims herein, and seek damages from Defendants to compensate for the atrocities they have suffered, atrocities for which they have never received any compensation.

*****

22.     This action is limited in scope.  It involves the legality of the actions of BNPP, all of which are private actors that went far beyond ordinary commercial or banking activity to engage in clandestine criminal conduct.  The immediate GOS perpetrators of atrocities against Plaintiffs, some indicted by the International Criminal Court ("ICC"), are not parties here and, unlike the criminally-convicted BNPP, are beyond the remedial reach of U.S. courts.  Plaintiffs' claims do not seek relief that would require the Court to intervene against or declare invalid any official, governmental act of the GOS.  To the contrary, the claims here arise out of the horrific, settled

---

[6] Note, although there were separate fines and penalties, these fines and penalties were deemed satisfied by virtue of BNPP's payment of the approximately $8.9 billion forfeiture.

[7] Editorial Board, *BNP Got Off Easy*, Wall St. J. Asia, July 3, 2014, at 9.  The Board also noted that the bank was "lucky not to lose its U.S. banking license." *Id.*

finality of the GOS's transnational crimes.  Plaintiffs seek only to obtain damages from the private parties whose deliberate, criminal conduct were a substantial factor in these acts and the resultant harm.

## II.   THE PARTIES

### A.   Plaintiffs

23.     Each Plaintiff is a refugee from Sudan, including the portion of Sudan that, in 2011, became the Republic of South Sudan ("South Sudan").  Each Plaintiff entered and resides lawfully in the United States or is a U.S. citizen.  Plaintiffs participated in U.S. refugee resettlement programs administered in conjunction with the United Nations High Commissioner for Refugees or authorized non-governmental organizations ("NGOs").  All have undergone background investigations and met the rigorous security standards established by the United States.

24.     Each Plaintiff claims significant injuries that began in Sudan, including the part that is now South Sudan, from 1997 through 2011.  This time frame includes 1997-2007, the period when BNPP provided criminal assistance to the GOS, and an additional four, 2008-2011, during which the effects of the conspiracy continued.[8]  As set out in detail below, Plaintiffs suffered extraordinary and unspeakable harm at the hands of the GOS as a result of BNPP's assistance.  These actions violate all human decency and norms of conduct.

25.     Before fleeing to the United States, Plaintiffs resided in three main geographic areas: (1) southern Sudan, including the states of Upper Nile, Jonglei, the Equatorias, Western Bahr el Ghazal, Northern Bahr el Ghazal, and Unity; (2) the contested border region of Abyei; and (3) in the north, the Nuba Mountains region of Southern Kordofan, the Darfur region, and Khartoum, Sudan's capital where many groups fled to escape the violence in their homelands.

---

[8] In fact, the conspiracy's effects likely continued for far longer.

Plaintiffs are culturally diverse and practice various religions.  Those Plaintiffs from southern Sudan, now the separate country of South Sudan, generally practice traditional African religions or Christianity, while those who reside in the west (Darfur) are primarily Muslim.  These regions are reflected on the maps attached hereto as **Exhibits L-O**.

26.     Unlike Sudan's ruling elite, which come predominantly from the Nile Valley in and around Khartoum, and which have "riverine" identity, Plaintiffs are overwhelmingly black Africans.  Many of their Arab countrymen, and the Khartoum-based riverine elite in particular, often refer to them as "zurga," a racial slur frequently used in Darfur, or "abid," a term which is predominately used in Central and Southern Sudan and means slave.  Successive governments in Khartoum stretching back decades have marginalized the peoples living away from the Nile, who are Arabs as well as Africans.  This marginalization has always been stratified and layered such that some groups (who often self-define as "African") have faced greater degrees of exclusion and violent repression than others.  The Sudanese state has long sought to assimilate the different people in the country to the riverine identity, including through the promotion of one language (Arabic) and one faith (Islam) at the expense of others.  Those people who have sought to resist that effort (like the people in the South, Darfur, and the Nuba Mountains in Central Sudan) have faced the brunt of state-organized violence.  This marginalization and persecution escalated significantly in 1997.

27.     After fleeing the GOS's vio'lence, many of the Plaintiffs experienced serial displacement, starvation, disease, and prolonged stays in overcrowded refugee camps.  They were living in abject poverty and suffering from physical injuries, loss of all their possessions, and emotional scars inflicted by the GOS and its proxies.

28.     Plaintiffs arrived in the United States with nothing and continue to suffer from physical and emotional injuries.

29.     Plaintiff Rosa Bol Ring was born November 9, 1974 and resides in Overland Park, KS. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998, government soldiers attacked a marketplace in Wau, South Sudan. She witnessed gunfire, beating with hands and sticks, burning of homes, and beating, raping, kidnapping and killing of civilians. Plaintiff hurt her back in the attack and saw older women be burned alive in their huts. Also in 1998, Plaintiff was arrested by the government military in Khartoum City. She was detained by men in green uniforms for 5 to 7 days in a military prison. During that time, Plaintiff was subjected to forced confession, insults, a gunshot, blindfolding, starvation, forced standing for long periods, threats to loved ones, forced witness to others being tortured and forced harm of others. She was raped and sexually humiliated while detained. Her captors would rape her and then urinate on her. She still has pain in her arm from an injury she sustained while detained. She was forcibly displaced from her home, fleeing Sudan in 1999, and arriving in the United States in 2002 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, depression, anxiety, fear for her safety and the safety of her family members, intrusive thoughts, nightmares, trouble sleeping, feeling distant from her loved ones, anger, reduced ability or receive an education, difficulty concentrating, flashbacks, loss of interest in activities she used to enjoy, and feeling as if she does not have a future, as well as a loss of property and sources of income.

30.     Plaintiff Adiel Abaker Abdalla was born on September 11, 1978 and resides in Denver, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those

funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2008, government soldiers and the Janjaweed attacked Plaintiff's village in Shiekh Tabaldi. Plaintiff experienced physical injury to his hip when he was run over by a vehicle during the attack. Plaintiff witnessed fighters on horses or camels, military vehicles, gunfire, heavy gunfire, the burning of homes, the beating, raping, kidnapping, torture, and killing of civilians, as well as the stealing and killing of livestock. Plaintiff witnessed the attack and burning of his property and village, and the killing of his father and brother. Plaintiff was forcibly displaced from his home and fled Sudan in 2011 and arrived in the United States in 2013 as a refugee.  As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional, psychological injuries, including, cuts, bruises, reduced use of his leg, depression, anxiety, fear for safety and safety of family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from Plaintiff's loved ones, reduced ability to work, reduced ability to receive an education, difficulty concentrating, feeling jumpy or easily startled, loss of interest in activities Plaintiff used to enjoy, and feeling as if Plaintiff doesn't have a future, as well as a loss of property, including house, livestock and sources of income.

31.     Plaintiff Arbab Khamis Khater was born on April 4, 1985 and resides in Carlisle, PA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers, government police and the Janjaweed attacked Plaintiff's village in Masteri. Plaintiff witnessed the attack and burning of his property and village, and the killing of his father. Plaintiff was arrested and detained for 15 days, held in an army base in Masteri, and subjected to torture, beating, kicking, being hit with objects, beating the soles of his feet (falaka), accusations of supporting the political opposition, forced to witness others being tortured, forced to hurt others,

beating to his genitalia, sexual humiliation, sexual assault, rape, and strangulation. Plaintiff was forcibly displaced from his home and fled Sudan in 2004 and arrived in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional, psychological injuries, including, disease, fear for safety of self and family members, nightmares, memory loss, as well as a loss of property, including house and sources of income.

32.     Plaintiff Ismail Idris Adam was born on September 29, 1980 and resides in San Diego, CA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and the Janjaweed attacked Plaintiff's village in Dalij. Plaintiff witnessed the attack and burning of her property and village, the killing of Plaintiff's father, friends and raping of women and children in the village. Plaintiff was also raped during the attack. The Janjaweed arrested and detained Plaintiff for 5 days.  Plaintiff was held in an outdoor camp in the Zalingel mountains, and subjected to torture, starvation, lack of water or medical care, beatings, kicking, tied up in painful positions, mock execution, threats to loved ones, forced to witness torture of others, exposed to extreme temperatures, beating to genitalia, and simulated drowning/submersion in water. Plaintiff was forcibly displaced from her home, fled Sudan in 2003 and arrived in the United States in 2007 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional, psychological injuries, including disease, malnutrition, anxiety, fear for the safety of self and family members, intrusive thoughts, nightmares, memory loss, flashbacks, feeling jumpy and easily startled, loss of interest in activities Plaintiff use to enjoy, feeling as if she does not have a

future, trauma, as well as a loss of property, including Plaintiff's home, livestock, and sources of income.

33.     Plaintiff Fatma Omar Ahmed was born January 1, 1979 and resides in Tucson, AZ. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers and Janjaweed attacked Plaintiff's village in Nyala, Darfur. Plaintiff witnessed fighters on horses and camels, military vehicles, burning of homes, use of chemical weapons, beating, raping, kidnapping and killing of civilians, as well as killing and stealing of livestock. In the attack, government soldiers raped, interrogated, insulted, beat, blindfolded, sleep deprived, and starved Plaintiff. She was also forced to stand for long periods, witness others being tortured, she was exposed to extreme temperatures, and subjected to threats to her loved ones. Government soldiers killed her father and separated her from her 3 children, with whom she has not yet been reunited. She was forcibly displaced from her home, fleeing Sudan in 2004, and arriving in the United States in 2010 as a refugee.  As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for her safety and the safety of her family members, intrusive thoughts, nightmares, trouble sleeping, feeling distant from her loved ones, anger, difficulty concentrating, flashbacks, feeling easily startled, and loss of interest in activities she used to enjoy, as well as a loss of property and sources of income.

34.     Plaintiff Hawa Ismail was born May 1, 1951 and resides in Tucson, AZ. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP— Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers and Janjaweed attacked Plaintiff's village in Nyala, Darfur. Plaintiff witnessed fighters on horses

and camels, burning of homes, use of chemical weapons, beating, raping, kidnapping and killing of civilians, as well as killing and stealing of livestock. In the attack, her husband was killed, they burned her home and took all of her belongings. Government soldiers and militia members interrogated, insulted, beat, blindfolded, sleep deprived, and starved Plaintiff. She was also forced to stand for long periods, witness others being tortured, she was exposed to extreme temperatures, and subjected to threats to her loved ones. She was forcibly displaced from her home, fleeing Sudan in 2004, and arriving in the United States in 2010 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer from physical injury, depression, anxiety, fear for her safety and the safety of her family members, intrusive thoughts, feeling distant from her loved ones, anger, reduced ability to work, difficulty concentrating, flashbacks, feeling easily startled, and loss of interest in activities she used to enjoy, as well as a loss of property and sources of income.

35.     Plaintiff Adam Abakar Hissein was born January 1, 2000 and resides in Carlisle, PA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and Janjaweed attacked Toulus. They attacked with aerial bombing, shelling from artillery or tanks, fighters on horses and camels, military vehicles, gun fire, heavy machine gun fire, burning of homes, beatings, kidnapping, raping and killing of civilians, as well as killing and stealing livestock. During the attack, Plaintiff's brother and two sisters were killed. He was forcibly displaced from his home, fleeing Sudan in 2004 and arrived in the United States in 2015. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant

from his loved ones, anger, reduced ability to work, difficulty concentrating, flashbacks, feeling easily startled, and loss of interest in activities he used to enjoy, as well as a loss of property and sources of income.

36.     Plaintiff Achan Achor Dumo was born January 1, 1945 and resides in Phoenix, AZ. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998, Janjaweed forces attacked Plaintiff's village Awel, killing her brother, son, and daughter, kidnapping her son and niece, and forcing Plaintiff to flee to Khartoum. In 2000, security services detained Plaintiff for 3-4 days in an underground ghost house in Khartoum. Some of the men were in uniforms and others were in plain clothes. Plaintiff was subjected to interrogation, insults, being tied in painful positions, beatings, blindfolding, sleep deprivation, forced standing for long periods, threats to loved ones, being subjected to extreme temperatures, and sexual assault and humiliation. She sustained bruises and scars from the beatings on her neck, back, mouth, and foot. She fell into a deep depression following her detention and she lost her job as a nurse. . She was forcibly displaced from her home, fleeing Sudan in 2003 and arrived in the United States in 2007. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for her safety and the safety of her family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, anger, and flashbacks, as well as a loss of property and sources of income.

37.     Plaintiff Mong Peter Lam was born May 30, 1991 and resides in National City, CA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2000, government soldiers and Janjaweed attacked Plaintiff's village in the Upper Nile. Plaintiff

witnessed aerial bombings, shelling from artillery or tanks, fighters on horses or camels, military vehicles, heavy machine gunfire, burning of homes, beating, raping, kidnapping and killing civilians, as well as stealing and killing of livestock. Plaintiff lost two grandfathers and two aunts in the attack and all personal property, including Plaintiff's home, was burned. In 2000, the government military and Janjaweed detained Plaintiff in an outdoor camp for 1 month. He was forcibly displaced from his home, fleeing Sudan in 2000, and arriving in the United States that same year as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, and in addition to his physical injuries, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work, difficulty concentrating, flashbacks, feeling easily startled, and a loss of interest in activities he used to enjoy, as well as a loss of property and sources of income.

38.    Plaintiff Jacob Lok Gatkouth was born May 15, 1962 and resides in San Diego, CA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998, government soldiers attacked Plaintiff's village in Juba. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, military vehicles, gunfire, heavy machine gunfire, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. Plaintiff was shot in the left leg and many of his family members were murdered. His property was stolen and house was burned down. He was forcibly displaced from his home, fleeing Sudan in 1999 and arriving in the United States in 2000 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, and in addition to his physical injuries, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members,

intrusive thoughts, nightmares, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work, difficulty concentrating, flashbacks, feeling easily startled, and loss of interest in activities he used to enjoy, as well as a loss of property and sources of income.

39.     Plaintiff Mahdi Altigani Alnour was born January 1, 1969 and resides in Phoenix, AZ. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2009, government soldiers and Janjaweed attacked Plaintiff's village in Darfur. Plaintiff witnessed aerial bombing, fighters on horses and camels, military vehicles, heavy machine gunfire, burning of homes, beating, kidnapping and killing of civilians, as well as killing and stealing of livestock. Plaintiff's cousins and uncle were killed in the attack and his house burned down. He was forcibly displaced from his home, fleeing Sudan in 2009 and arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer fear for his safety and the safety of his family members, intrusive thoughts, nightmares, trouble sleeping, feeling distant from his loved ones, anger, difficulty concentrating, flashbacks, feeling easily startled, and loss of interest in activities he used to enjoy, as well as a loss of property and sources of income.

40.     Plaintiff Haydar Ahmed Abdalla was born January 1, 1969 and resides in Des Moines, IA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. From 1998 to 2000, government soldiers, security services and Janjaweed attacked in El Geneina. Plaintiff witnessed aerial bombings, fighters on horses and camels, military vehicles, gunfire, burning of homes, raping, kidnapping beating and killing of civilians, as well as stealing and killing of livestock. Plaintiff was shot in his left foot and was badly injured. His homes, property and

livestock were burned. In 1998, government military, security services and Janjaweed detained Plaintiff in a military base for 6 months. He saw men in army uniforms and in plain clothes. Plaintiff was subject to interrogation, insults, being tied in painful positions, beatings, a gunshot, blindfolding, sleep deprivation, starvation, forced standing for long periods and hanging from hands or feet. He was forcibly displaced from his home, fleeing Sudan in 1998 and arriving in the United States in 2001 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, and in addition to his physical injuries, Plaintiff continues to suffer depression, anxiety, fear for his safety, intrusive thoughts, nightmares, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work, difficulty concentrating, flashbacks, feeling easily startled, and a loss of interest in activities he used to enjoy, as well as a loss of property and sources of income.

41.     Plaintiff Mahmoud Mohamed Ibrahim was born January 15, 1969 and resides in Des Moines, IA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998, government soldiers and Janjaweed attacked Plaintiff's village Oshra in El Geneina. Plaintiff witnessed fighters on horses and camels, burning of homes, beating and killing of civilians as well as killing of livestock. Plaintiff's mother was killed in the attack. They also burned Plaintiff's property, including house and car. Afterwards, Plaintiff was detained for 21 days by the government military at an army base in Geneina. He was in a room that looked like a prison. He was beaten every night and day and burned with metal, leaving him with scars on his chest. He was interrogated, beat, shot, sleep deprived, starved, hung from his hands or feet, and had body parts mutilated. He was forcibly displaced from his home, fleeing Sudan in 2000, and arrived in the United States in 2004 as a refugee. As a result of the human rights abuses experienced in Sudan

and the subsequent forced displacement, Plaintiff continues to suffer fear for his safety, nightmares, trouble sleeping, flashbacks, and feeling easily startled, fear for his safety and the safety of his family members as well as a loss of property and sources of income.

42.     Plaintiff Rabab Ahmed El Sayed Adam was born January 1, 1977 and resides in San Diego, CA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2001, civilian police arrested plaintiff and detained her in her home in Omdurman while her husband was arrested and detained elsewhere. She was detained at home for 8 days. During that time, security services subject her to torture, including grabbing and throwing, beating, beating the soles of the feet or the hands, starvation, suffocation, humiliation, terror and intimidation. Her belongings, including wedding jewelry, furniture and cattle were stolen. She was forcibly displaced from her home, fleeing Sudan in 2001 and arrived in the United States in 2004.  As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for her safety and the safety of her family members, intrusive thoughts, anger, reduced ability to work and receive education, flashbacks, feeling jumpy or easily startled, and feeling as if she does not have a future, as well as a loss of property and sources of income.

43.     Plaintiff Hanadi Abaker Mohamed was born January 1, 1996 and resides in San Diego, CA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In approximately 2004, the Janjaweed attacked Chuvuki, in Darfur, where she was living with her family. Plaintiff witnessed the rape and beating of others during the attack, including her father. Her home and property were burned. She was forcibly displaced from her home, fleeing Sudan in

2009 and arriving in the United States approximately one year later as a refugee.  As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer fear for the safety of her family members, anger, and a loss of activities she used to enjoy and depression, as well as a loss of property and sources of income.

44.     Plaintiff Ahmed Juma Ahmed was born January 1, 1964 and resides in Denver, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1997 and 2003, government soldiers and Janjaweed attacked Plaintiff's village Zawiya, east of El Geneina. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters in military vehicles, heavy machine gunfire, burning of homes, raping, kidnapping, torture and detention of civilians, and the killing of livestock. During the 2003 attack, Plaintiff was beaten and sexually assaulted unconscious by the government and Janjaweed perpetrators and he woke up an entire day later. The perpetrators killed Plaintiff's uncle. Plaintiff's property was stolen and burned. He was forcibly displaced from his home, fleeing Sudan in 2003 and arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer severe physical injuries, disease, depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work and receive education, difficulty concentrating, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy, and feeling as if he does not have a future, as well as a loss of property and sources of income.

45.     Plaintiff Atong D Deng was born February 1, 1990 and resides in Houston, TX. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by

BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2008, government soldiers attacked Plaintiff's village of Makuach. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters, gunfire, heavy machine gunfire, burning of homes, and torture of civilians, as well as the stealing of livestock. Her family members were injured and killed, her property was burned and her livestock was stolen. She was forcibly displaced from her home, fleeing Sudan in 2010 and arriving in the United States in 2012 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer disease, depression, anxiety, fear for his safety and the safety of his family members, nightmares and trouble sleeping, as well as a loss of property and sources of income.

46.    Plaintiff Abdalla Mohamed Idriss was born January 1, 1987 and resides in Dayton, OH. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and Janjaweed attacked Plaintiff's village of Arara around 10 am. Plaintiff witnessed aerial bombing, fighters on horses or camels, gunfire, heavy machine gunfire, use of chemical weapons, burning of homes, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. Plaintiff witnessed the murder of his father and was separate from his family for two years. He was forcibly displaced from his home, fleeing Sudan in 2003 and arriving in the United States in 2011 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, memory loss, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work, difficulty concentrating, feeling easily startled, and feeling as if he does not have a future, as well as a loss of property and sources of income.

47.     Plaintiff Mohamed Omer Salih Hasabo was born January 1, 1984 and resides in Denver, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, the Janjaweed attacked Plaintiff's village of Labado. Plaintiff witnessed fighters in military vehicles and the beating, raping and killing of civilians. All of Plaintiff's property was stolen. He was forcibly displaced from his home, fleeing Sudan in 2010 and arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues fear for the safety of his family members, trauma, depression, anxiety, and he suffers the loss of property and sources of income.

48.     Plaintiff Omar Baher Sibouru was born January 1, 1987 and resides in Denver, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers and Janjaweed attacked Plaintiff's village of Labado. Plaintiff witnessed aerial bombing, heavy machine gunfire, gunfire, military vehicles, attackers on horseback and camel, helicopters, shelling from artillery or tanks, and the raping, beating and killing of civilians. During the attack, Plaintiff's father and three brothers were killed, his home was hit by a rocket propelled grenade ("RPG") and destroyed, and his property and livestock were looted or destroyed. Shrapnel from the RPG embedded in Plaintiff's right leg. In 2011, the government military detained Plaintiff in an outdoor camp for 46 days. He was subjected to interrogation, forced confession, insults, forced labor, kicking, sleep deprivation, starvation, blindfolding, water deprivation, hanging from feat, beatings, removal of finger or toenails, and was forced to hurt others.  He was forcibly displaced from his home, fleeing Sudan in 2011 and arriving in the United States 2012 as a refugee. As a result of the human rights abuses experienced in Sudan and the

subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, fear for his safety and the safety of his family members, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work and receive education, feeling easily startled, loss of interest in activities he used to enjoy and feeling as if he does not have a future,  as well as a loss of property and sources of income.

49.     Plaintiff Adam Abdelrahman Ismail was born January 1, 1992 and resides in Carlisle, PA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers, security services and Janjaweed attacked Plaintiff's village, Ambasana. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on horses or camels, military vehicles, heavy machine gunfire, burning of homes, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. During the attack, Plaintiff was stabbed and thrown into a tree and broke his elbow. His house and village were destroyed and his livestock was stolen. He was forcibly displaced from his home, fleeing Sudan in 2003 and arriving in the United States in 2013. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work and received education, difficulty concentrating, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy, and feeling as if he does not have a future, as well as a loss of property and sources of income.

50.     Plaintiff Abdulmajid A Gamar was born January 1, 1976 and resides in Clarkston, GA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded

by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and Janjaweed attacked Plaintiff's village of Canja in El Geneina. Plaintiff witnessed aerial bombing, fighters on horses or camels, gunfire, use of chemical weapons, burning of homes, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. Plaintiff's cousin was killed in the attack, and all of Plaintiff's properties were burned. He was forcibly displaced from his home, fleeing Sudan in 2004 and arriving in the United States in 2009 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, fear for his safety, nightmares, memory loss, feeling distant from his loved ones, anger, and reduced ability to receive education, as well as a loss of property and sources of income.

51.     Plaintiff Mutaz Mohamed Maki Komi was born November 24, 1976 and resides in Des Moines, IA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998, government soldiers and security services attacked Plaintiff's village in South Kordofan. Plaintiff witnessed aerial bombing, fighters in military vehicles, heavy machine gunfire, beating, raping, kidnapping and killing of civilians as well as the stealing of livestock. Plaintiff's father was killed, his sister was raped and Plaintiff was arrested. All of Plaintiff's property was burned. Security services detained Plaintiff for 45 days in an army base in Eldang City, South Kordofan. Plaintiff was subjected to interrogation, forced confession, insults, being tied in painful positions, beatings, beating on the soles of the feet or hands, sleep deprivation, forced standing for long periods, hanging from hands or feet, and exposed to extreme temperatures. His eyes were covered with black tape and he was beat until he could not walk, his ear bled and his left shoulder was broken. He was forcibly displaced from his home, fleeing Sudan in 1999 and arriving in the United

States in 2004 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, fear for his safety and the safety of his family members, trouble sleeping, anger, depression and anxiety, reduced ability to receive education, flashbacks, and feeling as if he does not have a future, as well as a loss of property and sources of income.

52.    Plaintiff Gaffar Hamid Ali Noureldein was born January 1, 1959 and resides in Iowa City, IA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed.  In 2001, the Government of Sudan security forces asked Plaintiff's father about Plaintiff's location and indicated that he was suspected of supporting rebels. Plaintiff feared for his life and subsequently fled Sudan. He was forcibly displaced from his home, fleeing Sudan in 2001 and arriving in the United States 2012 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer anxiety, fear for his safety and the safety of his family members, feeling distant from his loved ones, anger, reduced ability to work or receive education, difficulty concentrating, loss of interest in activities he used to enjoy and feeling as if he does not have a future, as well as a loss of property and sources of income.

53.    Plaintiff Noha Gaffer Hamid Ali was born March 8, 1994 and resides in Iowa City, IA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2005, government soldiers and Janjaweed attacked Plaintiff's village, Ambro. Plaintiff witnessed aerial bombing, fighters on horses or camels, and heavy machine gunfire. She was forcibly displaced from her home, fleeing Sudan in 2006 and arriving in the United States in 2012 as a refugee.  As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement,

Plaintiff continues to suffer anxiety, fear for her safety and the safety of her family members, nightmares, feeling distant from her loved ones, anger, and a reduced ability to receive education, as well as a loss of property and sources of income.

54.     Plaintiff Fathia Yagoub Elnour Bakhat was born January 1, 1966 and resides in Iowa City, IA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and Janjaweed attacked Plaintiff's village of Um Baru. Plaintiff witnessed aerial bombing, heavy machine gunfire, burning of homes, beating and killing of civilians, as well stealing and killing of livestock. Plaintiff's house was burned, along with her belongings, and her livestock were stolen. The entire village was burned, looted and attacked. She was forcibly displaced from her home, fleeing Sudan in 2006 and arriving in the United States in 2012 as a refugee.  As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer anxiety, fear for her safety and the safety of her family members, nightmares, feeling distant from her loved ones, anger, diabetes and hypertension, and a reduced ability to work, as well as a loss of property and sources of income.

55.     Plaintiff Sadam Y Mohamed was born January 1, 1994 and resides in Aurora, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2008, government soldiers and Janjaweed attacked Plaintiff's village, Gereida in South Darfur. Plaintiff witnessed aerial bombing, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, use of chemical weapons, beating, raping and killing of civilians, as well as the stealing and killing of livestock. Plaintiff's grandparents and other relatives were killed and all of his livestock was stolen as he was forced to run from the village. He was forcibly displaced from his

home, fleeing Sudan in 2009 and arriving in the United States in 2014 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, intrusive thoughts, trouble sleeping, reduced ability to receive education, and difficulty concentrating, as well as a loss of property and sources of income.

56.    Plaintiff Khalid Sayfeldin Krameldin was born April 18, 1972 and resides in Aurora, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2006, the Janjaweed attacked Plaintiff's village, Kumbola. Plaintiff witnessed aerial bombing, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, beating, raping, kidnapping, torture and killing of civilians, as well as stealing of livestock.  Plaintiff's cousin was shot and killed and all of Plaintiff's property was burned. In 2006, government military and security services detained Plaintiff at Skaly camp, a military prison in Nyala, for a week. His captors wore military uniforms. During his detention, he was subjected to insults, being tied in painful positions, beatings, blindfolding, sleep deprivation, starvation, forced standing for long periods, hanging from hands or feet, mock execution and threats to loved ones. He was forcibly displaced from his home, fleeing Sudan in 2006 and arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, trouble sleeping, feeling distant from his loved ones, anger, flashbacks, and feeling easily startled, as well as a loss of property and sources of income.

57.     Plaintiff Salah Ibrahim Ahmed was born January 1, 1972 and resides in Denver, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and Janjaweed attacked Plaintiff's village, Bongass near Kass. Plaintiff witnessed aerial bombing, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, beating, burning of homes, kidnapping and killing of civilians, as well as stealing and killing of livestock. Plaintiff's brother and two of his uncles were killed in the attack. The soldiers and militia burned all of Plaintiff's property, including his farm, shop and land. He was forcibly displaced from his home, fleeing Sudan in 2003 and arriving in the United States in 2010 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer fear for his safety, fear for the safety of his family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work or receive education, difficulty concentrating, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy, and feeling as if he does not have a future, as well as a loss of property and sources of income.

58.     Plaintiff Somia Ali Ali was born February 28, 1990 and resides in Omaha, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers, security services and Janjaweed attacked Plaintiff's village, Mcgar. Plaintiff witnessed aerial bombing, gunfire, heavy machine gunfire, use of chemical weapons, and beating, kidnapping and killing of civilians. Plaintiff's uncle was killed in the attack, her house was burned down, her and all of her land and property, including livestock, was stolen. and Plaintiff house burned down and they stole all of her property including livestock. lost all of her land and property.

She was detained for six to eight months following the attack by government security forces in green and brown military uniforms, and during that time subjected to humiliation, insults, and beating. She was forcibly displaced from her home, fleeing Sudan in 2005 and arriving in the United States in 2010 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, anxiety, fear for her safety and the safety of her family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from her loved ones, anger, reduced ability to work or receive education, flashbacks, feeling easily startled, loss of interest in activities she used to enjoy and feeling as if she does not have a future, as well as a loss of property and sources of income.

59.     Plaintiff Abdelrahman Hassan Ahmed was born January 1, 1984 and resides in Omaha, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2005, government soldiers, security services and Janjaweed attacked Plaintiff's village in Mozbat, North Darfur. Plaintiffs witnessed aerial bombing, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, beating, raping, kidnapping, torture and killing of civilians, as well as stealing of livestock. Plaintiff was raped during the attack. His father was killed and all of his livestock was stolen. Plaintiff lost his dental clinic in the attack. In 2011, security services arrested Plaintiff in Khartoum and detained him in a ghost house for 3 months. His captors wore civilian clothes. During that time, Plaintiff was subjected to interrogation, insults, stabbings, beatings, blindfolding, sleep deprivation, starvation, exposure to extreme temperatures, harm to his genitalia, sexual humiliation and rape. He was forcibly displaced from his home, fleeing Sudan in 2013 and arriving in the United States in 2016 as a refugee. As a result of the human rights

abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety, nightmares, trouble sleeping, reduced ability to work or receive education, difficulty concentrating, and feeling easily startled, as well as a loss of property and sources of income.

60.     Plaintiff Mohamed Adam Osman Mohamed was born January 1, 1965 and resides in Schuyler, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. On several occasions between 1999 and 2004, Plaintiff's village, Angemi in West Darfur, was attacked by government soldiers and Janjaweed. Plaintiff witnessed fighters on horses or camels, military vehicles, gunfire, burning of homes, beating, raping, kidnapping, torture and killing of civilians, as well as stealing and killing of livestock. In an attack in 2000, Plaintiff's brother was injured, his son was killed, his house was burned and his farms, land and animals were stolen.  He was forcibly displaced from his home, fleeing Sudan in 2003 and arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer anxiety, fear for his safety and the safety of his family members, anger, and feeling as if he does not have a future, as well as a loss of property and sources of income.

61.     Plaintiff Elhadi Haroun Adam was born January 1, 1987 and resides in Denver, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers, security services, government police and Janjaweed attacked Plaintiff's village, Hazan Orch. Plaintiff witnessed fighters on horses or camels, heavy machine gunfire, use of chemical weapons, burning of homes, beating, raping, and killing of civilians, as well as stealing

and killing of livestock. Plaintiff was hit in the left leg by shrapnel from a bomb from an Antonov airplane. He was forcibly displaced from his home, fleeing Sudan in 2003 and arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to fear for his safety and that of his family members and he suffers from physical injuries and a loss of property and sources of income.

62.     Plaintiff Yahya Musa Abdalla was born January 1, 1983 and resides in Denver, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, the Janjaweed, and/or other pro-government militia. In 2004, government soldiers and Janjaweed attacked Plaintiff's village, Towal. Plaintiff witnessed fighters on horses or camels, gunfire, the burning of homes, the beating, raping, kidnapping, torture, and killing of civilians, as well as the stealing and killing of livestock. His uncle and cousin died in the attack. Plaintiff's home was burned and his livestock was stolen. He was forcibly displaced from his home, fleeing Sudan in 2004 and arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer fear for his safety, a reduced ability to receive education, and feeling as if he does not have a future, as well as a loss of property and sources of income.

63.     Plaintiff Abdalrahman Osman Fadoul was born January 1, 1979 and resides in Denver, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers, government police and Janjaweed attacked Plaintiff's village, Labado. Plaintiff witnessed aerial bombing, fighters on horses or camels, military vehicles, heavy machine gunfire, burning of homes, use of chemical weapons, beating, raping and killing of civilians, as

well as killing of livestock and burning of schools. Plaintiff lost his grandmother in the attack, and his father was shot in the leg. He was forcibly displaced from his home, fleeing Sudan in 2004 and arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer disease, depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work or receive education, difficulty concentrating, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy and feeling as if he does not have a future, as well as a loss of property and sources of income.

64.     Plaintiff Abdelkarim Muosa Omar was born July 9, 1978 and resides in Aurora, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2010, Government of Sudan soldiers, security forces, and Janjaweed attacked Plaintiff's city of Nyala. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, military vehicles, gunfire, burning of homes, beating and killing of civilians and the stealing of livestock.  He was forcibly displaced from his home, fleeing Sudan in 2011, arriving in the United States in 2013 as a refugee.  As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer nightmares, depression, anxiety, diseases, memory loss and flashbacks, as well as a loss of property and sources of income.

65.     Plaintiff Kuier Aguer Atemdeng was born January 1, 1966 and resides in Aurora, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998, government security services and Popular Defense Forces attacked Plaintiff in her home in Kongor

in South Sudan. Plaintiff witnessed the killing of her father and her brother was killed in a separate location.  Plaintiff witnessed tanks, infantry, military vehicles, guns, heavy guns, fighters on foot, and beating and killing of civilians. Plaintiff ran away during the attack and when she came back, the village, including her home, was burned, and her property and livestock were stolen. In May of 1998, security services arrested Plaintiff in Khartoum, detaining her in security headquarters for questioning for a number of hours. She was subjected to interrogation, kicking, forced confessions, kicking, slapping, and threats to loved ones. She was forcibly displaced from her home, fleeing Sudan in 1999, arriving in the United States in 2000 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, feeling easily startled, fear for her safety and the safety of her family members, difficulty concentrating and loss of interest in activities he used to enjoy, as well as a loss of property and sources of income.

66.    Plaintiff Said Abobakar Ahmed Abdala was born January 1, 1990 and resides in Aurora, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and the Janjaweed attacked Plaintiff's village, Adar. Plaintiff witnessed aerial bombing, fighters in military vehicles, fighters on camels and/or horses, gunfire, heavy machine gunfire, burning of homes, beating, raping and killing of civilians, as well as stealing of livestock. All of Plaintiff's home and property was burned by the Janjaweed, and his livestock was stolen. Plaintiff's brother and two sisters were killed in the attack. He was forcibly displaced from his home, fleeing Sudan in 2003, arriving in the United States in 2013 as a refugee.  As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff

continues to suffer physical and psychological injuries, including trouble sleeping, anxiety, flashbacks, depression, and anger, as well as a loss of property and sources of income.

67.     Plaintiff Abdelraziq Musa Hussein was born February 1, 1989 and resides in Aurora, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and Janjaweed attacked Plaintiff's village in Kutom. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, military vehicles, gunfire, use of chemical weapons, beating, raping, kidnapping and killing of civilians, as well as the stealing of livestock. Plaintiff was beaten with wood and his cousin and grandfather were killed in the attack. His family's homes and land were burned, and their livestock was stolen. In 2008, government military and security forces arrested Plaintiff in Khartoum, keeping him in a prison in Kober for 2-3 months. His captors wore civilian clothing, and the prison guards wore green and gray uniforms. During that time, Plaintiff was subjected to beatings, beatings on the soles of his feet or hands, sleep deprivation, starvation, forced standing for long periods, hanging from his hands or feet, mock execution, forced witnessing others being tortured, and extreme temperatures. He was hit in his left eye, causing permanent damage, and he injured his leg.  He was forcibly displaced from his home, fleeing Sudan in 2012, arriving in the United States in 2015 as a refugee.  As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, depression, anxiety, fear for his safety and the safety of his family members, nightmares, memory loss, trouble sleeping, feeling distant from his loved ones, anger, and reduced ability to work, as well as a loss of property and sources of income.

68.     Plaintiff Mustafa Alnor was born April 28, 1991 and resides in Omaha, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—

Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2009, government soldiers, government police and Janjaweed attacked Plaintiff and his family in Karnoy, North Darfur. Plaintiff witnessed aerial bombing, military vehicles, soldiers on foot, fighters on horses or camels, gunfire, heavy machine gunfire, beating, raping and killing of civilians, as well as the stealing and killing of livestock. Plaintiff was beaten and his uncle was killed in the attack. Plaintiff lost all of his livestock in the attack as well. At that time, Plaintiff as arrested and detained in a ghost house for 22 days. During that time, Plaintiff was subjected to interrogation, shocking, beating, the removal of fingernails or toenails, starvation, sleep deprivation, forced standing for long periods, and forced witnessing others being tortured. He was forcibly displaced from his home, fleeing Sudan in 2010, arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for the safety of his family members, nightmares, trouble sleeping, anger, and flashbacks, as well as a loss of property and sources of income.

69.     Plaintiff Mohamed I Aboh was born October 10, 1987 and resides in Omaha, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2006, government soldiers and Janjaweed attacked Plaintiffs village, Katila in South Darfur. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, beating, kidnapping and killing of civilians, as well as the killing of livestock. Plaintiff's father and brother were killed in the attack. The village, including Plaintiff's home, was burned and Plaintiff's livestock was stolen. He was forcibly displaced from his home, fleeing Sudan in 2010, arriving in the United States in 2014 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to

suffer fear for his safety and the safety of his family members, nightmares, reduced ability to receive an education and feeling as if he does not have a future, as well as a loss of property and sources of income.

70.     Plaintiff Ali Omer Amir Tagal was born January 1, 1995 and resides in Iowa City, IA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and Janjaweed attacked Plaintiff's village, Mahjeria. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, beating, kidnapping and killing of civilians, as well as stealing and killing of livestock. Plaintiff's father was shot in his shoulder and right hand, and three cousins were killed in the attack. His family's livestock was stolen and property destroyed. Plaintiff had to run and hide in the woods to keep cover from the airplanes and helicopters dropping bombs. He was forcibly displaced from his home, fleeing Sudan in 2004, arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, feeling distant from his loved ones, anger, reduced ability to receive an education, flashbacks, and feeling easily startled, as well as a loss of property and sources of income.

71.     Plaintiff Ibrahim Fadl Jumaa was born January 1, 1965 and resides in Omaha, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers and Janjaweed attacked Plaintiff's village, Twilla. Plaintiff witnessed aerial bombing, fighters in military vehicles, fighters on horses or camels, heavy machine gunfire,

beating, raping, and killing of civilians, as well as the stealing and killing of livestock. The attack happened around noon, with the soldiers and Janjaweed coming from different directions and burning houses, raping women, and looting properties  Plaintiff's uncle and two of his cousins were killed in the attack, and Plaintiff's family additionally lost five houses, hundreds of cattle, and over a ton of grains. He was forcibly displaced from his home, fleeing Sudan in 2011, arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer anxiety, fear for his safety and the safety of his family members, nightmares and flashbacks, difficulty sleeping, as well as a loss of property and sources of income.

72.     Plaintiff Abbas Khamis Haroon was born May 3, 1968 and resides in Omaha, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and Janjaweed attacked Plaintiff's village, Saleh in Zalenge, Central Darfur. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, beating, kidnapping and killing of civilians, as well as stealing of livestock. Plaintiff lost 2 cousins in the attack and 9 of his family members were injured. Plaintiff's shop and farm were burned, and all of the livestock were stolen. He was forcibly displaced from his home, fleeing Sudan in 2003, arriving in the United States in 2009 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer from diseases, anxiety, flashbacks, feeling distant from loved ones, and trouble sleeping, as well as a loss of property and sources of income.

73.     Plaintiff Zeinab Abbu was born December 15, 1978 and resides in Omaha, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, Janjaweed attacked Plaintiff's village in Zalinga. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, use of chemical weapons, beating, raping, kidnapping of civilians, as well as stealing and killing of livestock. Two of Plaintiff's brothers were detained and tortured and her uncle was killed. Plaintiff's property was stolen and burned.  She was forcibly displaced from her home, fleeing Sudan in 2003 and arriving in the United States in 2005 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, anxiety, fear for her safety and the safety of her family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from her loved ones, anger, reduced ability to work or receive education, difficulty concentrating, flashbacks, feeling easily startled, loss of interest in activities she used to enjoy and feeling as if she does not have a future, as well as a loss of property and sources of income.

74.     Plaintiff Younes Omar Adam was born January 1, 1986 and resides in Denver, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2008, Plaintiff and his family were traveling to Nyala from Mahjria when they were intercepted by Janjaweed. The Janjaweed opened fire on the truck Plaintiff was in, killing two people, injuring others and leaving Plaintiff with a broken arm. Plaintiff was accused of supporting the government's political opposition and suffered a beating by the Janjaweed that included harm to his genitalia. Later in 2008, the Janjaweed attacked Plaintiff's village. During the attack, Plaintiff witnessed fighters on

horses and camels, trucks, gunfire, heavy machinegun fire, beating, raping, kidnapping and killing of civilians, as well as stealing of livestock. Plaintiff's cousin was killed in the attack, and all of Plaintiff's livestock was stolen. He was forcibly displaced from his home, fleeing Sudan in 2009, arriving in the United States in 2013 as a refugee.   As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work or receive education, difficulty concentrating, feeling easily startled, loss of interest in activities he used to enjoy, and feeling as if he does not have a future, as well as a loss of property and sources of income.

75.     Plaintiff Ibrahim Fadel Hussein was born January 1, 1974 and resides in Aurora, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, Janjaweed attacked Plaintiff's village, Barde in West Darfur. Plaintiff witnessed aerial bombing, fighters on foot and in military vehicles, heavy machine gunfire, beating, raping and killing of civilians, as well as stealing of livestock. Plaintiff lost his farming land and livestock in the attack. He was forcibly displaced from his home, fleeing Sudan in 2003, arriving in the United States in 2012 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer fear for his safety and the safety of his family members, anxiety, feeling distant from his loved ones and feeling as if he does not have a future, as well as a loss of property and sources of income.

76.     Plaintiff Kalthoum Arbab Musa was born January 1, 1979 and resides in Omaha, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded

by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, Janjaweed attacked Plaintiff's village, Hejir. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, use of chemical weapons, burning of homes, beating, raping, kidnapping and killing civilians, as well as stealing and killing of livestock. Plaintiff's brother died in the attack and Plaintiff's land and livestock were stolen and burned. In his village in 2004, he was detained by the government military and the Janjaweed. He was subjected to interrogation, forced confession, insults, being tied in painful positions, beatings, a gunshot, stabbing, burning, removal of fingernails and toenails, blindfolding, sleep deprivation, starvation, forced standing for long periods, hanging from hands or feet, mock execution, threats to loved ones, forced to witness others being tortured, harm to his genitalia, sexual humiliation, rape, strangulation, suffocation, and mutilation of body parts. He was forcibly displaced from his home, fleeing Sudan in 2007, arriving in the United States in 2012 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, anxiety, fear for his safety and the safety of other family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work or receive an education, difficulty concentrating, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy, feeling as if he does not have a future, as well as a loss of property and sources of income.

77.     Plaintiff Musa S Adam was born June 15, 1992 and resides in Omaha, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and Janjaweed attacked Plaintiff's village in Zalingei, West Darfur. Plaintiff witnessed aerial

bombing, fighters on horses or camels, military vehicles, gunfire, burning of homes, beating and killing of civilians, and stealing of livestock. Plaintiff's father and cousin were killed in the attack. Janjaweed looted Plaintiff's home and set his house on fire, then stole Plaintiff's livestock.   He was forcibly displaced from his home, fleeing Sudan in 2003, arriving in the United States in 2009 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, fear for his safety and the safety of his family members, trouble sleeping and anger, as well as a loss of property and sources of income.

78.    Plaintiff Abdulatif Isaak was born January 1, 1986 and resides in Lincoln, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, the Janjaweed attacked Plaintiff's village in Usoore, El Geneina. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, military vehicles, gunfire, burning homes, beating, raping and kidnapping of civilians, as well as stealing and killing livestock. Plaintiff was outside the village, going home after a day of farming when his father stopped to pray. Janjaweed saw and killed his father. All of Plaintiff's property, including his home, was stolen and burned. In 2004, the government military arrested Plaintiff in El Geneina, detaining him in a military prison for 2 months. During that time, Plaintiff was subjected to interrogation, forced confession, insults, being tied in painful positions, beatings, beatings on the soles of his feet or hands, blindfolding, sleep deprivation, starvation, forced standing for long periods, hanging from hands or feet, mock execution, threats to loved ones, forced to witness other being tortured, strangulation, and suffocation. He was forcibly displaced from his home, fleeing Sudan in 2008, arriving in the United States in 2011 as a refugee. As a result of the human rights abuses experienced in Sudan and the

subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, trouble sleeping, anger and loss of interest in activities he used to enjoy, as well as a loss of property and sources of income.

79.     Plaintiff Maryam Babo was born January 1, 1992 and resides in Omaha, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and Janjaweed attacked Plaintiff's village in Geneina. The attack began during morning prayer on Eid, when the Janjaweed came to the village and started burning everything. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, beating and killing of civilians, as well as stealing of livestock. Plaintiff was beaten and three of her sisters and her father were killed during the attack.  She was forcibly displaced from her home, fleeing Sudan in 2003, arriving in the United States in 2012 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, depression, anxiety, fear for her safety and the safety of her family members, intrusive thoughts, nightmares, feeling distant from her loved ones, anger, reduced ability to receive education, difficulty concentrating, flashbacks, feeling easily startled, loss of interest in activities she used to enjoy and feeling as if she does not have a future, as well as a loss of property and sources of income.

80.     Plaintiff Babiker Abdalla Isaac was born January 1, 1978 and resides in Lincoln, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and Janjaweed attacked Plaintiff's village, Oussori. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine

gunfire, burning of homes, beating, raping and killing of civilians, as well as killing of livestock. Plaintiff saw his father shot and killed by the Janjaweed. Plaintiff lost his property in the attack, including hundreds of heads of livestock.  He was forcibly displaced from his home, fleeing Sudan in 2007, arriving in the United States in 2012 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, memory loss, feeling distant from his loved ones, anger, reduced ability to work or receive education, difficulty concentrating, loss of interest in activities he used to enjoy, and feeling as if he does not have a future, as well as a loss of property and sources of income.

81.     Plaintiff Ibrahim Alnor Juma was born January 1, 1965 and resides in Kansas City, MO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers and Janjaweed attacked Plaintiff's village of Hujir Tono. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, military vehicles, heavy machine gunfire, burning of homes, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock.  Plaintiff lost his cousin in the attack, all of his livestock was stolen and the village was completely burned. He was forcibly displaced from his home, fleeing Sudan in 2004, arriving in the United States in 2011 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer disease, depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work or receive education, flashbacks, feeling easily startled, loss of interest in activities

he used to enjoy and feeling as if he does not have a future, as well as a loss of property and sources of income.

82.    Plaintiff Aboud Issa Saleh was born January 1, 1976 and resides in Iowa City, IA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2001, government soldiers and the Janjaweed attacked Plaintiff's village of Hamada in South Darfur. Plaintiff witnessed fighters on horses or camels, heavy machine gunfire, burning of homes, the beating, raping, and killing of civilians, as well as the killing of livestock. Plaintiff's land was burned and his livestock destroyed.  He was forcibly displaced from his home, fleeing Sudan in 2003, arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, a reduced ability to receive education and difficulty concentrating, as well as a loss of property and sources of income.

83.    Plaintiff Omer Amir Bakhit was born January 1, 1962 and resides in Iowa City, IA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and Janjaweed attacked Plaintiff's village, Mahajariya. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of civilians. Plaintiff was wounded by a gunshot to his right shoulder, breaking a bone in his arm. His cousins and other family members were killed in the attack. His home was burned and all of his livestock was stolen. He was forcibly displaced from his home, fleeing Sudan in 2003, arriving in the United States in 2013 as a refugee.

As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, trouble sleeping, feeling distant from his loved ones, reduced ability to work or receive education, difficulty concentrating, memory loss, flashbacks, feeling easily startled, and a loss of interest in activities he used to enjoy, as well as a loss of property and sources of income.

84.     Plaintiff Noreldin Adam Osman was born January 1, 1972 and resides in Iowa City, IA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers and the Janjaweed attacked Plaintiff's village, Grabichi in South Darfur State. Plaintiff witnessed aerial bombings, fighters on horses or camels, military vehicles, heavy machine gunfire, use of chemical weapons, burning of homes, beating and killing of civilians, as well as killing of livestock. Plaintiff's older brother was killed in the attack and all of Plaintiff's property, including his livestock, was stolen. His home was burned as well.  He was forcibly displaced from his home, fleeing Sudan in 2010, arriving in the United States in 2012 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, feeling distant from his loved ones, and a reduced ability to receive an education, as well as a loss of property and sources of income.

85.     Plaintiff Eisa Mohamed was born July 1, 1958 and resides in Grand Island, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1999, government soldiers and Janjaweed attacked Plaintiff's village, Bulbul in Nyala, South Darfur.

Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, beating and killing of civilians, as well as stealing and killing of livestock. Plaintiff's uncle was killed, his livestock was stolen and his home was burned in the attack.  He was forcibly displaced from his home, fleeing Sudan in 1999, arriving in the United States in 2004 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, trouble sleeping, feeling distant from his loved ones, anger, flashbacks, feeling easily startled, and feeling as if he does not have a future, as well as a loss of property and sources of income.

86.     Plaintiff Idriss Adam Mohamed Dawoud was born January 1, 1968 and resides in Lexington, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2007, the Janjaweed attacked Plaintiff's village, Jaale. Plaintiff witnessed fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, beating, raping, kidnapping and killing of civilians. Plaintiff's brother was in a car attacked by the Janjaweed and died when he was struck on the head. Plaintiff lost his business in the attack as well. He was forcibly displaced from his home, fleeing Sudan in 2009, arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work and receive an education, difficulty

concentrating, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy and feeling as if he does not have a future, well as a loss of property and sources of income.

87.    Plaintiff Ramadan Yahai Haroun was born January 1, 1965 and resides in Lexington, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers, security services and the Janjaweed attacked Plaintiff's village, Al-Tina. Plaintiff witnessed aerial bombing, fighters on horses or camels, military vehicles, gunfire heavy machine gunfire, use of chemical weapons, burning of homes, beating and killing of civilians. The planes struck first, then the soldiers and Janjaweed attacked, killing innocent people, burning houses and looting property. Plaintiff's uncle and brother-in-law died in the attack. Plaintiff was shot twice and was lying on the ground next to the bodies of his family members. Plaintiff lost his home, livelihood, including livestock and crops, and family. Earlier, in 1998, Plaintiff was arrested by government police in El Geneina. He was first held at a police station for three weeks and then moved to an unknown location for a month and subjected to interrogation. He was detained again in 2004 by government soldiers, security services and Janjaweed. During that time, he was subjected to interrogation, forced confession, beatings and removal of a fingernail. He was injured in the right shoulder and had a fingernail removed from his left hand. He was forcibly displaced from his home, fleeing Sudan in 2004, arriving in the United States in 2009 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, fear for his safety and the safety of his family members, intrusive thoughts, memory loss, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to receive education, difficulty

concentrating, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy and feeling as if he does not have a future, as well as a loss of property and sources of income.

88.     Plaintiff Abdushafaie Abubaker Ahmed was born August 9, 1986 and resides in Lexington, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and the Janjaweed attacked Plaintiff's village of Tour, Bogaej. Plaintiff witnessed fighters on horses or camels, military vehicles, heavy machine gunfire, the burning of homes, and the beating and killing of civilians. His cousin and uncle were killed in the attack while the family was trying to flee. Plaintiff's house was burned and all livestock and land was stolen. He was forcibly displaced from his home, fleeing Sudan in 2005, arriving in the United States in 2012 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer fear for the safety of his family members, trouble sleeping, flashbacks, depression, nightmares, anxiety, and intrusive thoughts, as well as a loss of property and sources of income.

89.     Plaintiff Nawal Abakr was born January 1, 1989 and resides in Grand Island, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers, government police and the Janjaweed attacked Plaintiff's village in Darfur. Plaintiff witnessed aerial bombing, fighters on foot, military vehicles, gunfire, burning of homes, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. Plaintiff's uncle was shot and killed and Plaintiff's property was burned down in the attack. She was forcibly displaced from her home, fleeing Sudan in 2011, arriving in the United States in 2014 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent

forced displacement, Plaintiff continues to suffer disease, depression, anxiety, fear for her safety and the safety of her family members, nightmares, trouble sleeping, feeling distant from her loved ones, anger, reduced ability to work, and a loss of interest in activities she used to enjoy, as well as a loss of property and sources of income.

90.     Plaintiff Musa Mohamed Ahmed was born December 13, 1980 and resides in Lexington, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and the Janjaweed attacked Plaintiff's village, Hadur.  They attacked early, around 4am, killing a large number of people in the village, including Plaintiff's father, Muhammed Ahmed Muhammed. Plaintiff witnessed fighters on foot, fighters on horses and/or camels, gunfire, heavy machinegun fire, burning of homes, beating and killing of civilians, as well as stealing and killing of livestock. The Janjaweed burned homes in the village, including Plaintiff's and stole or killed livestock. In 2009, the government military arrested Plaintiff in Kabkabiya and detained him in a military prison for 1 month. During that time, he was subject to interrogation, forced confession, kicking, beatings, forced standing from long periods, mock execution, and sleep deprivation.  He was forcibly displaced from his home, fleeing Sudan in 2009, arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer from nightmares, anxiety, fear for his safety and the safety of his family members, trouble sleeping, feeling jumpy, as well as a loss of property and sources of income.

91.     Plaintiff Mustafa Isaac Mohammed was born July 17, 1974 and resides in Louisville, KY. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In

late 1997 and again in 2004, government soldiers and the Janjaweed attacked Plaintiff's village in Andita in Western El Geneina. During those attacks, Plaintiff witnessed fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, use of chemical weapons, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. In the 1997 attack, Plaintiff sustained an injury to his hand, his property was completely burned, and his uncle was killed. The 2004 attack was on a larger scale, with the entire village burned all villagers killed or displaced. He witnessed many murders in both attacks. He was forcibly displaced from his home, fleeing Sudan in 2005, arriving in the United States in 2009 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, fear for his safety and the safety of his family members, trouble sleeping, depression, anxiety, feeling distant from his loved ones, anger, reduced ability to work, flashbacks, and feeling as if he does not have a future, as well as a loss of property and sources of income.

92.     Plaintiff Haroun Mohamed Idris was born January 1, 1976 and resides in Lexington, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2000, the government military attacked Plaintiff's camp in Gedaref State. Plaintiff was serving as a relief worker for Ethiopian refugees in the camp when government soldiers attacked. Plaintiff witnessed fighters on foot, raping and killing of civilians during the attack, as well as stealing of livestock. Plaintiff's home was looted and his livestock was stolen. The soldiers took Plaintiff from the camp, detaining him in an army base and subjected him to forced confession, beatings, mock execution, forced witnessing of others being tortured, forced harming of others, food and water deprivation, and suffocation. He was forcibly displaced from his home, fleeing Sudan in 2000,

arriving in the United States in 2002 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer fear for his safety and the safety of his family members and anger, as well as a loss of property and sources of income.

93.     Plaintiff Abdalla Omer Amir was born January 1, 1998 and resides in Iowa City, IA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and the Janjaweed attacked Plaintiff's village in Mahajaria. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, beating and killing of civilians, as well as stealing and killing of livestock. Plaintiff's home and farm were burned, his livestock was stolen, and four of his cousins were killed trying to retrieve the livestock. He was forcibly displaced from his home, fleeing Sudan in 2004, arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, fear for his safety and the safety of his family members, intrusive thoughts, and feeling distant from his loved ones, as well as a loss of property and sources of income.

94.     Plaintiff Haleema Harswon Abdalla was born January 1, 1971 and resides in Portland, ME. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1999, government soldiers, government police and the Janjaweed attacked Plaintiff's village, Garsela in Zalinga. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, heavy machine gunfire, beating and killing of civilians, as well as stealing and killing of livestock.

Plaintiff's grandmother, aunt and cousin were shot and killed in front of her. Plaintiff miscarried her first baby as a result of this attack. Plaintiff and her family lost their homes and livestock, fleeing during the attack. In 2002, Plaintiff was arrested in South Zalinga by government army and the Janjaweed. Plaintiff was subjected to beatings, beating on the soles of her feet or hands, a gunshot, burns, nail removal, harm to her genitalia, sexual humiliation and rape. She was forcibly displaced from her home, fleeing Sudan in 2002, arriving in the United States in 2005 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer anxiety, fear for her safety and the safety of her family members, nightmares, anger, reduced ability to receive an education, and feeling as if she does not have a future, as well as a loss of property and sources of income.

95.     Plaintiff Abdelgadir Mohamed Abbaker was born March 5, 1959 and resides in Iowa City, IA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers and the Janjaweed attacked Plaintiff's village, Mellt in North Darfur. Plaintiff witnessed aerial bombing, fighters on foot, fighters on camels or horseback, gunfire, heavy machine gunfire, and beating and killing of civilians. Plaintiff's house and farm were destroyed in the attack. He was forcibly displaced from his home, fleeing Sudan in 2004, arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer from diseases, depression, nightmare, anxiety, trouble sleeping, fear for his safety and fear for his family members, as well as a loss of property and sources of income.

96.     Plaintiff Musa Babiker Ali Hussein was born January 1, 1983 and resides in Lincoln, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those

funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003 and 2004, Plaintiff's village in Kutum suffered multiple attacks by government soldiers and the Janjaweed.  They would begin early in the morning while those in the village slept, stealing the livestock and burning village homes. Plaintiff witnessed aerial bombing, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, beating and killing of civilians, as well as stealing and killing of livestock. Plaintiff's brother, uncle, and two cousins were killed in an attack. Plaintiff was beaten all over his body with a stick. Plaintiff's family owned six houses, all of which were burned, and hundreds of livestock, all of which were stolen. He was forcibly displaced from his home, fleeing Sudan in 2010, arriving in the United States in 2014 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to receive an education, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy, and feeling as if he does not have a future, as well as a loss of property and sources of income.

97.     Plaintiff Abdelkarim Mohamed Togol Baket Bakhit was born May 7, 1945 and resides in Greensboro, NC. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers and the Janjaweed attacked Plaintiff's Tayara in Tawila. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, beating, raping, and killing of civilians, as well as stealing and killing of livestock. Plaintiff witnessed his family members being beaten and injured, and three of Plaintiff's cousins were killed. His home was burned down and livestock were

stolen. He was forcibly displaced from his home, fleeing Sudan in 2005, arriving in the United States in 2012 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, nightmares, trouble sleeping, and feeling easily startled, as well as a loss of property and sources of income.

98.     Plaintiff Mohamed Abdalla Mohamud was born January 1, 1986 and resides in Anchorage, AK. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, the Janjaweed attacked Plaintiff's village, Dokoyat. Plaintiff witnessed gunfire, fighters on camels and horses, burning of homes, the beating, raping, kidnapping, and killing of civilians, as well as the theft of livestock. Plaintiff's home was looted and burned and his livestock was stolen. He was forcibly displaced from his home, fleeing Sudan in 2007, arriving in the United States in 2012 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer fear for his safety, intrusive thoughts, flashbacks, nightmares, and feeling distant from his loved ones, as well as a loss of property and sources of income.

99.     Plaintiff Hassen A Mohamed Ismael was born January 1, 1987 and resides in Jacksonville, FL. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and the Janjaweed attacked Plaintiff's village, Khaterta. Plaintiff witnessed fighters on horses or camels, gunfire, heavy machine gunfire, burning of homes, beating, raping, kidnapping and killing of civilians, as well as stealing of livestock. The Janjaweed burned Plaintiff's house and stole Plaintiff's livestock and food supplies. Plaintiff witnessed the murder

of his family members, neighbors and friends. He was forcibly displaced from his home, fleeing Sudan in 2003, arriving in the United States in 2012 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work or receive an education, difficulty concentrating, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy, and feeling as if he does not have a future, as well as a loss of property and sources of income.

100.    Plaintiff Yakoub A Yakoub was born January 2, 1969 and resides in Denver, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2005, government soldiers and the Janjaweed attacked Plaintiff's village, Abu Zariga. Plaintiff witnessed aerial bombing, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. Plaintiff lost his home and all of his livestock in the attack. He was forcibly displaced from his home, fleeing Sudan in 2005, arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, trouble sleeping, feeling distant from his loved ones, flashbacks, intrusive thoughts, nightmares, trouble sleeping, difficulty concentrating, feeling easily startled, loss of interest in activities he used to enjoy, fear for his safety and the safety of his family members, as well as a loss of property and sources of income.

101.    Plaintiff Saleh Mohamed Ahmed was born January 1, 1994 and resides in Denver, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded

by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and the Janjaweed attacked Plaintiff's village, Arfait in North Darfur. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, beating, raping and killing of civilians, as well as stealing and killing of livestock.  They attacked early in the morning and Plaintiff's father told him to hide in the grass. While he was there, Plaintiff saw the Janjaweed shoot his father more than 5 times, killing him.  Over 30 other people were killed in Plaintiff's village that day, including Plaintiff's brother, three uncles, and two cousins. Several people were killed by being thrown into burning buildings. They burned pregnant women and children with boiling water. Plaintiff's home and farm were burned and his livestock was stolen. He was forcibly displaced from his home, fleeing Sudan in 2003, arriving in the United States in 2013 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, nightmares, feeling jumpy and easily startled, depression, anxiety, fear for his safety and the safety of his family members, trouble sleeping, and feeling distant from his loved ones, as well as a loss of property and sources of income.

102.   Plaintiff Yagoub Omer Elsheikh was born January 1, 1983 and resides in Jacksonville, FL. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers, security services and the Janjaweed attacked Plaintiff's village, Tondosa. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, use of chemical weapons, burning of homes, beating, raping, kidnapping and killing civilians, as well as stealing and killing of livestock. Most of Plaintiff's family, 13 members, were killed when the Janjaweed

burned down a building with them inside. All of the houses in the village were burned, including Plaintiff's. All of Plaintiff's livestock was stolen. He was forcibly displaced from his home, fleeing Sudan in 2010, arriving in the United States in 2014 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer anxiety, depression, fear for his safety and the safety of his family members, trouble sleeping, feeling distant from his loved ones, and flashbacks, as well as a loss of property and sources of income.

103.   Plaintiff Shadia Mokhtar Hamad Abdelrhaman was born January 1, 1981 and resides in Aurora, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and the Janjaweed attacked Plaintiff's village, Disa in Al-Kamil. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, gunfire, heavy machine gunfire, burning of homes, beating, raping, kidnapping and killing of civilians, as well as stealing and kidnapping of livestock. The entire village was burned, including Plaintiff's home and her father's shop. Plaintiff's father, father-in-law and two of her cousins were killed in the attack. All of her family's livestock were stolen. Following the attack, Plaintiff stayed with her family in the bush, before moving onto Khashum Kuma, which was also attacked. She was forcibly displaced from her home, fleeing Sudan in 2010, and arriving in the United States in 2012 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for her safety and the safety of her family members, nightmares, trouble sleeping, feeling distant from her loved ones, reduced ability to receive an education, difficulty concentrating, and a loss of interest in activities she used to enjoy, as well as a loss of property and sources of income.

104.    Plaintiff Ismail Abbas was born January 1, 1977 and resides in Grand Island, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers, government police, and the Janjaweed attacked Plaintiff's village in Darfur. Plaintiff witnessed aerial bombing, gunfire, beating, kidnapping and killing of civilians, as well as killing of livestock.  Plaintiff suffered a gunshot wound, a number of his family members were shot and killed and his home was burned. During the attack, he witnessed the murder of women and children. In 2002, the Janjaweed arrested Plaintiff and detained him in an outdoor camp for 24 hours. During that time, Plaintiff was subjected to being tied in painful positions, beatings, beatings on the soles of his feet or his hands, nail removal, blindfolding, starvation, forced standing for long periods, hanging from hands or feet, and forced witnessing of others being tortured.  His friends were killed next to him and he had to watch while the Janjaweed carried women away to rape them. He was forcibly displaced from his home, fleeing Sudan in 2010, and arriving in the United States in 2014 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work, and a loss of interest in activities he used to enjoy, as well as a loss of property and sources of income.

105.    Plaintiff Maria Adam Salih was born January 1, 1965 and resides in Portland, ME. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers, government police and the Janjaweed attacked Plaintiff's village, Arwallah. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on

horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, use of chemical weapons, beating, raping, kidnapping and killing civilians, as well as stealing and killing of livestock. Her mother and father were killed by members of the Janjaweed. Her house was burned and her livestock were stolen in the attack. She was forcibly displaced from her home, fleeing Sudan in 2004, and arriving in the United States in 2014 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, anxiety, fear for her safety and the safety of her family members, nightmares, memory loss, trouble sleeping, feeling distant from her loved ones, anger, reduced ability to work, reduced ability to receive an education, flashbacks, feeling easily startled, loss of interest in activities she used to enjoy, and feeling as if she does not have a future,  as well as a loss of property and sources of income.

106.     Plaintiff James Thon Aleer was born January 1, 1981 and resides in Saint Joseph, MO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998, government soldiers and government police attacked Plaintiff's village in Panagor, Jonglei State. Plaintiff witnessed fighters on foot, military vehicles, gunfire, heavy machine gunfire, burning of homes, beating, raping and killing of civilians, as well as stealing and killing of livestock. Plaintiff's uncle was killed in the attack and Plaintiff's home and farm were burned. All of Plaintiff's livestock were stolen or killed.  He was forcibly displaced from his home, fleeing Sudan in 1998, and arriving in the United States in 2001 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from his

loved ones, anger, reduced ability to work or receive an education, difficulty concentrating, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy, and feeling as if he does not have a future, as well as a loss of property and sources of income.

107.    Plaintiff Malual Manyok Deng Duot was born January 1, 1982 and resides in Blue Springs, MO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998, government soldiers attacked Plaintiff's village in Eastern Equatoria. Plaintiff witnessed aerial bombing, beating and killing of civilians, burning of homes, and the stealing and killing of civilians. Plaintiff's father and stepmother were killed during the attack, his home was burned and his livestock was stolen. He was forcibly displaced from his home, fleeing Sudan in 2009, and arriving in the United States in 2012 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer disease, depression, fear for his safety and the safety of his family members, feeling distant from his loved ones, reduced ability to work or receive education, and a loss of interest in activities he used to enjoy, as well as a loss of property and sources of income.

108.    Plaintiff Amir Suleiman Shawkar was born February 25, 1978 and resides in Kansas City, MO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2005, Plaintiff was arrested in Nyala by government security services and government police. Plaintiff witnessed fighters on foot and heavy machine guns mounted to trucks. They looted Plaintiff's home, stealing all of his belongings. Plaintiff was detained for over a month at a police station. During that time, Plaintiff was subjected to strip searches, insults, beatings, beatings on the soles of his feet or his hands, nail removal, and stabbings. He was forcibly displaced from his

home, fleeing Sudan in 2005, and arriving in the United States in 2009 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer disease, depression, fear for his safety and the safety of his family members, trouble sleeping, and feeling distant from his loved ones, as well as a loss of property and sources of income.

109.    Plaintiff Abdelazim Adam Ahmed Abdelmoula was born January 1, 1986 and resides in Lexington, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers, government police and the Janjaweed attacked Plaintiff's village, Kutum-Fono in North Darfur. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock.  Plaintiff's eye was injured in the fires set by the Janjaweed and his grandfather was burned to death. All of Plaintiff's livestock was taken and the village was burned to the ground, including Plaintiff's family's property.  In 2005, government policy arrested Plaintiff in Khartoum and kept him in a prison for 1 month.   During that time, Plaintiff was subjected to forced confession, being tied in painful positions, and beatings. His left arm was broken. He was forcibly displaced from his home, fleeing Sudan in 2011, arriving in the United States in 2014 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, fear for his safety and the safety of his family members, trouble sleeping, anxiety, nightmares, and feeling as if he does not have a future, as well as a loss of property and sources of income.

110.    Plaintiff Yor Chol Yor was born January 1, 1965 and resides in Milan, MO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP— Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998, security forces attacked Plaintiff at his home near the Souk Arabi, a marketplace in Khartoum at which he worked. Plaintiff was at work in the Souk Arabi marketplace when the security forces arrived at his home. When he arrived at his home after work, his wife was tied up and surrounded by security forces; the security forces asked him if he was the owner of his house, and after he responded "yes," the security forces forcibly removed his wife from the home. Plaintiff also witnessed beating, kidnapping and killing of civilians. He was beaten with sticks alongside other students and was accused of being a rebel. His niece was kidnapped and raped, and his nephews were taken. Plaintiff was detained by security forces in a ghost house for 4 months, where he witnessed people being killed and dragged and dumped into a nearby river. During that time, Plaintiff was subjected to interrogation, forced confession, accusations of supporting political opposition, insults, being tied in painful positions, beatings, blindfolding, sleep deprivation, starvation, forced standing for long periods, mock execution, threats to loved ones, and extreme temperatures. He had bruises on his back, chest, legs and arms. He was forcibly displaced from his home, fleeing Sudan in 1998, and arriving in the United States in 2001 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work and receive an education, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy, and feeling as if he does not have a future, as well as a loss of property and sources of income.

111.    Plaintiff Morwel Mathiang Deng was born January 1, 1985 and resides in Milan, MO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998, government soldiers and the Janjaweed attacked Plaintiff's village, Gok Amiol in Turalei, Warrap. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. One of Plaintiff's uncles was shot and some of his friends were kidnapped. Plaintiff's property was burned and his livestock were stolen in the attack. He was forcibly displaced from his home, fleeing Sudan in 1998 and arrived in the United States in 2000 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, difficulty sleeping, fear for his safety and the safety of his family members, and nightmares, as well as a loss of property and sources of income.

112.    Plaintiff Thon Majak Deng was born January 1, 1978 and resides in Kansas City, MO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998, government soldiers, security services and government police attacked Plaintiff's village in Rumbek in the Lake State. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, military vehicles, gunfire, heavy machine gunfire, burning of homes, use of chemical weapons, beating, raping and killing of civilians, as well as killing of livestock. Plaintiff witnessed the torture and murder of his brother and uncle during the attack. His mother died of exhaustion after fleeing the attack. Plaintiff's home and land were burned. He was forcibly displaced from his home, fleeing Sudan in 2000 and arrived in the United States in 2001 as a

refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, trouble sleeping, feeling distant from his loved ones, anger, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy, and feeling as if he does not have a future, as well as a loss of property and sources of income.

113.    Plaintiff Ishag Othman Adam Ahmed was born January 1, 1982 and resides in East Moline, IL. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2006, government soldiers, security services, and the Janjaweed attacked Plaintiff's village, Alshariah Sadah in South Darfur. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, and beating, raping, kidnapping and killing of civilians. During the attack, Plaintiff's leg was broken after being hit by a heavy machine gun and his uncle was killed.  The entire village was burned, including Plaintiff's home and farms, and many people in the village were killed.  All of his livestock were stolen. He was forcibly displaced from his home, fleeing Sudan in 2010 and arriving in the United States in 2015 as a refugee.  As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, depression, anxiety, fear for his safety and the safety of his family members, nightmares, trouble sleeping, feeling distant from his loved ones, anger, and a reduced ability to work or receive an education, as well as a loss of property and sources of income.

114.    Plaintiff Suleiman Mohamed Saleh was born May 10, 1974 and resides in Columbus, OH. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of

those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers and the Janjaweed attacked Plaintiff's village, Kapka in North Darfur. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, gunfire, heavy machine gunfire, burning of homes, beating, raping and killing of civilians, as well as stealing and killing of livestock. Plaintiff's home, farm and crops were burned and his livestock was stolen.  He was forcibly displaced from his home, fleeing Sudan in 2004 and arriving in the United States in 2008 as a refugee.  As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer disease, depression, fear for his safety and the safety of his family members, intrusive thoughts, trouble sleeping, feeling distant from his loved ones, reduced ability to receive an education, difficulty concentrating, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy, and feeling as if he does not have a future, as well as a loss of property and sources of income.

115.    Plaintiff Joseph Ajeo Moilinga was born January 1, 1977 and resides in La Mesa, CA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998, government soldiers attacked Plaintiff's village, Nimule. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, gunfire, heavy machine gunfire, and beating, raping and killing of civilians. In the attack, Plaintiff was injured by shrapnel and his father was killed in an airstrike. His home was completely razed. He was forcibly displaced from his home, fleeing Sudan in 1998 and arriving in the United States in 2001 as a refugee.  As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, fear for his safety, nightmares, trouble

sleeping, anger, and a reduced ability to receive education, as well as a loss of property and sources of income.

116.    Plaintiff Kristena Peter Rufael was born October 28, 1992 and resides in San Diego, CA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998, government soldiers and Janjaweed attacked Plaintiff's village in Wau. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. Plaintiff injured her leg when she fell running away, her mother was beaten, and her uncles were beaten with weapons while trying to protect Plaintiff. Plaintiff's home and land was burned. He was forcibly displaced from his home, fleeing Sudan in 1999 and arriving in the United States in 2003 as a refugee.  As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for her safety and the safety of her family, trouble sleeping, anger, and feeling as if she does not have a future, as well as a loss of property and sources of income.

117.    Plaintiff Elaf Rufael was born May 26, 1997 and resides in San Diego, CA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998, government soldiers and Janjaweed attacked Plaintiff's village in Wau. She was forcibly displaced from her home, fleeing Sudan in 1999 and arriving in the United States in 2003 as a refugee.  As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical and psychological injuries, as well as a loss of property and sources of income.

118.    Plaintiff Noureldin Mahdi Abdalla Eltom was born November 28, 1961 and resides in San Diego, CA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and Janjaweed attacked Plaintiff's village in Marla, South Darfur. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, burning of homes, beating, raping, and killing of civilians, as well as stealing and killing of livestock. Plaintiff was burned on his leg and was cut along his neck with a knife, leaving a long scar. His father-in-law, brother, uncle and many others were killed in the attack. Plaintiff lost his house, livestock and all of his property in the attack. His bus and Land Rover were taken or destroyed. In 2003, Plaintiff was arrested by government security services and detained for three weeks in a camp near Nyala, during which he endured interrogation, racial insults, beatings, starvation, water deprivation, mock execution, and forced confession. He was forcibly displaced from his home, fleeing Sudan in 2005 and arriving in the United States in 2007 as a refugee.  As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, nightmares, memory loss, anger, reduced ability to work, and feeling easily startled, as well as a loss of property and sources of income.

119.    Plaintiff Arbab Abdallah Adam was born September 17, 1981 and resides in San Diego, CA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, the Janjaweed attacked Plaintiff's village in Trababa. Plaintiff experienced physical injuries and sexual assault. Plaintiff witnessed the attack and burning of his property and village and killing Plaintiff's father, fraternal cousin and uncle, 2 maternal cousins, losing 5 relatives in total. Plaintiff

was forcibly displaced from his home, and fled Sudan in 2004. He arrived in the United States in 2016 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional, psychological injuries including, disease malnutrition, depression, anxiety, fear for Plaintiff's safety and the safety of other family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from loved ones, loss of interest in activities Plaintiff used to enjoy, and feeling as if Plaintiff does not have a future, as well as a loss of property, including house, farm, shop and sources of income.

120.    Plaintiff Moustapha Ibrahim Mahamat was born January 1, 1977 resides in Stone Mountain, GA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers, security services, and the Janjaweed attacked Plaintiff's village in Kododhan, near Geneina, West Darfur. Plaintiff witnessed the attack and burning of his property and village, and the killing of his father and brother. Plaintiff was caught, tied up in a painful position, beaten, kicked and hit with objects, cut on finger, and forced to stand for a long period of time. Plaintiff was forcibly displaced from his home and fled Sudan in 2003. He arrived in the United States in 2015 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional, psychological injuries, including, disease, malnutrition, depression, anxiety, fear for the safety of self and family members, intrusive thoughts, nightmares, trouble sleeping, feeling distant from loved ones, anger, reduced ability to work or receive an education, difficulty concentrating, flashbacks, loss of interest in activities that Plaintiff used to enjoy, feeling as if he has no future, as well as a loss of property, including house, farm, livestock and sources of income.

121.     Plaintiff Samia Arbab Abdurhaman was born January 1, 1987 and resides in San Diego, CA. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers, security services, government police, and the Janjaweed attacked Zaway, in West Darfur, a suburb of Geneina, where Plaintiff was living. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters in military vehicles, heavy machine gunfire, use of chemical weapons, beating, raping, kidnapping and execution of civilians, as well as killing and stealing of livestock. Plaintiff's brother and uncle were killed during the attack. Plaintiff was forcibly displaced from her home, fleeing Sudan in 2004 and arriving in the United States in 2016 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer anxiety, fear for her safety, intrusive thoughts, trouble sleeping, anger, difficulty concentrating, and feeling easily startled as well as a loss of property and sources of income.

122.     Plaintiff Hamra Ibrahim Fadoul was born January 1, 1971 resides in Aurora, CO. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers, the Janjaweed attacked Plaintiff's village in Jadulta. Plaintiff witnessed the attack and burning of her property and village and the attack on her daughter where she injured her leg. Plaintiff was forcibly displaced from her home and fled Sudan in 2003. She arrived in the United States in 2015 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional, psychological injuries, including fear for the safety of Plaintiff and other family members, feeling

distant from loved ones, reduced ability to work, as well as a loss of property, including house, livestock, pets and sources of income.

123.    Plaintiff Djouma Arbab Adam was born January 1, 1987 and resides in Columbus, OH. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers, security services, government police and Janjaweed attacked Ahrara, in Darfur, where he was living. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on horses or camels and in military vehicles, heavy machine gunfire, setting fires to homes, beating, raping, kidnapping, executing civilians, as well as stealing and killing livestock. He was forcibly displaced from his home, fleeing Sudan in 2003 and arriving in the United States in 2015 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work, difficulty concentrating, flashbacks, feeling easily startled, and loss of interest in activities he used to enjoy,  as well as a loss of property and sources of income.

124.    Plaintiff Matar Makine Abakar was born January 1, 1980 and resides in Baltimore, MD. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and Janjaweed attacked Bida, Sarfia, in West Darfur, where Plaintiff was living. Plaintiff witnessed fighters on horses and camels, military vehicles, gunfire, beatings, burning of homes and stealing livestock. During the attack, Plaintiff was shot in the back and then beat with the gun. When he fell to the ground, the Janjaweed surrounded him, took out large

swords, and cut him in different places on his head. The cut to his forehead was the deepest and penetrated his skull. The Janjaweed continued to beat him with swords and sticks, fracturing his left arm and disabling his pinky finger on his left hand. Plaintiff was shot in his right ear as well. He is currently taking medication for his headaches following this attack and he continues to feel pain in his lower left arm.  He was forcibly displaced from his home, fleeing Sudan in 2003 and arriving in the United States in 2015 as a refugee. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, and in addition to his physical injuries, Plaintiff continues to suffer depression, fear for his safety and the safety of his family members, nightmares, trouble sleeping, anger, and flashbacks, as well as a loss of property and sources of income.

125.    Plaintiff Yakub Haroun Abdulmola was born January 1, 1985 and resides in Lexington, NE. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, the Janjaweed, and/or other pro-government militia. In 2003, government soldiers attacked Merreh, in the vicinity of Zalingei in Darfur, where Plaintiff was living. Plaintiff witnessed aerial bombings, shelling from artillery or tanks, fighters on horses or camels, military vehicles, heavy machine gunfire, burning of homes, use of chemical weapons, kidnapping, raping, beating and executing civilians, as well as killing and stealing of livestock. In the attack, Plaintiff's father and brother were killed when their house was bombed and Plaintiff lost all livestock and land to the Janjaweed. In 2003, government military and Janjaweed detained Plaintiff for approximately 3 months, in a detention center in Darfur and subjected Plaintiff to interrogation, insults, beatings, blindfolding, sleep deprivation, starvation, forced standing, threats to loved ones, witnessing others being tortured, extreme temperatures and suffocation. Plaintiff was swollen all over his body and was bleeding

from his head, face, nose and ears. He did not know if he was going to live to see the next day or

if his family was alive; he thought he was going to die. He was forcibly displaced from his home,

fleeing Sudan in 2003 and arriving in the United States in 2014 as a refugee. As a result of the

human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff

continues to suffer severe emotional distress, fear of police, depression, anxiety, fear for his safety

and the safety of his family members, intrusive thoughts, nightmares, trouble sleeping, feeling

distant from his loved ones, anger, reduced ability to work, difficulty concentrating, flashbacks,

feeling easily startled, and loss of interest in activities he used to enjoy, as well as a loss of property

and sources of income.

126.   BNPP's actions were a substantial factor in causing the foreseeable harm described

above to each of the Plaintiffs.

**B.   Defendants**

127.   Defendant BNP Paribas, S.A. is a global financial institution headquartered in Paris,

France.  BNP Paribas, S.A. came into existence in May 2000 as the result of a merger of Banque

Nationale de Paris S.A. and Banque de Paris et des Pays-Bas S.A.[9]  BNPPSA is the ultimate parent

of its U.S. branch office and has its U.S. headquarters located at The Equitable Tower, 787 Seventh

Avenue, New York, New York 10019.  BNPPSA is also the parent of its subsidiary, BNPP Geneva

(BNP Paribas (Suisse) S.A.), located in Geneva, Switzerland ("BNPP Geneva").  BNPPSA pled

guilty for U.S. Sanctions violations and criminal conduct committed by its subsidiaries, including

BNPP Geneva and BNPPNY.

---

[9] Each of the two parent banks descended from four founding banks:  BNP resulted from the 1966
merger of two French banks, Banque Nationale Pour le Commerce et l'Industrie ("BNCI"), and
Comptoir National d'Escompte de Paris ("CNEP"); Paribas was formed in 1872 from two
investment banks based in Paris and Amsterdam.

128.    Defendant BNP Paribas, S.A. New York Branch a/k/a BNP Paribas is registered with the New York State Department of Financial Services as a "foreign bank branch."  Its offices are located at 787 Seventh Avenue, New York, New York, 10019.

129.    Defendant BNP Paribas US Wholesale Holdings, Corp. (f/k/a BNP Paribas North America, Inc.) ("BNPPNA") is a U.S. subsidiary of BNPPSA.  It is incorporated in Delaware and registered to do business in New York as a foreign business corporation.  Its offices are located at 787 Seventh Avenue, New York, New York, 10019.

130.    Plaintiffs are informed and believe and thereon allege that at all times herein mentioned each Defendant sued herein was the agent, alter ego, subsidiary, and/or employee of each of the remaining Defendants and at all times was acting within the purpose and scope of such agency, alter ego, subsidiary relationship, or employment, with the permission and consent of their Co-Defendants and with the knowledge, authorization, permission, and consent and/or subsequent ratification and approval of each Co-Defendant.

### III.    JURISDICTION AND VENUE

131.    This Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) because the matter in controversy as to each Plaintiff exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States, citizens of a State and citizens or subjects of a foreign state, or citizens of different States and citizens or subjects of a foreign state are additional parties.

132.    This Court has personal jurisdiction over BNPPSA because BNPPSA, *inter alia*, purposefully availed itself of the New York forum and transacted business in New York under CPLR § 302(a)(1) by deliberately processing thousands of financial transactions in U.S. dollars, from and through the New York financial system, beginning in 1997 through 2007, which it knew were in violation of U.S. Sanctions and New York law.  BNPPSA also knew that its actions would

cause foreseeable harm to the Plaintiffs.  Personal jurisdiction is also proper under CPLR § 302(a)(2) because BNPPSA committed these tortious acts within the state as alleged herein. These acts were confirmed by BNPPSA's admitted crimes in this district in the criminal prosecutions by the United States and the DANY.  Indeed, both this Court and the New York State Supreme Court exercised jurisdiction over BNPPSA when BNPPSA pled guilty.

133.     This Court has personal jurisdiction over BNPPNY because, *inter alia*, New York is its principal place of business.  Its address is 787 Seventh Avenue, New York, New York 10019. BNPPNY transacts business in New York as defined by CPLR § 302(a).   BNPPNY is headquartered in New York.  BNPPSA used BNPPNY as a conduit for thousands of financial transactions in, from, and through New York beginning in 1997 through 2007.  Personal jurisdiction is also appropriate under CPLR § 302(a)(2) because BNPPNY committed tortious acts within the state as alleged herein and confirmed by its admitted crimes in this district in the criminal prosecutions by the United States and the DANY and the consent order BNPPNY entered into with the DFS.

134.     This Court has personal jurisdiction over BNPPNA, *inter alia*, because its principal place of business is located in this state at 787 Seventh Avenue, New York, New York, 10019. BNPPNA transacts business in New York as defined by CPLR § 302(a) in that its New York office was used as part of BNPP's scheme to conduct thousands of financial transactions in, from, and through New York beginning in 1997 through 2007.  Personal jurisdiction is also proper under CPLR § 302(a)(2) because BNPPNA committed tortious acts within the state as alleged herein.

135.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a) and (b)(1), (2), and (3).  First,     venue is proper under (b)(1) because BNPPNY's principal place of business is New

York.  Further, BNPPSA is a resident under (c)(2) because it is subject to the Court's personal jurisdiction with respect to the civil action in question.

136.    Second, venue is proper under (b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" occurred in this judicial district.  Here, a substantial part of the events or omissions that gave rise to the claims occurred within New York and this district, including the criminal investigations, charges, and convictions.  As the United States' global financial center, New York was inextricably linked to BNPP's criminal conduct, which in turn, essential for the GOS to have the resources to perpetrate its campaign of violence against Plaintiffs.  Although dollar-denominated transactions can clear elsewhere in the United States, the New York City-based Clearing House Interbank Payments System ("CHIPS") handles approximately 95% of all cross-border U.S. dollar payments.  Thus, without New York, the global locus for financial clearinghouse services for petrodollars, BNPP would not have been able to provide access to U.S. dollars and the U.S. financial system that the GOS needed to circumvent the U.S. Sanctions.  Further, BNPP cleared transactions in New York, thereby placing the funds at issue here in New York, yielding another basis for venue.

137.    The fact that the DANY investigated, charged, and convicted BNPP for falsifying business records demonstrates that BNPP committed illegal actions in New York and under New York state law, *e.g.*, "cooking" its records to cover up its violations of the U.S. Sanctions and/or formulating its intent to do the same, in New York.  Importantly, this criminal charge was not limited to the period in which BNPP used its New York Branch to process the illicit transactions. The charges included the time period after 2004 in which BNPP used a third-party correspondent bank to process transactions in New York on Sudan's behalf.

138.    The fact that venue is proper here is confirmed by the fact that New York State law regulated BNPP's conduct, and New York state-based prosecutors and agencies, including the DANY, the DFS, the U.S. Attorney for the Southern District of New York, and the FRB-NY, exercised investigatory and regulatory authority over BNPP.

139.    Further, the Southern District is the proper forum because much of the evidence relevant to proving Plaintiffs' causes of action is already in New York.  During the investigations by multiple government agencies in New York, the agencies collected extensive information from BNPP, much of which demonstrates BNPP's liability.  Further, BNPPNY and the third party correspondent bank that BNPP also used to process financial transactions in New York, key components of the criminal conduct that is the subject of this suit and the above-mentioned investigations, are located in New York.

## IV.    FACTUAL BACKGROUND

### A.    The Government of Sudan Sought to Exploit Its Oil Resources to Maintain Power and Fund a Campaign of Mass Atrocities

#### 1.    The al-Bashir Regime

140.    Sudan was, until the July 2011 secession of South Sudan, Africa's largest country, but despite being endowed with a wide variety of natural resources, it remains one of the poorest countries in the world.  It has been torn by civil strife since achieving independence in 1956, with a multitude of violent, interlocking conflicts in Western, Central, Eastern, and Southern Sudan. The root cause of the decades of catastrophic violence is the continued dominance of certain groups from Khartoum and the surrounding Nile Valley.  To maintain its position of wealth and power, these riverine elite followed a strategy of divide and rule.  In the process, the elite have used religion, ethnicity, and language to divide and oppress disfavored groups, and have left the vast majority of the Sudanese in dismal poverty.

141.    This long history of oppression and division entered one of its darkest chapters in June 1989, when a cabal of Islamist politicians and military officers took power in a coup against a democratically elected government.  The coup installed Omar Hassan al-Bashir as head of the Revolutionary Command Council for National Salvation, the authority by which the junta exercised control.  Under the reign of al-Bashir and his allies, the GOS conducted a bloody and ever-intensifying campaign of violence against those in the south, east, and west of the country who might stand in the way of its efforts to consolidate power and expand oil exploration and revenue, including those disfavored civilians living in oil rich regions.

142.    Notably, even in the early 1990s, the human rights violations by the al-Bashir regime were internationally reported.  For example, in 1990, Africa Watch, a prominent African NGO, released one of the first major independent accounts of the crisis in the country, "Sudan, a Human Rights Disaster," which garnered substantial international media attention.[10]  In 1993, the U.S. designated Sudan as a state sponsor of terrorism, a designation that it still has.  And, in 1996, Human Rights Watch published a book-length report, "Behind the Red Line: Political Repression in Sudan," describing the violently coercive control the GOS imposed to discipline and punish its own citizens.  That report generated considerable international attention.[11]

---

[10] *See, e.g.*, Neil Henry, Life in Impoverished Sudan Grows Harder after Failed Coup, Wash. Post, May 24, 1990, at A45; Famine 'Used as Weapon', Guardian, Mar. 19, 1990; Michael A. Hiltzik, Sudan Accused of 'Brutal Repression' of Opposition: Human Rights: Hundreds were Jailed, Tortured or Hanged, the Africa Watch Group Reports, L.A. Times, Mar. 15, 1990.

[11] Human Rights Watch, Sudan: Rights Group Calls on Sudan to Open Secret Trials, Africa News, Sept. 13, 1996; Sudan: Slavery and War Abuses Continue, Rights Group Says, Inter Press Service, May 29, 1996; Abed Jaber, Rights Groups Accuses Sudan of Abuses, United Press Int'l, May 28, 1996.

### 2.      Sudan's 1997 Entry Into International Oil Markets

143.    The GOS, as part of its efforts to consolidate power and enrich itself, sought to develop Sudan's oil resources.  Although major oil deposits were discovered in southern Sudan beginning in 1979, efforts to exploit them, through concessions to foreign operators, had been frustrated by the on-going civil war, especially in the period following 1983, known as the Second Civil War.

144.    Beginning in 1995, the GOS looked to jump-start its oil production to obtain much needed revenue.  Given the lack of domestic know-how, the GOS needed to attract foreign partners with the technical ability to drill and export the oil.  To this end, al-Bashir visited China in 1995.  There, he signed an agreement with the China National Petroleum Corporation ("CNPC") to develop an oil rich region called Block Six, which is in the Muglad Basin in the Kordofan and Abyei regions.[12]  Two years later, CNPC and its partners, including Arakis Energy Corporation, a Canadian company that was taken over by Talisman Energy, Inc. ("Talisman") in 1998, formed a joint operating company, known as the Greater Nile Petroleum Operating Company ("GNPOC") to develop Blocks One, Two, and Four.

145.    By 1997, Sudan's effort to develop its oil reserves were well underway and it began planning to begin exporting oil.  This represented an auspicious opportunity for the regime to tap into new sources of funding for the military, but also to reward its key constituencies who had supported the military-Islamist government.  Thus, from the onset, the regime saw politics and the economy as mutually constitutive:  Political power was to be buttressed and expanded through the military and through wealth accumulation for new elites fiercely loyal to the new order, and,

---

[12] Sudan's oil fields are divided into a series of "blocks," each of which has been allocated to a different concessionaire.  Sudan awarded many of these blocks to foreign concessionaries to develop.

conversely, political networks were put at the service of enriching those deemed to deserve it for their support of the regime.

### 3.    To Capitalize on Oil Exports, the GOS Needed Access to "Petrodollars," Which BNPP Agreed to Provide

146.    The GOS, like other oil exporters, sought to market and sell its oil globally.  In 1997, as now, that meant selling its oil for U.S. dollars, a/k/a "petrodollars," because that would maximize the revenues from its oil and give it U.S. dollars with which to import goods.

147.    Oil transactions on the global market are priced and settled in U.S. dollars.  This is so for many reasons:  As the global reserve currency, the dollar is considered uniquely stable and easily convertible, unlike the currencies of many other countries with a large presence in the oil trade; the bulk of international trade is priced and transacted in U.S. dollars; over half of the world's central banks' foreign currency reserves are held in dollars; the United States has historically been a major buyer and seller in the global oil market; and the OPEC countries, which account for the bulk of global oil exports, price their oil in U.S. dollars.

148.    For the GOS, like other oil exporters, to sell oil in dollars meant that it needed access to the U.S. financial system.  Because of the structure and organization of global financial markets, transactions settled in dollars must be processed through the U.S. financial system in the United States.  As mentioned above, the New York City-based CHIPS handles approximately 95% of all cross-border U.S. dollar payments.  Payments flow through CHIPS even if both the payer and recipient are based outside of the United States.[13]  Foreign banks settle U.S. dollar transactions

---

[13] See Barry E. Carter & Ryan Farha, Overview and Operation of U.S. Financial Sanctions, Including the Example of Iran, 44 Geo. J. Int'l L. 903-913 (2013).

either through a United States-based subsidiary or a correspondent bank based in the United States.[14]

149.   The GOS's alternatives to selling oil in U.S. dollars were significantly less advantageous, a fact confirmed by the experience of other oil producers like Iraq and Iran that suffered under U.S. Sanctions.  Without access to dollars via the U.S. financial system, the GOS would either have had to (*i*) barter its oil in exchange for other goods or services, or (*ii*) accept other currencies, both of which have significant drawbacks.

150.   Bartering limits potential counterparties to those that have something the oil producer wants and who, in turn, want oil.  Russia and China, two of the GOS's main weapons suppliers, are the second and fifth largest global oil producers and therefore are unlikely barter partners for Sudan's oil.  Bartering also requires shipping oil to the counterparty, which can be an expensive or difficult proposition.  Similarly, using an alternative currency is generally financially disadvantageous.  Currencies other than the U.S. dollar are less stable and less convertible, and therefore they increase transaction costs due to risk discounts and currency arbitrage.

151.   Access to letters of credit from reputable, internationally known banks such as BNPP, including letters of credit denominated in U.S. dollars, was also crucial to the GOS's ability to monetize its oil from and after the late 1990s, both for its exports and imports.

152.   Letters of credit are an essential part of trade finance, where payment for imported goods is not made at the time of delivery (typically, it is made thirty days after).  In international trade, assessing the creditworthiness of counterparties in different countries is difficult, and seeking and obtaining compensation for contractual nonperformance is expensive, time-

---

[14] A correspondent bank is a financial institution that provides services on behalf of another financial institution, including wire transfers, business transactions, and accepting deposits.

consuming, and problematic.  Letters of credit are designed to address these issues.  A letter of credit is a commitment to pay by the issuing bank, enabling a seller to substitute the bank's creditworthiness for that of the buyer, and it is used when the transaction value is sizeable.  For example, a single cargo of crude oil could be worth $20 million to $75 million, depending on the price of oil.  A letter of credit guaranteed payment in the case of buyer non-performance.

153.    In addition, when buyers incur costs in purchasing goods (*e.g.*, in chartering a tanker to pick up a cargo of crude oil), or are concerned that sellers may not make delivery on previously agreed pricing terms (*e.g.*, when markets are volatile), sellers may need to post a performance bond, which are often in the form of a letter of credit.

154.    Thus, by 1997, the GOS needed and sought out a banking partner such as BNPP that would be able to settle oil transactions in the U.S. and to provide it with U.S. dollar denominated letters of credit to maximize its exploitation of its oil resources.  The GOS also needed a banking partner willing to violate U.S. Sanctions against prohibiting those very services due to the likely impact on civilian populations.

**B.     U.S. Sanctions Implemented U.S. Policy Opposing the Government of Sudan's Persecution of Disfavored Sudanese Civilians and the Use of Oil Income to Finance Such Persecution**

155.    Just as the GOS was entering the global market for oil and in need of access to the U.S. financial system, the United States implemented and increased its Sanctions on Sudan.  The United States did so, in part, because of the atrocities being committed by the GOS and the fact that oil revenues would undoubtedly boost the GOS's ability to continue them.  The critical role of the U.S financial system in international trade, including the oil industry, were well known in the 1990s, and, when it exercised its sanctions power, the United States did so knowing that a

country cut off from access to it would suffer economically.  They were not paper tigers.  The sanctions were intended and expected to have a material impact on the GOS.

*****

156.    Congress and the Executive Branch recognized the Sudanese people's suffering at the hands of the GOS, their own government, and took action to try to end these atrocities by imposing economic sanctions on Sudan and those that would do business with the GOS.

157.    A 1992 concurrent resolution in the House of Representations and the Senate "condemn[ed] the egregious human rights abuses by the [GOS] and call[ed] upon [it] to cease its abuses of internationally recognized human rights."[15]  Congress admonished the GOS for its "imprisonment, torture, and execution of suspected dissidents across the country," "cruel campaign to relocate some 500,000 internally displaced southerners and westerners from the outskirts of Khartoum to inhospitable camps far from the city," and "campaign of forced displacement of tens of thousands of Nuba from their ancestral homes in southern Kordofan Province, the destruction of Nuba villages, and the killing of hundreds of civilians."[16]

158.    In 1993, the U.S designated Sudan as a state sponsor of terrorism, a designation that it still has today.

159.    In 1995, a U.S. State Department report to Congress principally attributed Sudan's on-going internal havoc to the GOS's campaign of massive human rights abuses.[17]

---

[15] S. Con. Res. 140, 102 Cong., 106 Stat. 5207 (Oct. 6, 1992).

[16] *Id.*

[17] U.S. Department of State Dispatch, U.S. Policy Toward Sudan, Statement by Edward Brynn, Acting Assistant Secretary for African Affairs, before the Subcommittee on Africa, House, International Relations Committee (Mar. 22, 1995).

160.    As the violence persisted and as Sudan was working to exploit its oil resources and begin exporting oil, President Bill Clinton issued Executive Order 13067 on November 3, 1997 ("E.O. 13067"), pursuant to authority granted by, *inter alia*, the IEEPA.[18]

161.    E.O. 13067 was designed to cut off the GOS from the U.S. financial system to deprive the GOS of access to the dollars that it needed to fund its human rights violations.  E.O. 13067 imposed broad economic sanctions that froze GOS assets in the United States and prohibited broad categories of transactions by any individual or entity in the United States with the GOS, its agencies, instrumentalities, and controlled entities, including the Central Bank of Sudan.  The 1997 sanctions covered the import and export of goods, technology, and services, including brokerage, lending, and financing services.[19]  The sanctions did so because "the policies and actions of the [GOS], including continued support for international terrorism; ongoing efforts to destabilize neighboring governments; ***and the prevalence of human rights violations, including slavery and the denial of religious freedom***, constitute an unusual and extraordinary threat to the national security and foreign policy of the United States." (emphasis added)[20]

162.    The 2002 Sudan Peace Act recognized the continuing grave situation on the ground: "The acts of the [GOS] . . . constitute genocide as defined by the Convention on the Prevention and Punishment of the Crime of Genocide."[21]  Congress found that the GOS: (*i*) "intensified its prosecution of the war against areas outside of its control, which has already cost more than 2,000,000 lives and has displaced more than 4,000,000 people;" (*ii*) "used divide-and-conquer

---

[18] Codified at 50 U.S.C. 1701 *et seq.*

[19] Exec. Order No. 13067, 62 Fed. Reg. 59989 (Nov. 3, 1997), reprinted in 31 C.F.R. 538 (62 Fed. Reg. 59989, November 5, 1997).

[20] *Id.*

[21] The Sudan Peace Act, Pub. L. 107-245 at § 2(10), 116 Stat. 1504 (2002) (codified at 50 U.S.C. § 1701 note).

techniques effectively to subjugate its population;" and (*iii*) "utilize[d] and organize[d] militias, Popular Defense Forces, and other irregular units for raiding and enslaving parties in areas outside of [its] control . . . in an effort to disrupt severely the ability of the populations in those areas to sustain themselves."[22]   The Act singled out the GOS's "use of raiding and slaving parties [as] a tool for creating food shortages and [ ] as a systematic means to destroy the societies, culture, and economies of the Dinka, Nuer, and Nuba peoples. . . ."[23]

163.    The Peace Act required the President, after consultations with Congress, to implement further sanctions if the President concluded that the GOS was not making a good faith effort to end the on-going civil war and its human rights abuses.[24]   The Act focused specifically on the direct relationship between GOS's abuses and its access to oil revenues, finding that the GOS "***has repeatedly stated that it intends to use the expected proceeds from future oil sales to increase the tempo and lethality of the war against the areas outside of its control.***"[25] (emphasis added).  To that end, the Act instructed the President to "take all necessary and appropriate steps . . . to deny the [GOS] access to oil revenues to ensure that the [GOS] neither directly nor indirectly utilizes any oil revenues to purchase or acquire military equipment or to finance any military activities."[26]

164.    Forerunning the explicit terms of the Peace Act itself, the Congressional debate on the Peace Act focused repeatedly on the link, recognized at that time, between the GOS's human

---

[22] Pub. L. 107-245 § 2(1)-(7).

[23] *Id*. at § 4(2).

[24] *Id*. at § 6(b).

[25] *Id*. at § 2(8).

[26] *Id*. at § 6(b)(2)(C).

rights abuses and its oil sales, further evidencing Congress's desire to protect the victimized Sudanese people when it enacted the Sudan Peace Act:

- "The Sudanese Government *has increased oil mining in areas inhabited by the southern Sudanese, thereby forcibly displacing the people to finance a more lethal and offensive war.* I would point out to my colleagues that *oil has been facilitating this war, and we have got to be very clear that any way that we help or enable the production of oil in the Sudan means that more innocent people will lose their lives.*"[27]

- "*And for the first time, there will be a link made officially between the genocide and the slaughter in Sudan and oil money.* [28]

- "[T]he bill before us today makes *the express link between oil and the Government of Sudan's intention to use future revenues to expand the war into areas beyond its control.*"[29]

165.    The 2004 Comprehensive Peace in Sudan Act[30] broadened the concerns of the 2002 Act to include the Darfur region,[31] because "both the executive branch and Congress [ ] concluded that genocide has been committed and may still be occurring in the Darfur region, and that the [GOS] and militias supported by the [GOS], known as the Janjaweed, bear responsibility for the genocide."[32]   Congress again recognized the role of oil in fueling the conflict and required the Secretary of State to submit to it a report describing the "*current status of Sudan's financing and construction of infrastructure and pipelines for oil exploitation, the effects of such financing*

---

[27] Statement of Representative Chris Smith, 107 Cong. Rec. H7105 (Daily ed. Oct. 7, 2002) (emphasis added).

[28] Statement of Representative Bachus, *Id*. at H7108 (emphasis added).

[29] Statement of Representative Eddie Bernice Johnson , *Id*. at H7109 (emphasis added).

[30] Comprehensive Peace in Sudan Act of 2004, Pub. L. 108-497, 118 Stat. 4012 (2004).

[31] Pub. L. 108-497 § 4(a).

[32] Pub. L. 108-497 § 3(6).

***and construction on the inhabitants of the regions in which the oil fields are located and the ability of the [GOS] to finance the war in Sudan with the proceeds of the oil exploitation.***"[33]

166.    President George W. Bush issued E.O. 13400 on April 26, 2006 ("E.O. 13400"),[34] which expanded the scope of E.O. 13067 to block property and property interests of certain persons connected to the conflict in Darfur.  E.O. 13400 was in response to "the persistence of violence in Sudan's Darfur region, particularly against civilians and including sexual violence against women and girls, and by the deterioration of the security situation and its negative impact on humanitarian assistance efforts. . . ."

167.    On October 13, 2006, President Bush signed the Darfur Peace and Accountability Act.[35]  Congress found that "the genocide unfolding in the Darfur region of Sudan is characterized by acts of terrorism and atrocities directed against civilians, including mass murder, rape, and sexual violence committed by the Janjaweed and associated militias with the complicity and support of the National Congress Party-led faction of the Government of Sudan."[36]  The Act required that the 1997 sanctions "remain[ed] in effect, and shall not be lifted . . . until the President certifies to the appropriate congressional committees that the [GOS] is acting in good faith to," among other things, "implement the Darfur Peace Agreement," "disarm, demobilize, and demilitarize the Janjaweed and all militias allied with the Government of Sudan," "fully implement the Comprehensive Peace Agreement for Sudan without manipulation or delay," and "withdraw[

---

[33] *Id*. at §8(a)(1) (emphasis added).

[34] Exec. Order No. 13400, 71 Fed. Reg. 25483 (Apr. 26, 2006).

[35] Darfur Peace and Accountability Act of 2006, Pub. L. 109-344, 50 U.S.C. § 1701 (2016).

[36] *Id*. at § 4(1).

] government forces from Southern Sudan consistent with the terms of the Comprehensive Peace Agreement for Sudan."[37]

168.    Days later, President Bush issued Executive Order 13412 ("E.O. 13412"), imposing additional sanctions aimed specifically at the GOS's ability to fuel genocide with oil.  It prohibited "***all transactions by United States persons relating to the petroleum or petrochemical industries in Sudan***, including, but not limited to, oilfield services and oil or gas pipelines. . . ."[38]

169.    As summarized in a 2007 State Department statement of "overall policy": the "United States has imposed economic sanctions on Sudanese individuals and companies owned or controlled by the Government of Sudan to increase pressure on Khartoum to end the violence in Darfur."[39]

170.    Throughout the awful history of the GOS since 1989,

U.S. policy in Sudan [has been] focused on achieving a definitive end to gross human rights abuses and conflicts, including in Darfur, Blue Nile and Southern Kordofan…. Sanctions underscore the U.S. commitment to ending the suffering of millions of Sudanese affected by the crisis in Darfur.[40]

171.    Thus, the U.S. Congress and the Executive Branch recognized the causal link between the GOS's access to the U.S. financial system and resulting increase in the GOS's oil

---

[37] Pub. L. 109-344 § 7(a).

[38] Exec. Order No. 13412, 71 Fed. Reg. 61369 (Oct. 17, 2006) (emphasis added).  The Office of Foreign Assets Control ("OFAC") promulgated the Sudanese Sanctions Regulations on July 1, 1998 to implement E.O. 13067.  *See* 31 C.F.R. part 538.  OFAC amended the regulations on October 31, 2007 to implement E.O. 13412.  It issued the Darfur Sanctions Regulations, 31 C.F.R. part 546 on May 28, 2009 to implement E.O. 13400.

[39] U.S. State Dept., U.S. Support for the People of Sudan, Nov. 20, 2007 (emphasis added), https://2001-2009.state.gov/documents/organization/95916.pdf.

[40]  U.S. State Dept., U.S. Relations with Sudan Fact Sheet (Nov. 3, 2015), http://www.state.gov/r/pa/ei/bgn/5424.htm.

revenue and the GOS's atrocities, including those committed in connection with the GOS's exploitation of its oil resources.

172.    Accordingly, the U.S. Sanctions, as established by laws of these United States and implemented by the Executive Branch were intended and expected to harm Sudan's economy and its exploitation of its oil resources and therefore to benefit disfavored civilians in Sudan and protect them from unspeakable violence at the hands of the GOS and its proxies.  Those civilians included Plaintiffs.  Plaintiffs were therefore the legislatively-intended beneficiaries of the U.S. Sanctions.

### C.   BNPP Agreed and Conspired with the GOS to Provide Illegal Access to U.S. Financial Markets with the Understanding That This Would Sustain and Expand the GOS's Campaign of Violence and Internal Repression

173.    Faced with a compelling need for access to the U.S. financial system to develop its oil resources and maximize its profits, a need for dollar-denominated letters of credit, and a need for dollars to acquire goods, the GOS sought to evade the U.S. sanctions, and BNPP agreed and conspired with the GOS to allow it to evade the impact of the sanctions and to enrich GOS. BNPP's agreement and conspiracy with the GOS were intended to provide the means to the GOS to continue and to increase its exploitation of its oil resources that was, and was understood to be, part and parcel of the GOS's atrocities and campaign of human rights abuses.  BNPP did so to make money, out of greed and desire for profits, even as it knew that its services were in support of a terrorist, human-rights abusing regime.[41]

174.    In 1997, on the heels of the initial U.S. Sanctions, BNPP became the GOS's sole correspondent bank in Europe, responsible for transactions that comprised a huge portion of

---

[41] *See* Press Release, NYDFS, Cuomo Administration Announces BNP Paribas to Pay 8.9 Billion, Including $2.24 Billion to NYDFS, Terminate Senior Executives, Restrict U.S. Dollar Clearing Operations for Violations of Law (June 30, 2014) (stating that "the commercial stakes are significant"), attached as Ex. J, and is incorporated herein as if set forth in its entirety.

Sudan's exports and imports, and undertook a decade-long, secret program of violating U.S. and New York law aimed at preventing GOS access to U.S. financial markets.  BNPP's participation was essential to the GOS's war against its own people.

175.    BNPP's actions were made in concert with the GOS.  By 1997, the GOS had taken total control of foreign exchange, and the GOS demanded complicity and alignment from its commercial partners in its objectives, which at that time included committing atrocities such as removing disfavored civilian populations from oil rich regions.  BNPP provided the explicit, or at least implicit, acquiescence required by the GOS of its commercial partners, including avoiding any conflict with the GOS objectives, in particular, its attacks on civilian populations that occurred with greater frequency and velocity after BNNP agreed to partner with the GOS.

176.    The GOS quickly directed all major Sudanese commercial banks to use BNPP as their primary correspondent bank in Europe.  As a result, nearly all major Sudanese commercial banks had U.S. dollar accounts with BNPP.  For example, in that role, BNPP held U.S. dollar accounts for the GOS and for sanctioned Sudanese entities ("Specially Designated Nationals" or "SDNs") in order to process U.S. dollar transactions and develop credit for Sudanese banks.

177.    As recounted in a diplomatic cable from the U.S. Embassy to the U.S. Secretary of State, the Director of the Petroleum Unit in the Sudanese Ministry of Finance and Economic Planning Yousif Ramadan Mohammed El Hassan, confirmed BNPP's crucial role in the GOS's oil sales and revenues:

> El Hassan said that money from the sales of oil are first deposited at the Central Bank of Sudan account at [BNPP Geneva].  From there, the money is transferred to the Bank headquarters in Khartoum, the amount due to the [GOS] is transferred to the Bank of Southern Sudan (BOSS).  BOSS is simply the southern branch of the Central Bank.  The BOSS maintains accounts in commercial banks in Khartoum

(e.g., Bank of Khartoum, Omdurman National Bank and Dubai Bank of Khartoum) as well as in Nairobi (at Stanbic Bank).[42]

Thus, revenue from the sales of oil transactions, performed and enabled by BNPP, provided revenue to the GOS.

178.    From 1997 to 2007, Sudan's primary export and source of government revenue was—by a significant amount—oil.[43]  During that time, as admitted by BNPP in the Statement of Facts supporting its guilty plea, it "developed a business in letters of credit for the Sudanese banks. Due to its role in financing Sudan's export of oil, BNPP Geneva also took on a central role in Sudan's foreign commerce market."[44]  BNPP provided letters of credit not only on behalf of the GOS's counterparties but also on behalf of the GOS itself.  ***By 2006, BNPP's letters of credit came to represent a quarter of all Sudan's exports and a fifth of its imports***.  Over 90% of these letters of credit were denominated in U.S. dollars.[45]  One state-owned Sudanese bank's deposits at BNPP "represented about 50% of Sudan's foreign currency assets during this time period."[46]  At the time of BNPP's guilty plea, the U.S. Deputy Attorney General described BNPP as acting "as a de facto central bank for the Government of Sudan."[47]

---

[42] Diplomatic Cable from U.S. Embassy, Sudan to Intergovernmental Authority on Development and U.S. Secretary of State, *Oil Revenue: 2007 GNU Budget Based on Questionable Assumptions*, (Feb. 9, 2007), at 5, https://www.wikileaks.org/plusd/cables/07KHARTOUM194_a.html ("Feb. 9 Cable").

[43] Foreign Trade Statistical Digest, Central Bank of Sudan, table of Trade Balances 2005-2014, at 5.  http://www.cbos.gov.sd/sites/default/files/digest_q4_14.pdf

[44] Statement of Facts dated June 30, 2014, Ex. 2 to Plea Agreement, Dkt. No. 14-CR-00460-LGS Doc. No. 13, attached as Ex. C, ¶19 (the "SOF") and is incorporated herein as if set forth in its entirety.

[45] *Id.* (emphasis added).

[46] *Id*.

[47] Remarks by Deputy Attorney General Cole at Press Conference Announcing Significant Law Enforcement Action, Justice News, June 30, 2014, https://www.justice.gov/opa/speech/remarks-deputy-attorney-general-cole-press-conference-announcing-significant-law.

179.    In addition to processing U.S. dollar transactions, in 2000, BNPP also developed a business in providing letters of credit for Sudanese banks that in turn facilitated the GOS's ability to buy imports, particularly those where the sellers priced their goods in dollars, thereby increasing the GOS's available resources to acquire goods.

180.    On information and belief, BNPP's letters of credit covered a significant part of Sudanese imports and therefore enabled the GOS to import weapons and other goods sold in dollars.  Similarly, on information and belief, BNPP's letters of credit covered a significant part of Sudanese exports and therefore facilitated and increased revenues from Sudan's crude oil sales, which accounted for nearly all of the country's exports.

181.    Thus, by having access to dollars and dollar-denominated letters of credit to purchase goods to import, the GOS was able to purchase materially more imports than it otherwise would because dollars, as the leading global currency, are more desirable than other currencies, are preferred to bartering, and are more widely accepted.  In other words, BNPP's assistance gave the GOS more buying power than it otherwise would have had.  As described above, U.S. Sanctions were intended to prevent this precise outcome.

182.    BNPP continued its key role clearing transactions through or into the United States until 2007 when the U.S. authorities alerted BNPP to their investigation, holding U.S. dollar accounts for the GOS and sanctioned Sudanese entities ("Specially Designated Nationals" or "SDNs") in order to process illegally U.S. dollar transactions in New York and develop credit for Sudanese banks.

183.    To enable it to continue its conspiracy with the GOS, for as long as it did, BNPP agreed with the GOS to use deceptive procedures and transaction structures to avoid U.S. screening procedures that identify and block transactions involving sanctioned entities.  For example, BNPP

concealed its illicit conduct by modifying or omitting references to SDNs in U.S. dollar transactions, including letters of credit, processed through the United States.

184.    BNPP also agreed with the GOS to evade sanctions by using banks unaffiliated with BNPP or Sudan to process illicit transactions.  BNPP called them "satellite banks."  In these transactions, Sudanese banks seeking to settle U.S. dollar transactions through New York first transferred funds within BNPP to a satellite bank's BNPP account.  The satellite bank transferred the funds to a U.S. bank and then on to the Sudanese bank's intended beneficiary.  This was all done without reference to Sudan or the Sudanese bank, which was not the usual and customary method.  To help to obscure the ultimate reason for the transactions, BNPP often instructed the satellite bank to wait a day or more to clear the funds through New York.  The process was reversed to get U.S. dollars into Sudan from third parties not located within the country.

185.    This satellite bank structure had no purpose other than to evade U.S. Sanctions, and the deceptive transaction-clearing procedures used by BNPP, enabled the SDNs to process thousands of illicit U.S. dollar transactions worth billions of dollars.[48]

186.    Even after having some "deficiencies" caught by U.S. regulators, BNPP continued its conspiracy with the GOS.  In 2004, the FRB-NY and the DFS first identified "deficiencies in [BNPPNY's] monitoring of transactions with overseas clients, including the processing of U.S. dollar transactions for overseas clients."[49]  In September 2004, BNPP entered into a Memorandum of Understanding ("MOU") with the FRB-NY and the DFS that required, *inter alia*, that BNPPNY improve its systems for compliance with U.S. Sanctions.  Instead, BNPP simply shifted the processing of U.S. dollar transactions—doctored to conceal any Sudan connection—from BNPP's

---

[48] SOF, Ex. C, ¶24.

[49] *Id*. ¶28.

New York branch to flow through an unaffiliated bank which, on information and belief, was also New York-based.  Thus, though the bank may have changed, BNPP continued to structure and accomplish settlement in New York of U.S. dollar transactions for the SDNs.

**D.    With Access to Petrodollars Provided by BNPP, Sudan's Exports of Oil and Revenues Rose Dramatically**

187.    Between 1998 and 2007, Sudan's oil production rose dramatically, and in turn, total GOS revenue grew substantially.

188.    Through BNPP financing, letters of credit in U.S. dollars, and *de facto* money laundering, the GOS transformed Sudan's rudimentary oil industry quickly and dramatically. World Bank data shows the 1997-2006 growth in Sudan's oil production, measured in 1,000s of barrels of oil per day.[50]  In 1997, Sudan produced 9,000 barrels of oil per day.  Just two years later, it produced 63,000 barrels per day and by 2006, Sudan's oil production had exploded to 331,000 barrels per day.

189.    On information and belief, GOS revenues from Sudan's export of oil also grew significantly rising from less than $2 billion in 2002 to nearly $10 billion in 2007.[51]  Sudan's increased oil production, exports and revenues were made possible only by its illegal financial transactions with BNPP.

190.    The fact that BNPP's partnership with the GOS to violate Sanctions was a substantial, causal factor in Sudan's increased oil production, exports and revenues is further

---

[50] Data from the World Bank, http://data.worldbank.org/country/sudan.

[51] European Coalition on Oil in Sudan, Sudan: Whose Oil?, at 25 (April 2008).  This comports with U.S. State Department data, which estimated that in 2002, Sudan's oil production yielded overall revenues as high as $1.2 billion.  *See* Press Release accompanying 2003 U.S. Department of State Sudan Peace Act Report to Congress. Press Release, State Dept., Sudan Peace Act: Presidential Finding and Reports to Congress (April 22, 2003), http://reliefweb.int/report/sudan/sudan-peace-act-presidential-finding-and-reports-congress.

demonstrated by the experience of other countries subject to U.S. sanctions.  Economic sanctions imposed against Iran in 2005 by the United States and the European Union are a case in point. Iran had to price its oil in the currencies of its main customers, China and India.[52]  Because their currencies are not readily convertible, Iran sold its oil for a significant discount, which may have been as much as ten percent.[53]  If Sudan—a poorer, less economically powerful, and less geopolitically important country than Iran, and, therefore, less able to barter or support its oil pricing—were to have suffered the same ten percent discount in 2006, when the country produced 331,000 barrels per day, it would have represented a potential loss of about $730 million or $2 million a day, an amount equal to about 30% of the GOS's 2006 military spending.

191.    When not undermined as they were in Sudan, U.S. financial sanctions are a potent economic tool in curbing the violent and repressive conduct of governments such as the al-Bashir regime.

---

[52] Kennth Katzman, Cong. Research Serv., RS20871, *Iran Sanctions*, at 51-52 (Oct. 11, 2013).

[53] See Wayne Ma and Tennille Tracy, Sanctions Gap Allows China to Import Iranian Oil; Beijing Bypasses U.S. Law by Importing More Fuel Oil Not Covered by Sanctions, Wall St. J. Online, Aug. 21, 2013,; *see also* Asia, Black Market Only Options for Iran's Crude, Petroleum Intelligence Weekly, Apr. 23, 2012.  This discount was not the only significant financial harm that Iran suffered as a result of the sanctions on its oil production.  Royal Dutch Shell, a Anglo-Dutch oil company and one of Iran's customers, was unable to remit to Iran $2 billion for oil it purchased prior to the sanctions going into effect.  See Benoit Faucon, Shell CEO Discusses $2 Billion Debt Payment With Iran Oil Minister, Wall St. J. Online, June 3, 2015, http://www.wsj.com/articles/shell-ceo-discusses-2-billion-debt-payment-with-iran-oil-minister-1433359074; see also Emmanuel Hache and Olivier Massol, Sanctions against Iran: An Assessment of their Global Impact Through the Lens of International Methanol Prices, at 7 (IFP Énergies Nouvelles, Working Paper 106, Apr. 2016), https://www.researchgate.net/profile/Emmanuel_Hache/publication/301222462_Sanctions_again st_Iran_An_assessment_of_their_global_impact_through_the_lens_of_international_methanol_p rices/links/570d602008ae3199889bbf62.pdf.

E.      **As a Result of Increased Oil Revenues, Military Spending Grew, Both in Total Dollars and as a Percentage of Government Spending**

192.    Plaintiffs are informed and believe that the proceeds to the GOS from BNPP's Sanctions violations during all or most of the period of Plaintiffs' injuries exceeded the GOS's total military expenditures.  They were such a substantial source of revenue that the GOS could otherwise not have funded the military at the nearly same level without BNPP's Sanctions violations during the period when GOS's military and proxy militia forces operated and funded by the GOS inflicted Plaintiffs' injuries.  Enabled by petrodollars, GOS troops and their surrogate paramilitaries caused the violent death and injury of thousands of Darfuris and citizens of central and south Sudan.

193.    At the start of BNPP's involvement, the GOS's oil revenue was insignificant; by 2006, according to World Bank data, oil revenue accounted for more than 10% of GDP.[54]  The GOS spent a disproportionate, increasing amount of its growing revenues on the military, the National Intelligence and Security Services (NISS), the Popular Defense Forces (PDF), and the other formal and informal branches of the GOS's coercive apparatus.  On information and belief, during most years when BNPP was processing oil exports for the GOS, military spending alone (*i.e.*, the officially allocated budget for the Sudanese Armed Forces) as a percentage of total GOS spending was more than double, or even triple, what it had been pre-BNPP.  ***Between 1997 and 2006, GOS military spending grew nearly ten-fold: from $282 million in 1997 to $2.7 billion in 2006, and, as a share of GDP, went from less than 1% to nearly 3.4%.***[55]  To spend this percentage of GDP on the military is quite remarkable, particularly for a poor country.

---

[54] World Bank, Sudan Public Expenditure Review: Synthesis Report, at 9 (Report No. 41840-SD, Dec. 2007).

[55] *See* Stockholm International Peace Research Institute, SIPRI Military Expenditure Database, https://www.sipri.org/databases/milex.

194.    Because true military spending is not public information, these figures are approximate.  Moreover, the figures almost certainly underestimate the GOS's actual military spending because they most likely do not include the money the GOS spent on the NISS, its most important secret service, and the various militias the GOS supported.

195.    The U.S. Embassy in Khartoum recognized the extent of Sudan's military spending: In 2007, Sudan's "budget allocate[d] substantial revenue to military and security expenditures, leaving relatively small amounts available for development, health and education."[56]

196.    In its country status report, the World Bank observed the connection between the GOS's oil revenues and the continuing conflict: "Petroleum has emerged as a major source of economic growth and revenue for the government.  It has also emerged as one of the major factors that keeps the war going."[57]

197.    The GOS's vast increase in oil revenue, made possible only because of BNPP enabled the GOS to grow its military spending and to keep the war going.[58]

## F.    Sudan Used its Oil Revenue to Buy and Manufacture Weapons and Weapons Delivery Systems

198.    The GOS used the oil wealth that it acquired thanks to BNPP's criminal actions to embark on a major weapons acquisition spree.  The GOS did not just purchase standard guns and

---

[56] Feb. 9 Cable ¶ 1.

[57] World Bank, Sudan, Country Economic Memorandum: Stabilization and Reconstruction, Report No. 24620-SU, at 18 (June 2003), http://documents.worldbank.org/curated/en/440091468777571140/main-text.

[58] When BNPP began its involvement in Sudan, Sudan was in arrears on the repayment of its foreign debt and could not have borrowed more money from the international debt market without the additional oil revenue.  By the end of 2001, Sudan's foreign debt was $20.9 billion, almost twice the country's GDP.  *See* Republic of Sudan and European Community, Country Strategy Paper and National Indicative Programme for the Period 2002-2007, DEV/0116/EN, at 11-13 (Oct. 2002).

ammunition.  It purchased modern, highly sophisticated, and extremely expensive armaments capable of inflicting massive amounts of harm and damage in a ruthlessly efficient manner. Sudan's major weapons suppliers included China, Russia, Ukraine, Iran, and Belarus.[59]

199.    The GOS's access to U.S. dollars that BNPP provided, on information and belief, enhanced the GOS's ability to import weapons, especially from suppliers in countries with nonconvertible currencies, such as those above.  Arms suppliers prefer payment in U.S. dollars for the same reasons as oil exporters—convertibility, liquidity, and stability.

200.    One branch of its military that the GOS focused on expanding was its air force. Prior to 1997, Sudan had only a rudimentary air force, composed of a small number of aging aircraft.  This changed once the GOS started receiving its oil revenues.  During the relevant period, the GOS purchased tactical attack jets (such as the MiG-29 and Su-25), combat helicopters (such as the Mi-17), helicopter gunships (such as the Mi-24),[60] and goods and troop transports (such as Antonovs).[61]  The GOS retrofitted many of the cargo planes into crude bombers from which barrel bombs were simply rolled out of the cargo bay and onto unsuspecting victims.[62]  Indeed, in just one year, 2001, the GOS *tripled* its fleet of attack helicopters by purchasing twelve Russian made

---

[59] Like its oil revenues, the GOS's arms purchases are likely underreported.  Therefore, the extensive weapons acquisitions detailed herein likely understate the full extent of what the GOS bought.

[60] *See* Small Arms Survey – Supply and Demand, Arms Flow and Holdings in Sudan, HSBA (Dec. 2009),  http://www.smallarmssurveysudan.org/fileadmin/docs/issue-briefs/HSBA-IB-15-arms-flows-and-holdings-in-Sudan.pdf.

[61] *See* Amnesty International, Sudan: Arming the Perpetrators of Grave Abuses in Darfur, at 19, 35-36 (Nov. 16, 2004), https://www.amnesty.org/en/documents/afr54/139/2004/en/

[62] *See* Amnesty International, Blood at the Crossroads: Making the Case for a Global Arms Trade Treaty, at 86-87, 94 (Sept. 17, 2008), https://www.amnesty.org/en/documents/ACT30/011/2008/en/.

aircraft.[63]  The MiG-29s were particularly expensive.  On information and belief, each plane cost $11 million, before the additional, substantial expenses of service and training contracts.[64]

201.    The GOS also spent its oil revenue building up its small arms and military hardware reserves.  For example, the GOS purchased Russian armored combat vehicles, large-caliber artillery systems from Belarus, Chinese made WeiShi-2/3 missiles (which have a range of 200 kilometers), tanks, armored personnel carriers, infantry fighting vehicles, multiple rocket launchers, portable surface to air missiles, recoilless rifles, mortars of various sizes, and heavy machine guns (such as Russian-built "Doshka" machine guns).[65]

202.    Further, the GOS used its oil revenue to establish a domestic weapons industry. Beginning in the late 1990s, Sudanese officials boasted of using its oil revenues to develop the ability to manufacture ammunitions, mortars, tanks, and armored personnel carriers.[66]  On January 7, 2002, the GOS paraded its domestically produced hardware in central Khartoum.

203.    The GOS used its new resources to manufacture its own armaments:  "[Sudan] will this year reach self-sufficiency in light, medium and heavy weapons from local production," thanks to its "*unprecedented economic boom particularly in the field of oil exploration and*

---

[63] *See* Human Rights Watch, Sudan, Oil, and Human Rights, at 37 (2003).

[64] *See* How Much Does a MiG-29 Cost?, Angel Fire, http://www.angelfire.com/ falcon/fighterplanes/texts/articles/MiG-29.html.

[65] *See* Eric Reeves, Kleptocracy in Khartoum: Self-Enrichment by the National Islamic Front/National Congress Party, Enough Project, Dec. 2015, http://www.enoughproject.org /files/EnoughForum_KleptocracyInKhartoum_Reeves_Dec2015.pdf

[66] *See* Human Rights Watch, Sudan, Oil, and Human Rights, at 353 (2003), https://www.hrw.org/reports/2003/sudan1103/sudanprint.pdf.

*exportation*." (emphasis added).  Sudan also produced rocket-propelled grenades, machine guns, and mortars.[67]

204.    The GOS shared many of its weapons, particularly the small arms, with the various proxy militias that fought under the government's direction to achieve its awful aims.  For example, the GOS provided militias with Russian-made arms.

205.    The effects of Sudan's enhanced military procurements during this period continue to be felt through today due to the long shelf lives of many of the military hardware and weapons the GOS purchased.  Thus, planes helicopters and weapons bought by the GOS between 1997 and 2007 continue to kill and harm civilians, and have been instrumental in displacing millions of people.  Further, Sudan's own ability to manufacture weapons, an ability it gained between 1997 and 2007 continues through today.

206.    In sum, BNPP's actions in facilitating the GOS's development of its oil industry and its economy overall were a substantial factor in facilitating the growth of the GOS's budget, its military spending, its acquisition of weapons, and the creation of a domestic arms industry.

## G.    Well-Funded by Oil Revenues and Equipped with Newly Purchased Weapons, Sudan Increased its Violence Against Civilians, Including Plaintiffs.

207.    With its new oil wealth and modernized army, that it had as a result of its conspiracy with BNPP the GOS went from a regime besieged on all sides—with rebels advancing in the south and east of the country, threatening to break the back of the Sudanese Armed Forces—to a government that was aggressively asserting its authority throughout the country, smashing any rebel hopes of advancing on Khartoum or capturing other major cities.

---

[67] Sudan to Achieve Self-Sufficiency in Weapons: Spokesman, Agence France Presse – English, July 1, 2000.

208.     In the process of securing its hold on power, the GOS engaged in systematic, widespread human rights abuses on a scale unseen before.  These atrocities included ethnic cleansing, violent forced displacement, and terror tactics such as arbitrary detention, theft, torture, rape, and murder as well as genocide, all in contravention of international law.  These inhuman depredations were experienced in various forms by all Plaintiffs and their communities, which were often defined ethnically—as "non-Arab" by the GOS and its proxies—and geographically—southern Sudan and Darfur.

209.     Plaintiffs were often victims of brutal sexual violence.  The GOS used this violence as a means of terror, torture, and ethnic cleansing.

210.     The GOS used its new air force to project its power on a scale it could not have contemplated before 1997.  For example, the GOS used its helicopter gunships in the Western Upper Nile and Unity State, much of which is now part of South Sudan.

211.     Similarly, the GOS used its retrofitted Antonov cargo planes to attack civilians in southern Sudan, the Nuba Mountains of South Kordofan, southern Blue Nile State, the Jebel Marra region in central Darfur, as well as numerous other regions in Darfur.  These attacks were particularly cruel because the purposefully crude nature of the retrofit made the Antonovs highly inaccurate, leading to massive amounts of terror in those regions.

212.     The GOS also used its oil money to finance third party militias who also committed significant acts of violence.  These militias acted as proxies for the GOS, killing, raping, and displacing large numbers of civilians, many of whom belonged to ethnic groups associated with the rebels, such as Dinka (who were primarily in Abyei and South Sudan), Ingessana (Blue Nile), Fur (Darfur), and Zaghawa (Darfur).  The most infamous militia was the Janjaweed, also known as the Jingaweid, which was under the GOS's control.  It wreaked havoc in Darfur from 2002

onwards.[68]  This region is home to various non-Arab groups, including the Fur, Zaghawa, and Massalit.  Often, the GOS's military and the Janjaweed worked in tandem to brutal ends.  After the GOS's air force bombarded a village, the Janjaweed would attack on horseback, brandishing GOS-provided weapons.  The militiamen swept into villages, killing and mutilating the men, raping the women, and killing or kidnapping the children.  The raiders also destroyed the foundations of the village, burning fields and homes, poisoning wells, and seizing anything of value.

213.    The GOS's actions in Darfur are frequently labeled as crimes against humanity and genocide by the international community.  As set out above, those actions were recognized as genocide by the U.S. Congress, as well Secretary of State Colin Powell and President Bush in 2004, a time when BNPP continued to violate U.S. Sanctions.[69]  The U.N. Security Council referred the situation in Darfur to the ICC in March 2005.  In 2007, the ICC issued its first arrest warrants for Sudanese government officials.[70]  The genocide began in 2003 and continued through

---

[68]  *See* U.S. State Dept. Fact Sheet, Sudan: Ethnic Cleansing in Darfur (Apr. 27, 2004), https://2001-2009.state.gov/g/drl/rls/31822.htm:

"The Government [GOS] operates jointly with these militias, known as 'Jingaweid,' in attacks on civilians from the Fur, Masaalit, and Zaghawa ethnic groups.  …The Jingaweid have perpetrated widespread atrocities against theses civilians." …In February 2004, an eyewitness account of a raid on the village of Tawila noted that a well-organized attack by horseman and members of the military dressed in fatigues in which 67 people were killed, 16 girls abducted and over 93 females were raped.  The attack displaced over 5,000 people."

[69]  Glen Kessler and Colum Lynch, *U.S. Calls Killings in Sudan Genocide, Khartoum and Arab Militias Are Responsible, Powell Says*, Wash. Post, Sept. 10, 2004, www.washingtonpost.com/wp-dyn/articles/A8364-2004Sep9.html; George W. Bush Address to United Nations (Sept. 21, 2004), http://www.presidentialrhetoric.com/speeches/09.21.04.html.

[70]  International Criminal Court - Situation in Darfur, Sudan, ICC-02/05, (Dec. 22, 2016), https://www.icc-cpi.int/darfur.

the signing of a ceasefire in 2004, a peace agreement in 2006, to today.  It was made possible in substantial part by BNPP's financial support of the GOS.

214.    Plaintiffs from Darfur were victims of brutal attacks by the GOS-funded Janjaweed.

215.    Much of the focus of the GOS's attacks was on civilians living in the path of oil development.  The GOS's ability to exploit its oil after 1997 thus intensified pre-existing conflicts as the GOS sought to monopolize the gains from oil and, in the process, cleansed, by brute force, the oil rich regions of their native inhabitants.  Essentially, the GOS used its military and paramilitary forces to remove entire villages living on or near oil fields.  A Chinese geologist on the ground in Sudan described this forced displacement in 2000 from Heglig in the disputed Abyei region:

> I was based at a Chinese camp in Heglig, which was located close to the main camp of Talisman.  We (workers of the Chinese company) were guarded by Sudanese soldiers all the time.  Every time we went to the field to conduct exploration activities, the soldiers went ahead and shot into the bush with big guns to cause the natives to flee.  Then the soldiers informed the Chinese that it was safe.  We moved into the area and did the required work.  In some places, we found deserted villages and burnt houses.  Also, we found human bodies in the exploration area and dead elephants.[71]

216.    In its 2003 report to Congress, the U.S. State Department recognized this horrifying connection between oil exploitation and the GOS's atrocities.  Specifically, the State Department found that the increase in oil production "translated into at least proportionally increased military expenditures by the [GOS]."[72]  The report noted that between 2002 and 2003

> most reported incidents of attacks on civilians and forced displacement have occurred in Western Upper Nile, most as a result of actions by the government and its allied militias.  Various types of violent actions against civilians have been used to compel their displacement from their usual areas of habitation, including killing,

---

[71] *See* Leben Moro, *Oil Development Induced Displacement in the Sudan* (University of Durham, Institute for Middle Eastern and Islamic Studies, Working Paper 10, 2009), at 14. http://dro.dur.ac.uk/6232/1/6232.pdf.

[72] State Dept., Sudan Peace Act: Presidential Finding and Reports to Congress (Apr. 22, 2003).

rape, abduction, burning of shelters, and looting of property (including cattle and crops) necessary for livelihood.[73]

217.    The State Department also found that these types of attacks "have been regularly reported throughout the history of the civil war."[74]

218.    Many were victims of the GOS's crimes simply because they had the misfortune of being on or near an oil field.

219.    Those people who were fortunate enough to survive the GOS's onslaught became refugees, forced to leave their homes with nothing more than a mat or some cattle.  The unlucky ones had to take refuge in the bush.  According to the NGO, the Internal Displacement Monitoring Centre, as of August 2006, there were approximately 5 million IDPs in Sudan; 1.8 million were from Darfur.[75]

220.    Many of the IDPs fled to Khartoum, believing they would be safe.  However, once there, they were subjected to yet more horrors.  For example, many people who were part of disfavored groups were put into "ghost houses," secret detention facilities where many of the inmates were tortured used "unspeakably sadistic methods."[76]  The GOS's use of ghost houses started before BNPP's involvement and continued throughout the relevant period.[77]

_____

[73] *Id*.

[74] *Id*.

[75] iDMC, Slow IDP Return to South While Darfur Crisis Continues Unabated, at 1 (Aug. 17, 2006), http://www.internal-displacement.org/sub-saharan-africa/sudan/2006/slow-idp-return-to-south-while-darfur-crisis-continues-unabated.

[76] Claude Adams, *On the Run from Sudan's Enforcers*, Globe and Mail (Canada), Oct. 21, 1995.

[77] *See, e.g.*, Caroline Cox, John Eibner, *The Government of Sudan Enslaves its Own*, Asian Wall St. J., July 30, 1996, at 6; Caroline Cox, John Eibner, *Sudan Government Enslaves its Own*, Wall St. J. Europe, May 21, 1996, at 10; Claude Adams, *On the Run from Sudan's Enforcers*, Globe and Mail (Canada), Oct. 21, 1995; Con Coughlin, *Sudan Training Next Terrorist Generation*, Globe and Mail (Canada), May 16, 1994; Eileen Alt Powell, *Suffering Rises in Sudan, U.S.*

221.    Though the Fur, Zaghawa, Massalit, and other non-Arab ethnic groups in Darfur may have been the most reported on ethnic groups that were harmed by the GOS, they were hardly the only ones.  Other communities that the GOS harmed include the Dinka Ngok in Abyei, the Nuba in South Kordofan, and the various ethnic groups in the Blue Nile (particularly the Ingessana), as well as civilians from various ethnic groups along the North/South border, from Upper Nile State to Western Bahr el Ghazal.  The GOS particularly victimized the Nuer communities of Unity State (formerly Western Upper Nile) during 2002, the last year of major fighting in the Second Sudanese Civil War.  In addition, the eastern Sudan states of Red Sea, Kassala, and Gedaref (particularly the Beja people) suffered terribly from economic and political marginalization and domination by the GOS.  The Nubian people of far northern Sudan were similarly marginalized and harmed by environmentally and economically irresponsible dam projects along the Nile.  Many thousands of farmers from this community were displaced from their lands without compensation.

---

*Suspects it of Backing Terrorism, Cuts Aid*, Miami Herald, Jan. 9, 1994, at B4; William Johnson, *The Stakes are High for Muslims*, Globe and Mail (Canada), Nov. 1, 2001, at A25; *Sudan vs. Civilization*, Wall St. J. Europe, Oct. 10, 2000, at 12; Peter Dalglish, *Witness to War*, Globe and Mail (Canada), Feb. 18, 2000, at A13.

The U.S. government also took note of the ghost houses:  "The [GOS] human rights record remained extremely poor, and it continued to commit numerous, serious abuses.  Citizens do not have the ability to change their government peacefully.  Government forces were responsible for extrajudicial killings and disappearances.  Government security forces regularly tortured, beat, harassed, arbitrarily arrested and detained, and detained incommunicado opponents or suspected opponents of the [GOS] with impunity.  Security forces beat refugees, raped women, and reportedly harassed and detained persons on the basis of their religion.  Prison conditions are harsh, prolonged detention is a problem, and the judiciary is largely subservient to the Government."  State Dept.,  Sudan - Country Report on Human Rights Practices, 1999, at 2 (Feb. 23, 2000), http://www.state.gov/
j/drl/rls/hrrpt/1999/273.htm

222.    Children were also subjected to atrocities at the hands of the GOS, including physical violence and mental harm as a result of the GOS's persistent terror against themselves and their families.

223.    BNPP's violations of U.S. Sanctions, assistance to, and conspiracy with the GOS, enabled the GOS to have increased resources to terrorize and exterminate politically disfavored civilian.  Thus, BNPP's actions were a substantial factor in causing injuries to Plaintiffs.

**H.    Plaintiffs' Injuries Were Foreseeable:  BNPP Knew the Atrocities in Sudan Were Funded By and an Intrinsic Part of the Government of Sudan's Exploitation of Its Oil Resources, Which BNPP Made Possible**

224.    Throughout its long partnership with the GOS, BNPP knew and accepted that: (*i*) the GOS was engaged in a persistent campaign of terrible atrocities against Sudanese civilian groups, including genocide; and (*ii*) the GOS's monetization of its oil—made possible through BNPP's criminal sanctions violations and falsification of business records in New York—was both a principal object of and the prerequisite for the GOS's atrocities.  Extensive reporting—by the United Nations, the governments of the United States and Canada, the ICC, international NGOs, and the international press—documented both the GOS's crimes and the causal link between those actions and its oil revenues.  Yet BNPP kept up its depraved, illegal conspiracy with the GOS.

**1.    Contemporaneous Reporting of the Atrocities in Sudan and the Connection to Oil**

225.    Even before 1997, the international community had recognized and condemned GOS atrocities against Sudanese civilians.  For example, in his 1995 *Interim Report on the Situation of Human Rights in the Sudan*, the U.N. Special Rapporteur on Human Rights in the Sudan reported "grave and widespread violations of human rights by government agents,"

including "[i]ndiscriminate and deliberate aerial bombardments by government forces on civilian targets."[78]

226.   In 1997, the international media widely reported on the imposition of U.S. Sanctions.[79]

227.   In 1999, the U.S. State Department's "Country Reports on Human Rights Practices" reported on Sudan's dismal human rights record, setting out serious abuses including extrajudicial killings, beatings rape, arbitrary, and forced conscription.[80]

228.   In 2000, Doctors Without Borders/Médecins Sans Frontières, recipient of the 1999 Nobel Peace Prize, reported on the GOS's use of indiscriminate bombings and chemical weapons against civilians.[81]

229.   In 2001 and 2002, the international media covered GOS attacks on civilians, including its use of attack helicopters, to clear civilians from oil blocks, especially Blocks One and 5A.[82]

---

[78] Gaspar Biro (Special Rapporteur of the Commission on Human Rights), *Interim Report on the Situation of Human Rights in the Sudan,* ¶¶ 10, 72, U.N. Doc. A/50/569 (Oct. 16, 1995). Concerning Resolution 1955/77 (Mar. 8, 1995). http://www.un.org/documents/ga/docs/50/plenary/a50-569.htm.

[79] *See, e.g.*, Norman Kempster, *U.S. Imposes Tougher Sanctions on Sudan*, L.A. Times, Nov. 5, 1997; AFP, *U.S. Sanctions Punish Sudan*, The Australian, Nov. 6, 1997.

[80] *See* State Dept., Sudan - Country Report on Human Rights Practices - 1999 (Feb. 23, 2000) http://www.state.gov/j/drl/rls/hrrpt/1999/273.htm.

[81] *See* Doctors Without Borders/Médecins Sans Frontières (MSF), Living under Aerial Bombardments: Report of an Investigation in the Province of Equatoria, Southern Sudan (Feb. 20, 2000), http://reliefweb.int/report/sudan/living-under-aerial-bombardments-report-investigation-province-equatoria-southern-sudan.

[82] Norimitsu Onishi, *Sudan Government Tops List of Those Causing Agony for Oil*, N.Y. Times, Oct. 13, 2001; W.F. Deedes, *Innocent Victims of Sudan's Forgotten War*, Daily Telegraph (London), Apr. 27, 2002.

230.    A 2002 report by the U.N. Special Rapporteur on Human Rights in Sudan concluded that, "the overall human rights situation has not improved" since 2001 and that "oil exploitation is closely linked to the conflict which . . . is mainly a war for the control of resources and, thus, power."[83]   The Rapporteur "noted that oil exploitation continued to cause widespread displacement" and, as a result, has "seriously exacerbated the conflict while deteriorating the overall situation of human rights."[84]

231.    In 2003, Human Rights Watch published its landmark report, "Sudan, Oil, and Human Rights," detailing the link between oil and human rights violations.[85]   It focused on the plight of southern Sudanese from the oil-producing areas, especially the Nuer and Dinka, who were displaced to facilitate oil operations through ethnic manipulation, direct military attack, and aerial bombing.  The report noted that, in addition to funding large purchase of weapons made elsewhere, "[t]he new oil revenue also facilitated a brand-new domestic arms industry."[86]

232.    In February 2004, the U.S. Department of State released its 2003 Human Rights report on Sudan.  The report stated:

> Security forces and associated militias were responsible for extrajudicial killings and disappearances.  Security forces regularly beat, harassed, arbitrarily arrested, and detained incommunicado opponents or suspected opponents of the Government, and there were reports of torture.  Security forces and associated militias beat refugees, raped women abducted during raids, and harassed and detained persons.  Government security forces and pro-government militias acted with impunity. . . .  Government forces pursued a scorched earth policy aimed at

---

[83] Gerhart Baum (Special Rapporteur on the Commission of Human Rights), *Situation of Human Rights in the Sudan*, at 3-4, U.N. Doc. E/CN.4/2002/46 (Jan. 23, 2002).

[84] *Id*. at 3, 12.

[85] *See* Human Rights Watch, Sudan, Oil, and Human Rights (2003), https://www.hrw.org/reports/2003/sudan1103/sudanprint.pdf.

[86] *Id.* at 353.

removing populations from around the oil pipeline and other oil production facilities, which resulted in deaths and serious injuries.[87]

233.    In March 2004, the U.N. humanitarian coordinator for Sudan, Mukesh Kapila, told the press that an "ethnic cleansing" campaign was taking place in Darfur that was "comparable in character, if not in scale," to the Rwandan genocide.[88]

234.    In April 2004, Human Rights Watch's report, "Darfur in Flames: Atrocities in Western Sudan,"[89] described an oil-fueled government strategy of forced displacement targeting civilians.[90]

235.    In July 2004, the House and the Senate passed House Concurrent Resolution 467, declaring that the GOS's atrocities in Darfur violated the Convention on the Prevention and Punishment of the Crime of Genocide.[91]

236.    In early September 2004, U.S. Secretary of State Colin Powell publicly stated that a "genocide has been committed" in the Sudanese region of Darfur.[92]

237.    In mid-September, 2004, the Security Council adopted Resolution 1564 requesting, *inter alia*, that the Secretary General,

rapidly establish an international commission of inquiry in order immediately to investigate reports of violations of international humanitarian law and human rights law in Darfur by all parties, to determine also whether or not acts of genocide have

---

[87] U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, Sudan, at 2, 12 (Feb. 25, 2004), https://www.state.gov/j/drl/rls/hrrpt/2003/27753.htm.

[88] *Mass Rape Atrocity in West Sudan*, BBC News, Mar. 19, 2004, http://news.bbc.co.uk/2/hi/africa/3549325.stm.

[89] Human Rights Watch Report, Darfur in Flames: Atrocities in Western Sudan (Vol. 16, No. 5 (A) Apr. 2004), https://www.hrw.org/reports/2004/sudan0404/sudan0404.pdf.

[90] *See id.* at 15-17.

[91] *See* H.R. Con. Res. 467, 108th Cong. (2004) (enacted). https://www.congress.gov/bill/108th-congress/house-concurrent-resolution/467.

[92] *Powell Calls Sudan Killings Genocide*, CNN.com, Sept. 9, 2004, at 1, http://www.cnn.com/2004/WORLD/africa/09/09/sudan.powell/.

occurred, and to identify the perpetrators of such violations with a view to ensuring that those responsible are held accountable.[93]

238.    In November 2004, Human Rights Watch published its report "If We Return, We Will be Killed: Consolidation of Ethnic Cleansing in Darfur, Sudan," focusing on the horrors faced by the approximately two million people driven from their homes.

239.    In January 2005, the Report of the International Commission of Inquiry on Darfur to the United Nations Secretary General, which the Security Council requested in Resolution 1564, was published.  The Report took "as the starting point for its work" the "irrefutable facts" that "there are 1.65 million internally displaced persons in Darfur, and more than 200,000 refugees from Darfur in neighboring Chad," and that "there has been large-scale destruction of villages throughout the three states of Darfur."[94]  After a "thorough analysis of the information gathered in the course of its investigations," the Report found "that the [GOS] and the Janjaweed are responsible for serious violations of international human rights and humanitarian law amounting to crimes under international law."[95]

240.    In June 2005, the ICC opened its investigation into the crisis in Darfur,[96] which ultimately led to the issuance of arrest warrants for President al-Bashir, other GOS officials, and a Janjaweed commander.

241.    On December 8, 2005, Human Rights Watch published a further report on the crisis in Darfur, "Entrenching Impunity: Government Responsibility for International Crimes in Darfur."

---

[93]  S.C. Res. 1564, ¶ 12 (Sept. 19, 2004), http://www.un.org/en/ga/search/view_doc.asp?symbol=S/RES/1564(2004).

[94]  Rep. of the Int'l Comm'n of Inquiry on Darfur to the U.N. Secretary-General, at 3 (Jan. 25, 2005).

[95]  *Id.*

[96]  Situation in Darfur, Sudan, ICC Investigations Opened: June 2005, ICC-02/05, https//www.icc-cpi.int/darfur.

It documented the role of civilian and military officials in the use of Janjaweed militias and the Sudanese armed forces to commit war crimes and crimes against humanity since mid-2003.

> **2.      Three Companies, Talisman, Lundin, and OMV, Were Forced to Withdraw from Sudan by Public Pressure**

242.    In addition to the reports above, the news media extensively covered the three Western companies, Talisman, Lundin, and OMV, which were publicly known to be doing business with the GOS.  Notable, none of these companies provided, or were capable of providing, access to the U.S. financial system, essential for exporting oil in petrodollars at market prices.

243.    Talisman, a Canadian company, was the operator of GNPOC's concession for three blocks in Sudan, including Block One.  Throughout 1999, the GOS launched a bloody campaign to kill or displace civilians living in Block One, primarily the Dinka, a black African ethnic group that the GOS considered hostile because the bulk of the rebels in the region were drawn from Dinka ranks.  The GOS used government troops, aerial bombardment, and militias to displace and kill those civilians unfortunate enough to live near Block One.  As the ground troops and militias swept through the Dinka communities, many of them looted freely and burned whatever was left.[97]

244.    In May of 1999, in a major offensive on Block One, the GOS made an all-out effort to clear civilians from the Block, using its Antonov bombers, helicopter gunships, tanks, armored personnel carriers, and proxy militiamen.  The GOS indiscriminately attacked civilians and destroyed items necessary for survival including food, huts, and seeds.  This drive succeeded in scattering residents away from Block One towards the north and south.  Though most of the displaced were Dinka, some Nuer, who sought shelter in the region after they were previously kicked out of their homes, were also displaced.[98]

---

[97] Human Rights Watch, Sudan, Oil, and Human Rights, at 186-95 (2003).

[98] *See id*. at 187-93.

245.    Talisman's annual shareholder meeting in May 1999 was marked by a shareholder proposal—blocked by management—criticizing the company's business in Sudan and by demonstrators protesting the company's profiting from the GOS's atrocities.[99]

246.    The U.S. government also criticized Talisman's business in Sudan.  In late 1999, Secretary of State Madeleine Albright personally expressed her displeasure to Canada's Foreign Minister Lloyd Axworthy, leading him to take "the unusual step of publicly expressing grave reservations about Talisman's involvement in Sudan."[100]  Axworthy also directed John Harker, a former director of affairs for the Canadian Labor Congress, to investigate Talisman's Sudanese business.[101]

247.    In January 2000, the Canadian Foreign Ministry issued its report on Talisman's business.[102]  The Harker Report concluded that oil became a key factor in "exacerbating the conflict in Sudan."[103]  As a result, it was "***difficult to imagine a cease-fire while oil extraction continues, and almost impossible to do so if revenues keep flowing to GNPOC partners and the GOS as currently arranged.***"[104]  The Report also criticized Talisman's oil extraction operations in Sudan for "contributing to the forced relocation of civilian populations residing in the vicinity

---

[99] *See id.* at 394-96; *see also* Ian Fisher, *Oil Flowing in Sudan, Raising the Stakes in Its Civil War*, N.Y. Times, Oct. 17, 1999, http://www.nytimes.com/1999/10/17/world/oil-flowing-in-sudan-raising-the-stakes-in-its-civil-war.html.

[100] Madeleine Drohan, *Sudan Play Bad Timing For Talisman*, Globe & Mail, Oct. 27, 1999, at B2.

[101] Joel Baglole, Canada to Probe Talisman Energy on Sudan Business, Wall St. J., Oct. 27, 1999.

[102] *See* Canadian Ministry of Foreign Affairs, Human Security in Sudan: The Report of a Canadian Assessment Mission (Jan. 2000) ("Harker Report"), http://www.ecosonline.org/reports/2000/Human%20Security%20in%20Sudan.pdf.

[103] *Id.* at 26.

[104] *Id.* at 16 (emphasis added).

of the oil fields in the interest of a more secure environment for oil extraction by the GOS and its partners, which include Talisman Energy Inc."[105]

248.    International media and high profile NGOs also chastised Talisman.  In October 2001, the New York Times ran a series of articles on Talisman's investments, focusing on the link between oil exploitation and the GOS's authoritarian repression.[106]  The U.S. Committee for Refugees and Immigrants—an NGO focused on helping forced migrants—also castigated Talisman, saying that the company was guilty of "the worst form of Western corporate irresponsibility."[107]

249.    In its 2000 Corporate Social Responsibility Report, Talisman acknowledged that its oil facilities in Sudan were used for military purposes, saying that the GOS's "use of oil infrastructure for non-defensive military purposes [was] of great concern to Talisman."[108]

250.    Talisman's CEO cited public pressure hurting the company's stock price as a reason for exiting Sudan.  Indeed, the announcement that the company would leave the GNPOC

---

[105] *Id.* at 2.

[106] Norimitsu Onishi, Sudan Government Tops List of Those Causing Agony for Oil, N.Y. Times, Oct. 13, 2001; Bernard Simon, Oil Company Defends Role in Sudan, N.Y. Times, Oct. 17, 2001; Norimitsu Onishi, Oil Money Pulls Sudan Out of Its Isolation and Toward an Uncertain Future, N.Y. Times, Oct. 17, 2001.

[107] U.S. Committee for Refugees and Immigrants, U.S. Committee for Refugees World Refugee Survey 2000 – Sudan, at 8 (June 1, 2000). http://www.refworld.org/publisher,USCRI,,,3ae6a8d133,0.html.

[108] *See* Fritz Brugger, Extractive Industries in Fragile States: Fueling Development or Undermining the Future?, at 180 (Graduate Institute of International and Development Studies, Geneva, 2013, Thesis No. 10). http://repository.graduateinstitute.ch/record/279321/files/PHDDEVSTUDIES-2013-012.pdf

consortium raised its stock price by five percent, despite Sudan's being a small part of its operations.[109]

251.    Like Talisman, BNPP is a publicly held company, owned primarily by institutional investors.  Like Talisman, BNPP's reputation, and hence the value of the company, would have been hurt by its Sudan business, had BNPP not affirmatively concealed its involvement at the time, including for example, by failing to disclose its involvement in its public announcements, its annual reports, and public filings, at the time.

252.    Lundin Oil, AB, a Swedish company, had the concession for Block 5A, just to the south of Block One.[110]  OMV, an Austrian company was Lundin's financial partner.[111]  The GOS was responsible for significant violence in Block 5A, which was perpetrated to enable the concessioners to develop the oilfield.  In the process, the GOS and the militias it sponsored indiscriminately killed, raped, and brutalized the local population.[112]

253.    Like Talisman, Lundin's involvement in Sudan also generated significant negative publicity and public pressure to divest.  In 2001, Christian Aid, the Anglo-Irish relief and development agency, presented evidence to Lundin's board highlighting the company's

---

[109] Richard Bloom and Lily Nguyen, *Talisman Shares Rise on Sudan Sale*, Globe and Mail, Oct. 31, 2002, http://www.theglobeandmail.com/report-on-business/talisman-shares-rise-on-sudan-sale/article25697061/.

[110] Human Rights Watch, Sudan, Oil and Human Rights, at 2, 49 (2003).

[111] *Id.*

[112] *See* Human Rights Watch, Lundin: Willfully Blind to Devastation in Block 5A (2003), https://www.hrw.org/reports/2003/sudan1103/25.htm.

involvement in the ongoing human rights crisis.[113]  Similarly, in 2003, Human Rights Watch issued

a report drawing public attention to Lundin's actions in Block 5A.[114]

254.    By the end of 2003, Talisman, Lundin, and OMV had all terminated oil operations

in Sudan due to the pressure of public awareness and international scrutiny of their direct role in

enabling the GOS to use its oil revenues to commit atrocities.[115]  **In contrast, BNPP, operating**

**illegally and in secret, had no such pressure and continued its faithful and invaluable service to**

**the GOS.**

*****

255.    Reflecting the extensive international reporting of GOS atrocities and their

connection to oil, internal BNPP memoranda show that its senior officials were well aware that

Sudanese oil money was financing the GOS's human rights abuses and that its support for what

the GOS was doing was unquestionably premeditated and intentional.

256.    BNPP officials discussed the economic environment created by burgeoning oil

sales, referring to it as "financial dynamism," while also acknowledging what was happening in

Sudan as a "human catastrophe."[116]

257.    In an August 2005 email, a senior compliance officer at BNPP warned that the

satellite bank system was being used to evade the Sanctions against Sudan, stating that the practice

---

[113] Christian Aid, Christian Aid Presents Sudan Evidence to Lundin Oil Board (Mar. 23, 2001), http://reliefweb.int/report/sudan/christian-aid-presents-sudan-evidence-lundin-oil-board.

[114] *See* Human Rights Watch, Lundin: Willfully Blind to Devastation in Block 5A (2003), https://www.hrw.org/reports/2003/sudan1103/25.htm.

[115] Human Rights Watch, Sudan, Oil, and Human Rights, at 33 (Nov. 24, 2003) https://www.hrw.org/report/2003/11/24/sudan-oil-and-human-rights.

[116] Press Release, Cuomo Administration Announces BNP Paribas to Pay $8.9 Billion, Including $2.24 Billion to NYDFS, Terminate Senior Executives, Restrict U.S. Dollar Clearing Operations for Violations of Law (June 30, 2014), p. 2 ("6/30/14 NYDFS Press Release").

"effectively means that we are circumventing or avoiding the U.S. embargo on transactions in USD [U.S. dollars] by Sudan."[117]

258.    The DFS investigation of BNPP found that, "in December 2005, when a settlement with U.S regulators and Dutch bank ABN AMRO was announced for violations of U.S. sanctions law, the Head of Ethics and Compliance for BNPPNA wrote, '**the dirty little secret isn't so secret anymore, oui?**'"[118]

259.    The DFS investigation showed that "BNPP's senior compliance personnel agreed to continue the Sudanese business and rationalized the decision by stating that 'the relationship with this body of counterparties is a historical one and the commercial stakes are significant.  For these reasons, Compliance does not want to stand in the way.'"[119]

260.    In 2007, a senior compliance officer at BNPP acknowledged that Sudanese banks with which BNPP dealt "play[ed] a pivotal part in the support of the Sudanese government which . . . refuses the United Nations intervention in Darfur."[120]

261.    When U.S. law enforcement officials warned BNPP that it was engaging in unlawful behavior, BNPP failed to cooperate honestly with the investigation.  It continued its unlawful conduct even after being told by U.S. regulators and its own legal advisors that it was violating the Sanctions, thereby facilitating the GOS's atrocities.

---

[117] OFAC Settlement Agreement, Ex. H, ¶ 10 (alteration omitted).

[118] 6/30/14 NYDFS Press Release, p. 2.

[119] *Id*.

[120] *Id*.

262.     Thus, BNPP continued to provide secret, essential, and illegal financial assistance to the GOS through 2007, and the GOS's atrocities and oil monetization were inseparable elements of an over-arching, depraved campaign in which BNPP willingly partnered.[121]

**I.     As a Result of an Array of Federal and State Investigations, BNPP Agreed to Two Criminal Guilty Pleas, Two Cease and Desist Orders, a Settlement Agreement, and a Consent Order**

263.     *Five* separate U.S. and New York State government entities—FRB-NY, OFAC, DFS, DANY, and the DOJ through the U.S. Attorney for the Southern District of New York—investigated BNPP's illicit financial dealings with the GOS and Sudan.[122]   Each made a determination to exercise its discretion to launch an investigation in BNPP's conduct.  Each made a determination that its jurisdiction extended to BNPP and BNPP's conduct.  Each made a determination that it had authority to take enforcement actions against, or prosecute, BNPP.  And each decided to exercise its discretion to take enforcement actions against, or prosecute, BNPP.  In other words, an overwhelming array of U.S. and New York government entities decided that they had authority to regulate BNPP's conduct and did so.

264.     These investigations culminated in two cease and desist orders, a settlement agreement, a consent order, and two criminal guilty pleas.  They also resulted in an approximately $8.9 billion criminal forfeiture.

**1.     BNPP Pled Guilty to Violating U.S. Sanctions**

---

[121] Following BNPP's cessation of its financing of the GOS, Sudan's economy entered a recession. Though the split with South Sudan was one cause of the recession, another was the loss of BNPP's financing as the U.S. Sanctions finally took hold.

[122] The key role that New York played in BNPP's conspiracy is also evidenced by the entities that conducted the investigations and the Sanctions they imposed.  The United States chose to marshal its New York-based resources, including FRB-NY and the U.S. Attorney for the Southern District of New York.  Further, many of the structural changes the federal regulators demanded of BNPP were New York-based.

265.     BNPP's years of financial dealings with Sudan and its banks, as well as its financial dealings with Iran and Cuba, ultimately led to a guilty plea in 2014 for violating the laws of the United States, specifically conspiring to violate E.O. 13067, E.O. 13412, the regulations implementing the two Executive Orders, the IEEPA, and the TWEA.[123]

266.     BNPP did not dispute the charges against it.  Indeed, it stipulated that it had **conspired with GOS entities** to unlawfully facilitate transfers in U.S. dollars for Sudanese banks and engaged in devious conduct to avoid detection.  As set out in the stipulated SOF supporting its guilty plea, BNPP agreed that these facts would, at a trial, be proved beyond a reasonable doubt. BNPP effectively admitted that it knowingly facilitated and supported the crimes of a lawless regime by providing the financial means by which the GOS committed widespread human rights violations against vulnerable citizens, including women and children.

267.     On May 1, 2015, the Honorable Judge Schofield of the District Court for the Southern District of New York entered judgment of the criminal conviction of BNPP and ordered BNPP to forfeit $8,833,600,000 to the United States and pay a $140,000,000 fine.  **The forfeiture was the single largest financial penalty ever imposed in a criminal case**.  It reflects the staggering amounts of money involved in BNPP's illegal activities in Sudan, Iran and Cuba and the seriousness of BNPP's crimes.  More than 70% of the forfeiture penalty related to BNPP's unlawful transactions with Sudanese banks, a penalty of such magnitude in the context of Sudan's

---

[123] The U.S. Attorney's Office charged BNPP with this conspiracy on July 9, 2014.  *See* Information, *United States v. BNP Paribas* (S.D.N.Y., filed July 9, 2014) (Docket 14-CR-460-LGS No. 002), attached as Ex. A, and is incorporated herein as if set forth in its entirety.  BNPP pled guilty 19 days later.  *See* Letter from Preet Bharara, United States Attorney for the Southern District of New York, Leslie Caldwell, Assistant Attorney General, Criminal Division, Department of Justice, and Jaikumar Ramaswamy, Chief, Asset Forfeiture and Money Laundering Section, Department of Justice, to Karen Patton Seymour, Esq., Sullivan & Cromwell LLP, *United States v. BNP Paribas, S.A.*, June 27, 2014, attached as Ex. B, and  incorporated herein as if set forth in its entirety.

economy that it further demonstrates that BNPP's actions were a substantial factor in the GOS's crimes.

268.    The stipulated SOF and the attached civil and criminal documents establish that, from as early as 1997, BNPP, its agents and affiliates, conspired with the SDNs, including those specifically designated by the Treasury Department as having their assets blocked from the U.S. financial system by virtue of being owned or controlled by, or acting for or on behalf of Sudan, to violate the Sanctions against the GOS by providing Sudanese banks with access to the U.S. financial system through its New York branch and other affiliates.

269.    BNPPSA admitted that, at all relevant times, BNPP knew that the GOS was a rogue nation that supported international terrorism, and was subject to the Sanctions.  BNPP also knew or consciously disregarded numerous and authoritative accounts that GOS and its proxies engaged in human rights violations including forced displacement and extrajudicial killings.

270.    As admitted in the stipulated SOF, BNPP played a decisive role in financing Sudan's export of oil and was involved with at least a quarter of all exports and a fifth of all imports for Sudan.  BNPP provided crucial financial support and aid to the GOS knowing this support and aid was crucial to the GOS's ability to obtain the resources to persecute its disfavored civilians. Indeed, BNPP's own compliance officer reminded other bank officers that the "Sudanese banks with which BNPP dealt 'play a pivotal part in the support of the Sudanese government which . . . refuses the United Nations intervention in Darfur,'"[124] and urged the bank to stop its support for Sudan's genocidal leadership.  BNPP thus knew that its aid to the GOS provided material assistance to the GOS in perpetrating the human rights violations and personal and property injuries suffered by Plaintiffs.

---

[124] SOF, Ex. C, ¶ 20.

## 2.  BNPP Pled Guilty to Violating New York Law

271.  BNPP pled guilty to one count of Falsifying Business Records in the First Degree, in violation of Penal Law Section 175.10, and one count of Conspiracy in the Fifth Degree, in violation Penal Law Section 105.05.[125]  Under New York law, Falsifying Business Records is typically a class A misdemeanor under Penal Law Section 175.05.  However, it rises to the level of a felony when, as here, the falsification is done with the "intent to commit another crime or to aid or conceal the commission thereof."[126]

272.  Pursuant to the terms of the New York Plea, BNPP agreed to forfeit $2,243,400,000.[127]  BNPP also agreed to series of "conditions" of its plea, including: (*i*) that any report by a compliance consultant or monitor submitted to the Federal Reserve or DFS must also be submitted to the DANY;[128] (*ii*) implementing "compliance procedures and training designed to ensure that BNPP is made aware in a timely manner of any" request by any entity "to withhold or alter its name or other identifying information where the request or attempt appears to be related to circumventing or evading U.S. sanctions laws;"[129] (*iii*) reporting in a timely manner to DANY "any known attempts by any BNPP employees to circumvent or evade U.S. sanctions laws"[130] (iv) complying promptly with DANY's requests for documents, information, and to interview BNPP employees;[131] (*v*) complying with the investigations of other federal and state law enforcement and

---

[125] Plea Agreement Between BNP Paribas SA and the District Attorney of the County of New York, June 30, 2014, attached as Ex. D, ¶ 2 ("New York Plea") and is incorporated herein as if set forth in its entirety.

[126] New York Penal Law § 175.10.

[127] *See* New York Plea, Ex. D, ¶ 14.

[128] *See id.* ¶ 15(a).

[129] *Id.* ¶ 15(b).

[130] *Id*.

[131] *See id.* ¶¶ 15(e), (f), (g), (h), (i), (j), (k).

regulatory agencies;[132] and (*vi*) alerting DANY of "all criminal conduct by BNPP or any of its employees acting within the scope of their employment related to DANY's [i]nvestigation" and "any administrative, regulatory, civil, or criminal proceeding or investigation of BNPP relating to DANY's [i]nvestigation."[133]

273.    As part of the New York Plea, BNPP also admitted a series of facts in the "Factual Statement," which set forth its criminal conduct.  These facts are largely similar to those set forth in the SOF.[134]

> ### 3.    BNPP Entered into Agreements with Federal and State Regulators Admitting Substantial Wrongdoing and Agreeing to Substantial Penalties

274.    In 2004, FRB-NY and the DFS "identified systematic failures in BNPP's compliance with the Bank Secrecy Act," a federal statute that prevents money laundering, "and specifically highlighted deficiencies in [BNPPNY's] monitoring of transactions with overseas clients, including the processing of U.S. dollar transactions for overseas clients."[135]  To address BNPP's failures, FRB-NY and the DFS entered into a Memorandum of Understanding BNPP that required, *inter alia*, BNPPNY to "improve its systems for compliance with U.S. bank secrecy and sanctions laws."[136]  But at this time, the scope of BNPP's actions were apparently not known by the federal or New York state authorities.

---

[132] *See* New York Plea ¶¶ 15(f), (i), (k).

[133] *See* New York Plea ¶¶ 15(m), (n).

[134] *See* Exhibit A to Plea Agreement Between BNP Paribas SA and the District Attorney of the County of New York, June 30, 2014, attached as Ex. E, and is incorporated herein as if set forth in its entirety.

[135] SOF, Ex. C, ¶ 28.

[136] *Id.*

275.   On June 30, 2014, BNPP entered into a cease and desist order with both the Board of Governors of the Federal Reserve System (the "Board") and the Autorité de Contrôle Prudential et de Résolution (the "ACPR"), one of BNPP's French regulators.[137]

276.   In the Joint Cease and Desist Order, the Board and the ACPR demanded that BNPP make a number of changes to the bank's structure.  BNPP made extensive use of New York's financial sector in order to carry out its federal and New York State crimes.  This fact is supported by the substantial structural changes set forth in the Joint Cease and Desist Order.  On information and belief, the regulators would not have required BNPP make such modifications in New York if they had not thought that such internal structures and regulations in New York would have made BNPP's criminal activities less likely to have occurred.

277.   Another required change was that BNPP had to relocate part of its compliance function to New York.[138]   This group, known as "Group Financial Security," is "ultimately responsible for [BNPP's] OFAC Compliance Program."[139]   The regulators ensured that the group had the tools necessary to help prevent and catch future sanctions violations.  These included: (*i*) "audit[ing] any transaction and overall compliance efforts by any branch, affiliate, or business line [of BNPP];"[140] (*ii*) "serv[ing] as the ultimate arbiter of U.S. Sanctions issues and hav[ing the] authority to compel [BNPP's] branches, affiliates, and global business lines to comply with the

---

[137] *See* Cease and Desist Order Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended; Supervisory Cooperation Decision Applying the Joint Statement of French and US Banking Supervisors of May 24, 2004, Dkt. No. 14-022-B-FB, attached as Ex. F ("Joint Cease and Desist Order") and is incorporated herein as if set forth in its entirety.

[138] Though the Joint Cease and Desist Order states that BNPP shall relocate the portion of the Group Financial Security responsible for OFAC compliance to the United States, the Settlement Agreement makes clear that the relocation is to New York.  *See* Settlement Agreement, Ex. H, *infra*.

[139] Joint Cease and Desist Order, Ex. F, ¶ 1(a).

[140] *Id.* ¶ 1(a)(i).

OFAC Compliance Program;"[141] (*iii*) "establish[ing] norms and procedures for [BNPP's] global compliance with the U.S. OFAC Compliance Program;"[142] (*iv*) "review[ing] high-level alerts escalated from [BNPP's] monitoring and sanctions filtering processes, to the extent that there is a U.S. Sanctions component;"[143] (*v*) "specifically regarding USD clearing, oversee[ing] and supervis[ing] compliance with the U.S. OFAC Compliance Program by [BNPP's] USD clearing and payment business lines, including all USD clearing for [BNPP] processed globally, defin[ing] the standard compliance processes for USD clearing and payments as relevant to the U.S. OFAC Compliance Program, and provid[ing] a second level of control to ensure appropriate implementation of those compliance processes."[144]

278.    That same day, June 30, 2014, BNPP also entered into a second cease and desist order with just the Board.[145]  In this second order, the Board found that

> [f]rom at least 2002 through at least January 2010, [BNPP] developed and implemented policies and procedures for processing certain U.S. dollar ("USD") denominated funds through the [BNPPNY] and through other unaffiliated U.S. financial institutions involving parties subject to OFAC Regulations that omitted or concealed relevant information from payment messages that was necessary for the Branch and other U.S. financial institutions to determine whether these transactions were carried out in a manner consistent with U.S. law.  Although [BNPP] made certain efforts in 2007 and 2008 in an attempt to comply with OFAC Regulations, [BNPP] continued to process certain USD denominated funds transfers through the [BNPPNY] involving a party subject to OFAC Regulations through 2012.[146]

---

[141] *Id.* ¶ 1(a)(iii).

[142] *Id.* ¶ 1(a)(iv).

[143] *Id.* ¶ 1(a)(v).

[144] *Id.* ¶ 1(a)(vi).

[145] *See* Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, Dkt. Nos. 14-022-B-FB, 14-022-CMP-FB, attached as Ex. G ("Cease and Desist Order") and is incorporated herein as if set forth in its entirety.

[146] Cease and Desist Order, Ex. G, at 2.

279.     Because of BNPP's "unsafe or unsound practices and violations of law,"[147] the Board assessed a civil penalty in the amount $508 million.  It also barred BNPP from employing those individuals who were the relationship managers for the GOS.[148]

280.     That same day, BNPP also entered into a settlement agreement with OFAC.[149]  The Settlement Agreement found that "[f]or a number of years, up to and including 2012, BNPP processed thousands of transactions to or through U.S. financial institutions that involved countries, entities, and/or individuals subject to the sanctions programs administered by OFAC."[150] Crucially, OFAC found that New York was an indispensable part of BNPP's conspiracy to violate U.S. sanctions law.  BNPP used the financial system based in New York to process transactions on behalf of the GOS and the SDNs throughout the relevant period.[151]

281.     OFAC also described how BNPP's branches, including its branch in Switzerland, "routed [ ] USD payments to or through the United States in apparent violation U.S. sanctions."[152] BNPP's use of the United States' financial system, which, on information and belief, principally refers to New York, included the following:

    a.   BNPP Suisse and BNPP Paris negotiated a variety of trade finance instruments on behalf of or that involved parties subject to U.S. sanctions on Sudan . . . and routed USD payments to or through the United States pursuant to these instruments; [and]

    b.   BNPP Suisse, BNPP Paris, BNPP's branch in Rome, and BNPP's branch in Milan all processed correspondent banking or retail banking transactions to

---

[147] See id.

[148] *See id.* at 4.

[149] *See* Settlement Agreement between the U.S. Department of Treasury's Office of Foreign Asset Control ("OFAC") and BNP Paribas SA ("BNPP"), COMPL-2013-193659, attached as Ex. H (the "Settlement Agreement") and is incorporated herein as if set forth in its entirety.

[150] *Id.* ¶ 3.

[151] *Id.* ¶ 8.

[152] Settlement Agreement, Ex. H, ¶ 16.

or through the United States that involved the interests of a person subject
to U.S. sanctions on Sudan . . . .[153]

282.    Thus, the Settlement Agreement makes clear that the U.S. financial system, which

is primarily based in New York, was an integral to BNPP's actions, irrespective of where the illicit

transactions originated.

283.    In addition to terminating its unlawful conduct,[154] BNPP agreed to a settlement in

the amount of $963,619,900 "arising out of the apparent violations by BNPP of IEEPA, TWEA,"

and the Executive Orders and regulations relating to sanctions on, *inter alia*, Sudan.[155]

284.    The day before, June 29, 2014, BNPP also entered into an extensive consent order

with the DFS for its violations of New York banking law and the DFS's regulations.[156]  The DFS

found that BNPP's "conduct violated U.S. national security and foreign policy and raised serious

safety and soundness concerns for regulators, including the obstruction of governmental

administration, failure to report crimes and misconduct, offering false instruments for filing, and

falsifying business records."[157]

285.    The Consent Order stressed the New York locus of BNPP's crimes, stating that

BNPP:

> engaged in a systematic practice, as directed from high levels of the Bank's group
> management, of removing or omitting the Sudanese . . . information from U.S.
> dollar-denominated payment messages that it sent through [BNPPNY] and other
> non-affiliated New York-based U.S. financial institutions to "guarantee the

---

[153] *Id*. ¶¶ 16(a), (b).

[154] *See* Settlement Agreement, Ex. H, ¶ 26.

[155] *Id.* ¶ 28.

[156] *See In re BNP Paribas, S.A. New York Branch*, *Consent Order Under New York Banking Law § 44*, New York State Department of Financial Services, attached as Ex. I (the "Consent Order") and is incorporated herein as if set forth in its entirety.

[157] *Id.* at 2.

confidentially [sic] of the messages and to avoid their disclosure to any potential investigatory authorities."[158]

286.    BNPP agreed that during the relevant time period, its New York-based compliance team "intentionally" "did not have adequate legal and compliance authority to ensure that activities conducted from [BNPP's] offices outside of the United States complied with New York and U.S. laws and regulations."[159]   Indeed, one BNPP employee was quoted in the Consent Order as describing an "omission" procedure purposefully designed to "avoid[ ] putting [BNPPNY] in a position to uncover these transactions [on behalf of Sudan], to block them, and to submit reports to the regulator."[160]

287.    In the Consent Order, BNPP agreed that it violated numerous New York banking laws and regulations—New York banking laws and regulations that it might not have violated had it not intentionally structured its legal and compliance departments to be insufficient to the bank's needs—in the course of processing financial transactions for Sudan.  Specifically, BNPP agreed that it: (*i*) "failed to maintain or make available at [BNPPNY] true and accurate books, accounts and records reflecting all transactions and actions in violation of Banking Law § 200-c;"[161] (*ii*) "made false entries in BNPP's books, reports and statements and willfully omitted to make true entries of material particularly pertaining to the U.S. dollar clearing business of BNPP at its [BNPPNY] with the intent to deceive" federal and state regulators "appointed to examine BNPP's conditions and affairs at its New York Branch in violation of Banking Law § 672.1;"[162] (*iii*) failed

---

[158] Consent Order, Ex. I, ¶ 3.

[159] Consent Order, Ex. I, ¶ 7.

[160] *Id.*

[161] Consent Order, Ex. I, ¶ 43.

[162] *Id.* ¶ 44.

to inform the DFS "immediately upon the discovery of fraud, dishonesty, making of false entries and omission of true entries, and other misconduct, whether or not a criminal offense," in violation of DFS regulation 3 NYCCRR § 300.1;[163] (*iv*) actively flouted its agreement in the MOU to "remediate, among other things, [its] systems for compliance" with various banking laws and regulations;[164] and (*v*) caused the cancellation of the MOU by FRB-NY and DFS based on the provision of "falsified facts," including failing to inform the regulators of "BNPP's continuing and longstanding efforts to conduct secret transactions" for, *inter alia*, Sudan.[165]

288.    As a result of its illegal conduct, the DFS fined BNPP over $2 billion and ordered BNPP to "make payment of reparations and restitution to the Department and the State of New York in the amount of $1,050,000,000.00 for injury caused by its wrongful conduct."[166]   BNPP was required to suspend its U.S. dollar clearing services through the New York branch on behalf of various other BNPP entities for one year and on behalf of unaffiliated third party banks in New York and London for two years.[167]

289.    BNPP also agreed to extend for two years the term of an independent consultant on site in the New York Branch that DFS required pursuant to the terms of a 2013 memorandum of understanding.   Initially, the consultant was charged with reviewing BNPP's compliance with various anti-money laundering laws and regulations and OFAC's rules and regulations.   Under the terms of the Consent Agreement, the consultant's mandate was extending to "oversee[ing],

---

[163] *Id.* ¶ 45.

[164] *Id.* ¶¶ 46-47.

[165] *Id.* ¶ 50.

[166] *See* Consent Order, Ex. I, ¶¶ 51-52.  The $1.05 billion fine was satisfied by BNPP's payment to the DANY.  *See id.* ¶ 52.

[167] *See id.* ¶¶ 53-54.

evaluat[ing] and test[ing] BNPP's remediation efforts, the implementation of BNPP's efforts to streamline the global U.S. dollar clearing through the New York Branch and the U.S. dollar suspension requirements contained in" the Agreement.[168]  Finally, BNPP agreed to terminate or punish 45 employees.[169]

290.    In sum, the two guilty pleas and the three other agreements BNPP entered into establish the egregious nature of BNPP's criminal conduct and conspiring with the GOS.  They also make clear not only the role that New York played in that criminal conduct, but also New York's continuing interest in regulating BNPP's conduct, after its convictions.

## V.    THE CAUSES OF ACTION ALLEGED HEREIN ACTION ARE TIMELY

291.    The applicable statute of limitations and tolling doctrine demonstrate that Plaintiffs have brought their claims alleged herein in a timely manner:

292.    Plaintiffs' claims are subject to tolling under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974).

293.    The putative class action, *Kashef v. BNP Paribas* No. 16-CV-3228 (S.D.N.Y.), was filed April 29, 2016, on behalf of U.S. citizens, lawful permanent residents or lawfully admitted refugees or asylees who formerly lived in Sudan or South Sudan and who were subjected to human rights abuses perpetrated by the Government of Sudan and its agents from 1997 through at least 2009. The motion for class certification filed in *Kashef* on June 9, 2023 proposes a class period of November 1997 through December 2011.

---

[168] *Id.* ¶ 56.

[169] *See id.* ¶ 57.

294.    Here, Plaintiffs are all members of the proposed class in *Kashef*. They are filing this action during the pendency of the class certification motion in *Kashef* because Defendants refused to enter into a tolling agreement.

295.    Defendants BNP Paribas, S.A., BNP Paribas, S.A. New York Branch, and BNP Paribas US Wholesale Holdings, Corp. are also defendants in the *Kashef* proceeding.

296.    The Court previously held that the *Kashef* plaintiffs stated a claim for relief under Article 50.1 of the Swiss Code of Obligations. Plaintiffs here likewise bring a claim for relief under Article 50.1 of the Swiss Code of Obligations. Proof of Plaintiffs' claims will require evidence of the same wrongful acts as would proof of the claim asserted in the *Kashef* proceeding.

297.    Plaintiffs reasonably and justifiably relied on the named plaintiffs in the *Kashef* proceeding to protect their rights, and they reasonably and justifiably relied on the class-action tolling doctrines articulated in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and *In re WorldCom Securities Litigation*, 496 F.3d 245, 256 (2d Cir. 2007).

298.    Under *American Pipe*, all putative class members are treated as if they filed their own individual actions, until they either opt out or a certification decision excludes them. *American Pipe*, 414 U.S. at 255.

299.    Accordingly, the claims here are deemed to have been brought as of the date they or similar claims were brought in the related class actions, and therefore the *Kashef* action tolled the limitation period for Plaintiffs' claims.

300.    The U.S. Court of Appeals for the Second Circuit found that the *Kashef* complaint was timely filed pursuant to NY CPLR § 215(8)(a). *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 63 (2d Cir. 2019).

301.     Under NY CPLR § 215(8)(a), a civil action is timely so long as (1) a criminal action has been commenced, (2) against the same defendants, and (3) concerning the same event or transaction from which the civil action arose.

302.     For the purposes of CPLR § 215(8)(a), the termination of the criminal action is measured from the date on which the defendants were sentenced.

303.     BNPP was criminally prosecuted by federal authorities, which arose from the same occurrence from which Plaintiffs' causes of action arise.

304.     BNPP's judgment of conviction was entered on May 1, 2015.

305.     By filing this action, Plaintiffs are now preserving their right to pursue individual claims pending the decision on class certification in the *Kashef* proceeding.

306.     Thus, for the reasons stated herein, Plaintiffs' claims are timely.

## VI.     CAUSES OF ACTION

### Violations of Article 50.1 of the Swiss Code of Obligations

### (All Plaintiffs Against All Defendants)

307.     Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

308.     Under Swiss law, secondary tort liability for accomplices is governed by Article 50.1 CO:

> Where two or more persons have together caused damage, whether as instigator, perpetrator or accomplice, they are jointly and severally liable to the person suffering damage.[170]

---

[170] The Swiss Code of Obligations is published online by the Swiss government, in an unofficial English translation: https://www.fedlex.admin.ch/eli/cc/27/317_321_377/en.

309.    Pursuant to Article 50.1 CO, Defendants are jointly and severally liable as accomplices for the economic and moral harms suffered by Plaintiffs as a result of the unlawful acts committed by the GOS and its agents.

310.    Plaintiffs suffered unlawful acts in the form of various human rights abuses, including forced displacement, committed by the Government of Sudan and its agents, detailed in paragraphs 29-125.

311.    These human rights abuses infringed on absolute rights of the Plaintiffs under Swiss law, including rights to life, bodily integrity and property.

312.    Defendants consciously assisted the Government of Sudan and its agents by providing financial support from 1997 through at least 2007. Defendants knew or should have known, had they exercised due care, that their support would contribute to the Government of Sudan's violation of human rights during and after that time period.

313.    The conscious cooperation between Defendants and the Government of Sudan was the natural and adequate cause of Plaintiffs' injuries as detailed above.

314.    Without Defendants' financial support of the Government of Sudan, the abuses committed by the al-Bashir regime and its agents would not have occurred at the same time, in the same way or in the same magnitude.

315.    Defendants' conscious cooperation with the Government of Sudan was capable, in the ordinary course of events and common experience, of leading to the abuses committed by the Government of Sudan and its agents against Plaintiffs, which were objectively foreseeable.

316.    By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs, and the probability of

severe injury to Plaintiffs, justifying an award of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

## VII.   PRAYER FOR RELIEF

WHEREFORE, each and every Plaintiff prays for judgment against each Defendant as follows:

(a)   That judgment be entered against Defendants determining that they have committed the violations of law as alleged in this Complaint;

(b)   An award of damages including general and special damages, to the full extent legally available, in an amount to be determined at trial;

(c)   An award of punitive or exemplary damages to the full extent legally available, in an amount to be determined at trial;

(d)   For costs of suit, including attorneys' fees, pre-judgment and post-judgment interest, expert witness fees, consultant fees, and other costs as and to the extent permitted by law; and

(e)   For such other and further relief as the Court may deem just and proper.

Dated: June 28, 2023

*/s/ Kathryn Lee Boyd*
Kathryn Lee Boyd
Theodor Bruening
Michael Eggenberger
Terrence Scudieri
HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, NY 10017
(646) 502-9515
(857) 557-5204
(646) 396-6452
(646) 777-2489
lboyd@hechtpartners.com
tbruening@hechtpartners.com
meggenberger@hechtpartners.com
tscudieri@hechtpartners.com

Kristen L. Nelson
HECHT PARTNERS LLP
6420 Wilshire Boulevard, 17th Floor
Los Angeles, CA 90048
(646) 490-2408
knelson@hechtpartners.com

Respectfully submitted,

*/s/ Brent W. Landau*
Brent W. Landau
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
(215) 985-3273
blandau@hausfeld.com

Michael D. Hausfeld
Richard S. Lewis
Amanda E. Lee-DasGupta
Scott A. Gilmore
Claire A. Rosset
HAUSFELD LLP
888 16th Street NW, Suite 300
Washington, DC 20006
(202) 540-7200
mhausfeld@ hausfeld.com
rlewis@ hausfeld.com
alee@hausfeld.com
sgilmore@hausfeld.com
crosset@hausfeld.com

*Counsel for Plaintiffs*